**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| **VIRGINIA CITIZENS DEFENSE LEAGUE, ET AL.,** | |
| **Plaintiffs,** | |
| **vs.** | **Civil No.:  3:16-cv-00757-JAG** |
| **KATIE COURIC, ET AL.,** | |
| **Defendants.** | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS COMPLAINT
OF DEFENDANTS ATLAS FILMS, LLC AND KATIE COURIC**

Nathan Siegel (admitted *pro hac vice*)
Mara J. Gassmann (VSB No. 82131)
Matthew E. Kelley (VSB No. 84045)
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1899 L Street, NW, Suite 200
Washington, DC 20036
Telephone:     (202) 508-1100
Facsimile:     (202) 861-9888
Email:        nsiegel@lskslaw.com

*Counsel for Defendant Atlas Films, LLC*

WILLIAMS & CONNOLLY LLP
Kevin T. Baine (admitted *pro hac vice*)
Thomas G. Hentoff (admitted *pro hac vice*)
Nicholas G. Gamse (admitted *pro hac vice*)
Emily A. Rose (VSB No. 89529)*
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone:     (202) 434-5000
Facsimile:     (202) 434-5029
Email:        thentoff@wc.com

*Attorneys for Katie Couric*

*\*Admitted only in Virginia and the Eastern District of Virginia. Practice supervised by D.C. Bar members pursuant to D.C. Court of Appeals Rule 49(c)(8).*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 4

I.     PLAINTIFFS' RELATIONSHIP TO THE DOCUMENTARY ......................................... 4

     A.     How *Under the Gun* Portrayed the Plaintiffs Prior to the Eight
           Seconds at Issue ...................................................................................................... 5

     B.     Plaintiffs' Responses to Couric's Question About Terrorists and
           Felons in the Underlying Interview ...................................................................... 6

     C.     The Eight Seconds at Issue in the Film ................................................................. 7

II.    PLAINTIFF VCDL CRITICIZES THE FILM AND ATTRACTS
     WIDESPREAD, NATIONAL MEDIA COVERAGE ...................................................... 7

III.   THE COMPLAINT ......................................................................................................... 9

ARGUMENT ........................................................................................................................... 10

I.     THE FILM IS NOT REASONABLY CAPABLE OF THE DEFAMATORY
     MEANING ALLEGED BY THE PLAINTIFFS ............................................................ 11

     A.     The Film Does Not Imply that Plaintiffs Had No Basis for Their
           Opposition to Universal Background Checks ....................................................... 13

     B.     Any Implication Conveyed By the Pause is Not Defamatory ............................. 14

     C.     The Film Does Not Imply that Plaintiffs Are Unfit in Their
           Professions ............................................................................................................ 19

          1.     Plaintiff Webb ......................................................................................... 19

          2.     Plaintiff Hawes ........................................................................................ 20

          3.     VCDL ....................................................................................................... 22

II.    VCDL'S CLAIMS ALSO FAIL AS A MATTER OF LAW BECAUSE THE
     FILM MAKES NO STATEMENT ABOUT IT ............................................................ 23

CONCLUSION ........................................................................................................................ 26

i

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Afftrex, Ltd. v. General Electric Co.*,
    555 N.Y.S.2d 903 (N.Y. 3d Dep't 1990) ...........................................................................25

*AIDS Counseling & Testing Centers v. Group W Television, Inc.*,
    903 F.2d 1000 (4th Cir. 1990) ...................................................................................23, 24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................................................10

*Bailey v. Virginia High School League, Inc.*,
    488 F. App'x 714 (4th Cir. 2012) .......................................................................................4

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 .................................................................................................................10, 11

*CACI Premier Technology, Inc. v. Rhodes*,
    536 F.3d 280 (4th Cir. 2008) ............................................................................................25

*Carwile v. Richmond Newspapers, Inc.*,
    196 Va. 1, 82 S.E.2d 588 (1954).............................................................................12, 19, 20

*Chapin v. Greve*,
    787 F. Supp. 557 (E.D. Va. 1992), *aff'd*, 993 F.2d 1087 (4th Cir. 1993)................................15

*Chapin v. Knight-Ridder, Inc.*,
    993 F.2d 1087 (4th Cir. 1993) .....................................................................................12, 13

*Church of Scientology of California v. Flynn*,
    578 F. Supp. 266 (D. Mass. 1984) ....................................................................................25

*Church of Scientology International v. Behar*,
    238 F.3d 168 (2d Cir. 2001)...............................................................................................24

*Cox v. Hatch*,
    761 P.2d 556 (Utah 1988)...................................................................................15, 16, 18

*Cretella v. Kuzminski*,
    2008 WL 2227605 (E.D. Va. May 29, 2008) ...................................................................20

*Darling v. Piniella*,
    1991 WL 193524 (E.D. Pa. Sept. 27, 1991) .....................................................................25

*Denver Publishing Co. v. Bueno,*
   54 P.3d 893 (Colo. 2002) .................................................................................18

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ..................................................................................6, 22

*Drake v. Filko,*
   724 F.3d 426 (3d Cir. 2013) ............................................................................22

*Eaton v. Meneley,*
   379 F.3d 949 (10th Cir. 2004) .........................................................................1

*Falwell v. Penthouse International, Ltd.,*
   521 F. Supp. 1204 (W.D. Va. 1981) ................................................................17

*Farah v. Esquire Magazine,*
   736 F.3d 528 (D.C. Cir. 2013) ........................................................................13

*Fleming v. Moore,*
   221 Va. 884, 275 S.E.2d 632 (1981) ...............................................................19

*Freedlander v. Edens Broadcasting, Inc.,*
   734 F. Supp. 221 (E.D. Va. 1990), *aff'd,* 923 F.2d 848 (4th Cir. 1991) ..................12

*Frinzi v. Hanson,*
   140 N.W.2d 259 (Wisc. 1966) ........................................................................16

*Hatfill v. New York Times Co.,*
   416 F.3d 320 (4th Cir. 2005) ...........................................................................19

*Hightower v. City of Boston,*
   693 F.3d 61 (1st Cir. 2012) .............................................................................22

*Kachalsky v. County of Westchester,*
   701 F.3d 81 (2d Cir. 2012) .............................................................................22

*Muhjadin v. Newby,*
   2016 WL 5844322 (E.D. Va. Oct. 3, 2016) ......................................................11

*Mylan Laboratories, Inc. v. Matkari,*
   7 F.3d 1130 (4th Cir. 1993) ............................................................................10

*New York Times Co. v. Sullivan,*
   376 U.S. 254 (1964) ..................................................................................15, 23

*Ostrzenski v. Seigel,*
   177 F.3d 245 (4th Cir. 1999) ..........................................................................17

*Perk v. Vector Resources Group, Ltd.*,
  253 Va. 310, 485 S.E.2d 140 (1997)...........................................................................12, 21

*Perry v. Isle of Wight County*,
  2016 WL 1601195 (E.D. Va. Apr. 20, 2016) ........................................................................12

*Philips v. Pitt County Memorial Hospital*,
  572 F.3d 176 (4th Cir. 2009) ...............................................................................................4

*Provisional Government of Republic of New Afrika v. American Broadcasting
  Companies, Inc.*,
  609 F. Supp. 104 (D.D.C. 1985) .........................................................................................25

*Renwick v. News & Observer Publishing Co.*,
  312 S.E.2d 405 (N.C. 1984)................................................................................................18

*Republican Party of N.C. v. Martin*,
  980 F.2d 943 (4th Cir. 1992) ..............................................................................................10

*Reuber v. Food Chemical News, Inc.*,
  925 F.2d 703 (4th Cir. 1991) ...........................................................................................1, 15

*Schaecher v. Bouffault*,
  290 Va. 83, 772 S.E.2d 589 (2015)......................................3, 11, 12, 13, 15, 23, 24

*Schnare v. Ziessow*,
  104 F. App'x 847 (4th Cir. 2004) .........................................................................................12

*Spencer v. American International Group, Inc.*,
  2009 WL 47111 (E.D. Va. Jan. 6, 2009) .............................................................................21

*Tatur v. Solsrud*,
  498 N.W.2d 232 (Wisc. 1993) ............................................................................................16

*Tharpe v. Saunders*,
  285 Va. 476, 737 S.E.2d 890 (2013).....................................................................................11

*Tronfeld v. Nationwide Mutual Insurance Co.*,
  272 Va. 709, 636 S.E.2d 447 (2006).....................................................................................20

*Webb v. Virginian-Pilot Media Cos.*,
  287 Va. 84, 752 S.E.2d 808 (2014)..........................................................3, 11, 12, 14

*WJLA-TV v. Levin*,
  264 Va. 140, 564 S.E.2d 383 (2002).....................................................................................17

*Woollard v. Gallagher*,
  712 F.3d 865 (4th Cir. 2013) ...............................................................................................22

*Yeagle v. Collegiate Times*,
   255 Va. 293, 497 S.E.2d 136 (1998)......................................................................12

**Other Authorities**

5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*
   § 1356 (1990).................................................................................................10

RESTATEMENT (SECOND) OF TORTS § 614 (1977)..........................................................11

RESTATEMENT (SECOND) OF TORTS § 652E (1977). ......................................................17

1 Robert D. Sack, *Sack on Defamation* § 2:9.1 (4th ed. 2016)....................................23

2 Robert D. Sack, *Sack on Defamation* § 16:2.1 (4th ed. 2016)..................................13

W. Prosser and W. Keeton, *The Law of Torts* § 111 (5th ed. 1984)............................12

## PRELIMINARY STATEMENT

This is not the first time that a court has considered a defamation case between parties with opposing perspectives about a highly charged political controversy.  In reviewing such claims, courts have often noted the law's preference for airing those debates in the court of public opinion, rather than in courts of law.  *See, e.g.*, *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 717 (4th Cir. 1991) ("[s]ome part of the burden for demonstrating falsity surely lies with the opposing public figures in a public controversy—a demonstration better made on the field of polemical battle than in a defamation suit."); *see also Eaton v. Meneley*, 379 F.3d 949, 956 (10th Cir. 2004) ("Plaintiffs in public debates are expected to cure most misperceptions about themselves through their own speech and debate.").

To be sure, that principle does not immunize members of the media if they engage in genuinely defamatory and malicious speech, including speech relating to disputes about public policy.  But it does suggest that in this context, courts should be particularly attuned to the importance of exercising their gatekeeping function to distinguish between allegedly false speech that may offend participants in political debate – often, understandably so – and the much narrower category of false speech that the law deems to be genuinely defamatory.  That distinction is at the heart of why Defendants' motion to dismiss should be granted.

This case arises out of about eight seconds from *Under the Gun*, a nearly two-hour long documentary about the highly controversial subject of guns.  Like many documentaries, *Under the Gun* has a point of view, which it makes no pretense about.  At the same time, the documentary includes excerpts of interviews, speeches, testimony, and other statements from supporters of more expansive gun rights, including about three minutes of excerpts from an

1

interview between Katie Couric and some members of Plaintiff Virginia Citizens Defense League ("VCDL").

About twenty minutes into the documentary, members of the group answer multiple questions about guns.  They express their opposition to universal background checks and explain some of the reasons for their views.  Shortly thereafter, Couric asks:  If there are no universal background checks, how can felons and terrorists be prevented from accessing guns?  During the actual interview, one of the interviewees responded that anyone who is not in jail should be able to buy guns.

Rather than showing that or other similar responses that followed, for about eight seconds the film shows a few of the interviewees sitting silently, each for a few seconds.  When the film was released to the public in May 2016, the VCDL immediately responded by pointing out the pause and accusing the filmmakers of deceptive editing.  As the media reports to which the Complaint links demonstrate, the VCDL's response garnered far more national media attention than the film itself had ever received.  Director Stephanie Soechtig publicly apologized for any misleading impression the edit may have caused.  Couric subsequently issued a statement that not only apologized for the edit, it strongly criticized it.

Nonetheless, Plaintiffs have now filed this defamation suit.  Yet a careful reading of their Complaint reveals that, beyond its vituperative rhetoric about the film and its producers, it strains to try to articulate how the brief pause allegedly defamed the Plaintiffs.  Moreover, in an effort to plead a defamation claim, the Complaint mischaracterizes the film.  Plaintiffs allege that the film implies that they "did not and could not present any basis for opposing [universal] background checks."  Complaint ("Compl.") ¶ 16, Sept. 13, 2016, Dkt. 1.  But no reasonable viewer could interpret the film that way, because just before the exchange in question, the film explicitly

depicted them explaining why they oppose background checks.  Plaintiffs further assert that the film implies they are unfit to engage in business activities such as selling guns.  Those alleged implications are equally strained.

At worst, the film might be construed to imply that some members of the interview group had trouble coming up with an answer to the much narrower question about how, if there are no background checks, felons and terrorists can be prevented from buying guns.  Defendants have never disputed that editorial choice may fairly be subject to criticism and debate, and indeed it has been.  But whatever one thinks about the propriety of the edit, it simply does not rise to the level of defamation.

In any defamation case, "the question for the [] court when ruling on the demurrer [is] whether, as a matter of law, the article is reasonably capable of the defamatory meaning [plaintiff] ascribes to it."  *Webb v. Virginian-Pilot Media Cos.*, 287 Va. 84, 89, 752 S.E.2d 808, 811 (2014).  To evaluate its meaning, "the publication must be taken as a whole," rather than considering only eight seconds of a film in isolation.  *Schaecher v. Bouffault*, 290 Va. 83, 93-94, 772 S.E.2d 589, 595 (2015) (citation omitted).  And Virginia law is clear that to qualify as potentially defamatory, a false statement must accuse the plaintiff of conduct that society regards as "odious" or "contemptible."  *Id*. at 102,  772 S.E.2d at 599.  Displaying hesitation in the face of one of Couric's questions in a multi-part interview is simply not that type of conduct.  In fact, other jurisdictions have rejected similar efforts to bring defamation suits based on allegedly false implications about a plaintiff's political conduct or point of view.  The Complaint therefore fails to state a claim for defamation as a matter of law, and it should be dismissed.

## STATEMENT OF FACTS

Filmmaker Stephanie Soechtig and journalist Katie Couric decided in 2012 to make a documentary focusing on gun safety. Compl. ¶ 32. Their efforts culminated in *Under the Gun*, a documentary film lasting approximately an hour and forty-five minutes. It was first shown at the Sundance Film Festival on January 24, 2016, followed by several other public screenings between January and April. *Id.* ¶¶ 51, 94. Defendant Epix, a premium entertainment network, aired the film in mid-May 2016. *Id.* ¶ 96. The Complaint notes that the film initially received some media attention from a few film critics. *Id.* ¶¶ 69 n.6; 70 nn.7-8; 71 n.9.[1]

## I.   PLAINTIFFS' RELATIONSHIP TO THE DOCUMENTARY

During research for the documentary, producer Kristin Lazure worked with Virginia Citizens Defense League President Philip Van Cleave to arrange a group interview between Couric and other individuals who were also members of the VCDL. Compl. ¶ 26. Nine people participated in that roundtable interview, which took place on June 18, 2015. *Id.* ¶ 35. They included Plaintiffs Patricia Webb, who owns and operates a store that sells firearms, *id.* ¶ 19, and Daniel L. Hawes, an attorney who "practices litigation involving firearms and personal defense," and who has "represented individuals and gun stores against attacks from anti-gun activists," *id.* ¶ 20.

---

[1] "In deciding whether a complaint will survive a motion to dismiss, a court evaluates the complaint and any documents attached or incorporated by reference." *Bailey v. Virginia High School League, Inc.*, 488 F. App'x 714, 715 (4th Cir. 2012). A court may also consider documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Here, the Complaint attaches several exhibits and refers to numerous other documents, frequently by citing and linking to their web addresses. Those materials, which include the documentary film itself, may therefore properly be considered by the Court in deciding this motion.

A.    **How *Under the Gun* Portrayed the Plaintiffs Prior to the Eight Seconds at Issue**

*Under the Gun* includes more than three minutes of excerpts from that group interview; the Complaint, however, focuses only on the last dozen seconds.  The film opens by showing members of the group filling a circle of chairs, while Couric is heard saying, "First of all, I want to say thank you all so much for doing this, because we want to get all different points of view, and I know you guys have a specific point of view on this issue and some of the issues that we're tackling."  Compl. Ex. 1 at 0:39-1:33.  Couric then asks the group, "I'm going to start by asking for a show of hands, how many of you are carrying guns now?"  *Id.* at 1:33-1:39. Everyone raises their hand, and Couric says, "all of you."  *Id.* at 1:39-1:42.

The film returns to the group about 17 minutes later, initially identifying them in a brief caption as "MEMBERS OF THE Virginia Citizens Defense League."  That is the only reference to Plaintiff VCDL in the film.  After reprising the footage of the group indicating they are all armed, *id.* at 18:34-18:44, Couric asks the group to explain the appeal of owning guns.  Judith Rudek and Plaintiff Webb each respond by explaining several reasons beyond personal protection that they enjoy owning and shooting firearms.  *Id.* at 18:51-19:47.  In Webb's 36 seconds' worth of comments, she explains that she likes to collect guns and enjoys target shooting, and she compares her affinity for guns to the way other people enjoy different recreational activities.  *Id.* at 19:11-19:47.

*Under the Gun* then shows several of the interviewees answering a series of four questions from Couric about public policy issues involving guns.  She first asks whether, given that people have to receive training and pass a test to drive a car, the same shouldn't be the case for owning a gun.  *Id.* at 19:55-20:07.  Terrell Prudé, identified as a systems engineer, explains

5

that driving is not a specifically enumerated constitutional right, while owning a gun is.  *Id.* at 20:07-20:17.

Couric then asks, "do you think that people should have to pass a background check before they purchase a gun?"  *Id.* at 20:18-20:23.  An unidentified man in a blue shirt and black tie answers, "no," Plaintiff Hawes then replies that no one in the group supports background checks, and Couric asks, "why?"  *Id.* at 20:23-20:29.  Ed Levine, identified as a telecommunications manager, explains that background checks amount to "nothing more than a gun registry" that would allow the government to locate and confiscate firearms.  *Id.* at 20:30-20:47.  Couric next asks how many of the group are afraid "the government will try to take away your guns," and most raise their hands.  *Id.* at 20:47-20:55.

The documentary then shifts for a few minutes to some remarks from gun control advocates about some of the same issues and a discussion of the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), which recognized a Second Amendment right to own guns for personal defense.  It then returns to the group interview.  Couric says, "Let me ask you another question.  If there are no background checks for gun purchasers, how do you prevent felons or terrorists from purchasing a gun?"  Compl. Ex. 1 at 22:08-22:19.

### B.    Plaintiffs' Responses to Couric's Question About Terrorists and Felons in the Underlying Interview

In the underlying interview, Couric's question about terrorists and felons (which as the Complaint alleges was edited to be shorter in the film) was answered initially by a member of the group (who is not a plaintiff), who said:  "Well, one, if you're not in jail then you should still have your basic rights and you should [inaudible] go buy a gun."  Compl. Ex. 2 at 37:01-37:08 & ¶ 38.  Couric then followed up, "So, if you're a terrorist or a felon?," and the same person

6

responded:  "If you're a felon and you've done your time, you should have your rights."  *Id.* at

37:08-37:15.

   Following that exchange, about 15 seconds after Couric's initial question, Plaintiff

Hawes weighed in, primarily to assert the legal proposition that:

> [W]hat we're really asking about is a question of prior restraint. How can we
> prevent future crime by identifying bad guys before they do anything bad?  The
> simple answer is you can't.  Particularly, under the legal system we have in the
> United States there are a lot of Supreme Court opinions that say, "No, prior
> restraint is something that the government does not have the authority to do."

*Id.* at 37:40-38:04.  Next, a full minute and ten seconds after Couric's question, Webb weighed

in by posing her own question back to Couric:  "I would take another outlook on this.  I'll ask

you what crime or what law has ever stopped a crime?  Tell me one law that has ever stopped a

crime from happening?"  *Id.* at 38:11-38:24.

### C.      The Eight Seconds at Issue in the Film

   The film itself did not include any of this exchange.  Rather, in the film, Couric's

question is followed by eight seconds of footage of a few members of the group sitting silently.

Webb's face is partially visible for a few seconds, out of focus and in the background as the

camera focuses on another person.  The film then focuses on Hawes for another few seconds,

before shifting to a different segment of the documentary, which explains how applicable laws

differ as to when background checks may be required.  *Id.* at 22:19-22:27.

## II.    PLAINTIFF VCDL CRITICIZES THE FILM AND ATTRACTS WIDESPREAD, NATIONAL MEDIA COVERAGE

   One day after the film was publicly released by Epix, Van Cleave emailed Lazure to

complain about it, including the question and pause that is the subject of this lawsuit.  Compl.

¶ 96.  A week later, the VCDL released a statement criticizing Couric for "unethical journalism"

and posted online a portion of its own audio recording of the group interview, which included

Couric's question on felons and terrorists.  *Id.* ¶ 78.  The statement quickly sparked intense national media coverage, most of it sympathetic to Plaintiffs.

For example, the Complaint cites to a report by CNN, which characterized the few seconds of the film in question as a "misleading edit" and a "misleading scene."  *Id.* ¶ 79 n.13. In response to the controversy, Soechtig released a statement explaining:

> I never intended to make anyone look bad and I apologize if anyone felt that way.
> . . . My intention was to provide a pause for the viewer to have a moment to
> consider this important question before presenting the facts on Americans'
> opinions on background checks.

*Id.* ¶ 80.  The controversy continued to receive significant media attention, however, such as an article by *The Washington Post*'s media critic which quoted Van Cleave and opined that Soechtig's statement was inadequate.  *Id.* ¶ 81 n.15.  The VCDL's website, to which the Complaint refers, took credit for the fact that the controversy "has been widely reported in the media."[2]  Couric released a public statement on May 30 that was posted on the *Under the Gun* website, where it remains today.  *Id.* ¶ 84.  The statement said, in relevant part:

> I take responsibility for a decision that misrepresented an exchange I had with
> members of the Virginia Citizens Defense League (VCDL).  My question to the
> VCDL regarding the ability of convicted felons and those on the terror watch list
> to legally obtain a gun, was followed by an extended pause, making the
> participants appear to be speechless.
>
> When I screened an early version of the film with the director, Stephanie
> Soechtig, I questioned her and the editor about the pause and was told that a
> "beat" was added for, as she described it, "dramatic effect," to give the audience a
> moment to consider the question.  When VCDL members recently pointed out
> that they had in fact immediately answered this question, I went back and
> reviewed it and agree that those eight seconds do not accurately represent their
> response. . . .
>
> I regret that those eight seconds were misleading and that I did not raise my initial
> concerns more vigorously.

---

[2] *See* Virginia Citizens Defense League, VCDL Sues Katie Couric For Defamation in Federal Court!, https://www.vcdl.org/ (last visited 11/28/2016).

*Id.* Ex. 4 at 1-2.

## III.   THE COMPLAINT

Plaintiffs filed this lawsuit on September 13, 2016, and the VCDL's website promotes it as an effort, in part, to "[a]dvance our mission to defend your right to defend yourself."[3]   The Complaint asserts two counts of alleged defamation, both of which focus exclusively on Couric's question about terrorists and felons and the pause that follows.   Count I is labeled "Defamation" and Count II is labeled "Defamation By Implication."   However, that distinction is a misnomer. Rather, both Counts allege the same theories of defamation by implication – or to be more precise, the same theory of defamation by double implication.

Count I first alleges that the scene "falsely informed viewers that the VCDL members had been stumped and had no basis for their position on background checks."   Compl. ¶ 103; *see also id.* ¶ 15 (scene "falsely represent[s] that" the Plaintiffs "had no basis for their opposition to universal background checks"); *id.* ¶¶ 6, 63-67, 106-08, 112-14, 132, 136-38.   But the film plainly never makes any such assertion; rather, as Plaintiffs subsequently plead, their real contention is that that the totality of the scene "falsely *implies* that the VCDL members had been stumped and had no basis for their position on background checks."   *Id.* ¶ 127 (emphasis added). Count I then proceeds to further allege that because the scene suggests that the group had no basis to oppose background checks, that in turn implies that each of them is unfit to engage in their respective businesses and professions.   *Id.* ¶¶ 113-118.   Thus, Count I alleges that the film is defamatory *per se.*   Specifically, Count I alleges the film implies that:

- The VCDL failed in its organizational mission to advocate for Second Amendment rights and oppose background checks.   *Id.* ¶¶ 113-14.

---

[3] *See* Virginia Citizens Defense League, VCDL Sues Katie Couric For Defamation in Federal Court!, http://www.vcdl.org/ (last visited 11/28/2016).

- Webb, as a licensed firearms dealer who is obligated to perform background checks, lacks knowledge about background checks. *Id.* ¶¶ 115-16.

- Hawes is not competent as an attorney to represent gun owners. *Id.* ¶¶ 117-18.

Count II is labeled "Defamation By Implication," but in reality it asserts the same alleged implications as Count I, namely that the scene (1) "falsely implies that the VCDL members had been stumped and had no basis for their position on background checks," *id.* ¶ 127, and so (2) "they are therefore unfit for their respective roles as a firearms advocacy organization, licensed firearms dealer, and attorney who practices litigation involving firearms and personal defense." *Id.* ¶ 131. Plaintiffs seek at least $12 million in compensatory damages, $350,000 per plaintiff in punitive damages, fees and costs, and an injunction prohibiting Defendants from disseminating "any footage of the VCDL's members, Hawes, or Webb that is judicially determined to be false." Compl. at 52 (Prayer for Relief).

## ARGUMENT

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Martin*, 980 F.2d at 952. However, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A plaintiff must allege facts sufficient "to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550

10

U.S. 544, 555 (citation omitted), stating a claim that is "plausible on its face," *id.* at 570, rather

than merely "conceivable," *id.*; *see also Muhjadin v. Newby*, 2016 WL 5844322, at *1 (E.D. Va.

Oct. 3, 2016).

## I.   THE FILM IS NOT REASONABLY CAPABLE OF THE DEFAMATORY MEANING ALLEGED BY PLAINTIFFS

In Virginia, the elements of defamation are "(1) publication of (2) an actionable statement

with (3) the requisite intent." *Tharpe v. Saunders*, 285 Va. 476, 737 S.E.2d 890, 892 (2013)

(internal quotation marks and citation omitted).  An "actionable" statement is both false and

defamatory.  *Id.* at 476, 737 S.E.2d at 892.  A threshold question of law for the court in every

defamation case is whether the challenged communication is actionable because it is reasonably

capable of the defamatory interpretation alleged by the plaintiff.  *Webb*, 287 Va. at 90, 752

S.E.2d at 812.  The court's "essential gatekeeping function" protects the freedom of speech

guaranteed by the federal and state constitutions by ensuring "that defamation suits proceed only

upon statements which actually may defame a plaintiff, rather than those which merely may

inflame a jury to an award of damages."  *Id.* at 90, 752 S.E.2d at 811.

The analysis has two main components:  (1) whether the publication is reasonably

susceptible to the interpretation the plaintiff alleges, and if so, (2) whether that interpretation is

potentially defamatory.  RESTATEMENT (SECOND) OF TORTS § 614 (1977) ("The court determines

(a) whether a communication is capable of bearing a particular meaning, and (b) whether that

meaning is defamatory."); *Webb,* 287 Va. at 91, 752 S.E.2d at 812.  Certain basic principles

govern this analysis.  In performing the first part, the Court must evaluate the specific elements

about which the plaintiff complains in the context of the publication as a whole.  *Schaecher*, 290

Va. at 93-94, 772 S.E.2d at 595.  Furthermore, the Court must interpret words or images

according to their plain and ordinary meaning; an alleged defamatory implication cannot extend

that ordinary meaning or "make that certain which is in fact uncertain." *Webb*, 287 Va. at 89-90, 752 S.E.3d at 811 (quoting *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 8, 82 S.E.2d 588, 592 (1954)).

When performing the second part of the analysis, *i.e.*, assessing whether an alleged implication is potentially defamatory, courts must ask whether the words and/or images "tend[] to injure one's reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon [the plaintiff], or which tend[] to hold him up to scorn, ridicule, or contempt, or which [are] calculated to render him infamous, odious, or ridiculous." *Schaecher*, 290 Va. at 92, 772 S.E.2d at 594 (internal marks and citation omitted). Words that are "[m]erely offensive or unpleasant . . . are not defamatory." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993); *see also* W. Prosser and W. Keeton, *The Law of Torts* § 111, at 773 (5th ed. 1984) (defamation "necessarily . . . involves the idea of disgrace").

Because the issue of defamatory meaning is a threshold question of law for the court, it is regularly a basis for courts to grant motions to dismiss in defamation cases. *See, e.g.*, *Chapin*, 993 F.2d at 1091 (affirming grant of motion to dismiss based on lack of defamatory meaning); *Schnare v. Ziessow*, 104 F. App'x 847, 847 (4th Cir. 2004) (same); *Perry v. Isle of Wight Cty.*, 2016 WL 1601195, at *3 (E.D. Va. Apr. 20, 2016) (granting motion to dismiss based on lack of defamatory meaning), *appeal dismissed* (June 8, 2016); *Freedlander v. Edens Broad., Inc.*, 734 F. Supp. 221, 226–27 (E.D. Va. 1990) (same), *aff'd*, 923 F.2d 848 (4th Cir. 1991); *Schaecher*, 290 Va. at 106, 772 S.E.2d at 601 (affirming trial court's sustaining of demurrer based on lack of defamatory meaning); *Yeagle v. Collegiate Times*, 255 Va. 293, 295, 497 S.E.2d 136, 137 (1998) (same); *Perk v. Vector Res. Grp., Ltd.*, 253 Va. 310, 316–17, 485 S.E.2d 140, 144 (1997) (same). As a leading treatise notes:

> [U]nlike in most litigation, in a libel suit the central event – the
> communication about which suit has been brought – is literally
> before the judge at the pleading stage . . . . Thus, courts routinely
> consider, on motions to dismiss . . . or demurrer, issues such as
> whether the statement at bar is capable of bearing a defamatory
> meaning . . . whether it is "of and concerning" the plaintiff,
> whether it is protected opinion . . . . and whether the suit is barred
> by privilege . . . and they frequently grant motions on these
> grounds and others.

2 Robert D. Sack, *Sack on Defamation* § 16.2.1 (4th ed. 2016) (collecting cases).

As previously noted, both defamation counts are premised on the allegations that (1) the film implies that Plaintiffs could not defend their opposition to universal background checks, and (2) that implication injured them in their respective professions.  Both Counts fail because the film does not imply that Plaintiffs had no basis to their opposition to background checks, nor does it impugn the Plaintiffs' professional competence or otherwise defame them.

### A.    The Film Does Not Imply that Plaintiffs Had No Basis for Their Opposition to Universal Background Checks

The film cannot reasonably be construed to imply that Plaintiffs "have no basis for their opposition to background checks."  Compl. ¶ 108.  The Complaint makes that assertion by focusing on the particular question and pause in isolation.  But Virginia law is clear that "the publication must be taken as a whole" for purposes of construing its meaning.  *Schaecher*, 290 Va. at 93-94, 772 S.E.2d at 595 (quoting *Farah v. Esquire Magazine*, 736 F.3d 528, 535 (D.C. Cir. 2013)); *see also Chapin*, 993 F.2d at 1098 ("we would err if we did not consider the article as a whole").  Once the entire film is considered, it becomes clear that the question Couric posed, about which Plaintiffs complain, was not asking for their reasons for opposing background checks.

That is obvious because Couric had already posed *that* question less than two minutes before the challenged footage.  Compl. Ex. 1 at 20:18-20:23 ("Do you think that people should

13

have to pass a background check before they purchase a gun?").  And the film makes clear that

the interviewees answered that question, because it was immediately followed by 33 seconds of

responses, including by Hawes, explaining why the interviewees oppose background checks.  *Id.*

at 20:24-20:57.  No reasonable viewer, having just heard several persons in the group explain the

basis for their opposition to background checks, would believe after watching the contested

footage that the film implies that Plaintiffs had no ability to answer that question.

### B.       Any Implication Conveyed By the Pause is Not Defamatory

At worst, the film might be construed as implying that the persons within the group being

interviewed could not quickly respond to Couric's much narrower question: "If there are no

background checks for gun purchasers, how do you prevent felons or terrorists from purchasing a

gun?"  *Id.* at 22:07-22:19.  Implying that any of the Plaintiffs – or anyone else, for that matter –

had difficulty immediately answering that public policy question is simply not the kind of

assertion that may be redressed by a defamation suit.  *Webb,* 287 Va. at 91, 752 S.E.2d at 812

("As a matter of law, the article is not reasonably capable of the defamatory meaning [plaintiff]

ascribes to it. The implication that may be reasonably drawn from the article does not defame

[plaintiff].").

While Plaintiffs no doubt take offense to their portrayal in the film, it is not "odious" or

"infamous" or "disgrace[ful]" in the "common estimation of mankind" to not have a ready retort

to the last of Couric's five questions that were included in the film.  Courts have dismissed

defamation cases premised on far more egregious implications.  For example, the Virginia

Supreme Court recently considered whether statements that a special use permit applicant had

violated easements and covenant restrictions and "was not totally truthful" in her answer to a

question from a county planning commission were defamatory.  The Court held they were not,

14

because those allegations did not rise to the level of a "reprehensible crime" or other odious behavior that a defamatory statement requires. *Schaecher*, 290 Va. at 95, 101-02, 772 S.E. 2d at 595-96, 599. If violating contractual obligations towards one's community and being less-than-truthful to a government agency is not defamatory, then surely being depicted as not promptly responding to just one of Couric's multiple questions falls well below the requisite threshold of reprehensibility. *See Chapin v. Greve*, 787 F. Supp. 557, 566 (E.D. Va. 1992) ("Yet refusing to answer reporters' questions is commonplace and certainly cannot reasonably be said to tarnish one's reputation. People in the public eye do it all the time. There is nothing odious or disgraceful about it."), *aff'd*, 993 F.2d 1087 (4th Cir. 1993).

Moreover, accepting Plaintiffs' premise that being unable to answer one of Couric's questions is defamatory requires accepting the proposition that it is somehow contemptible or ridiculous for a supporter of Second Amendment rights to be at least temporarily "stumped" when asked how terrorists and felons could be prevented from buying guns in the absence of background checks. But that is not the kind of implication that can be held to be defamatory if we are to have the "uninhibited, robust, and wide-open" debate the First Amendment protects. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Rather, that is a political judgment that is best left to the realm of public opinion, not to adjudication in a lawsuit. *Reuber*, 925 F.2d at 717 ("Some part of the burden for demonstrating falsity surely lies with the opposing public figures in a public controversy—a demonstration better made on the field of polemical battle than in a defamation suit.").

Courts from other jurisdictions considering similar defamation theories related to political controversies have reached the same conclusion. For example, in *Cox v. Hatch*, 761 P.2d 556 (Utah 1988), the plaintiffs sued Senator Orrin Hatch for defamation because his campaign

15

distributed political fliers that featured a photograph of them talking to the Senator.  The plaintiffs alleged that the use of the photograph falsely implied they had endorsed the Senator, and that it injured them professionally because as federal postal employees they were legally barred from participating in political campaigns.

The Court dismissed the case, holding that any implications that the plaintiffs were Republicans or supported Senator Hatch, even if false, were not defamatory.  The Court noted that "[a] publication is not defamatory simply because it is nettlesome or embarrassing to a plaintiff, or even because it makes a false statement about the plaintiff."  *Id.* at 561.  Because being falsely identified as a Republican or supporting a Republican candidate is "not at odds with the fundamental social order," it "is not defamatory."  *Id.* at 562.  Likewise, the Wisconsin Supreme Court has held that it was not actionable to misrepresent a politician's voting record on issues like taxes, because that is not something "of the nature that a vote on one side or the other" would reflect a point of view that society is prepared to regard as defamatory.  *Tatur v. Solsrud*, 498 N.W.2d 232, 234 (Wisc. 1993).  *See also Frinzi v. Hanson*, 140 N.W.2d 259, 278 (Wisc. 1966) ("Being charged with being a good, luke warm or nonmember of a political party is not libelous.").  Similarly, in this case, implying that a person or organization is at least temporarily "stumped" by a question about terrorists and felons obtaining guns is simply not defamatory.

Moreover, it bears noting that neither Webb nor Hawes did, in fact, immediately answer the question – another interviewee did.  Webb did not join in any discussion until 1 minute and 10 seconds after Couric's initial question, which by that point had been modified by a follow-up question.  Compl. Ex. 2 at 36:42-38:11.  Even Hawes only began to weigh in 15 seconds after the original question, double the amount of time shown in the film.  *Id.* at 37:01-37:15.  And even when they did answer, it could be at least fairly debated whether either Plaintiff actually

answered Couric's question.  Rather, both essentially asserted that the state may never enact any

law in any context to try to prevent crime.  The Complaint even seems to acknowledge that it

might be "literally true" that these Plaintiffs did not readily respond to Couric's question.

Compl. ¶ 119.

Thus, Plaintiffs' real grievance is not that they were defamed, but rather that *Under the

Gun* allegedly placed them in what some states' laws might characterize as a "false light" – *i.e.*,

it made them appear to have behaved differently than they allege they actually did.

RESTATEMENT (SECOND) OF TORTS § 652E, cmt. b ("The interest protected by this Section is the

interest of the individual in not being made to appear before the public in an objectionable false

light or false position, or in other words, otherwise than as he is.").  The false light branch of the

invasion of privacy tort requires a lesser showing than defamation.  It merely requires pleading

that the defendant made a false statement that could be highly offensive to a reasonable person in

the plaintiff's position, even if it might not rise to the level of what the law is prepared to

recognize as defamatory.  *See Ostrzenski v. Seigel*, 177 F.3d 245, 252 (4th Cir. 1999) (applying

Maryland law and noting that false light requires an allegation that "some [false] factual

assertion in the report is highly offensive"); RESTATEMENT (SECOND) OF TORTS § 652E, cmt. b

("It is not, however, necessary to the action for invasion of privacy that the plaintiff be defamed.

It is enough that he is given unreasonable and highly objectionable publicity that attributes to

him characteristics, conduct or beliefs that are false, and so is placed before the public in a false

position.").

But that tort is not available under settled Virginia law.  *WJLA-TV v. Levin*, 264 Va. 140,

160 n.5, 564 S.E.2d 383, 394-95 n.5 (2002); *Falwell v. Penthouse Int'l, Ltd.*, 521 F. Supp. 1204,

1206 (W.D. Va. 1981) ("Plaintiff's claim for 'false light' invasion of privacy must be dismissed

17

as a matter of law.  The courts of Virginia simply do not recognize such a common law cause of action.").  And that is for good reason.  A significant number of states have declined to recognize the false light tort precisely because it is "an amorphous tort [that] risks chilling fundamental First Amendment freedoms."  *Denver Publ'g Co. v. Bueno*, 54 P.3d 893, 898 (Colo. 2002).  False light carries a greater risk that robust public debate will result in lawsuits every time a plaintiff takes offense, even reasonably so, at an opponent's statement that may be false in some way.  Thus, the tort can too readily be misused to try to retaliate against all perceived "degree[s] of [journalistic] abuse."  *Renwick v. News & Observer Publ'g Co.*, 312 S.E.2d 405, 412 (N.C. 1984) ("to the extent it would allow recovery beyond that permitted in actions for libel or slander, would tend to add to the tension already existing between the First Amendment and the law of torts in cases of this nature.").  Defamation, by contrast, requires a more rigorous showing of a statement that is clearly damaging to reputation in some commonly accepted manner, which provides more breathing space for politically charged speech.[4]

The question and pause at issue here may well be offensive to Plaintiffs, but it is not defamatory.  For example, Plaintiff Webb may take offense that the film did not include her actual response to Couric's question (which was that no law has ever deterred a crime), and thus in her view portrayed her as behaving differently than she actually did.  Similarly, the Court in *Hatch* acknowledged that the plaintiffs there could well "feel affronted if they are identified as being affiliated with another party."  *Cox*, 761 P.2d at 562.  But it held that "such subjective perceptions and sensibilities have little to do with reputation, since reputation is based on a collective judgment of a large group of people."  *Id.*  Here too, the law does not regard it as defamatory for Webb to be silent in the face of one of Couric's questions.

---

[4] In fact, even states that do recognize the false light tort have proved reluctant to interpret it to apply in the political context.  *Cox*, 761 P.2d at 564.

### C.      The Film Does Not Imply that Plaintiffs Are Unfit in Their Professions

Finally, the documentary does not imply that any of the Plaintiffs are incompetent or unfit to engage in their respective business activities and professions.  First, the allegation that the film implies that Plaintiffs had no basis for their position on background checks is the predicate for the Complaint's further allegations about professional fitness.  As such, the failure of their first alleged implication vitiates Plaintiffs' entire defamation case.

Moreover, even considered independently, this second implication theory fails because the film is not reasonably capable of being construed to attack any Plaintiff's professional competence.  A publication may be defamatory *per se* where it "impute[s] to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of duties of such an office or employment," or "prejudice[s] such person in his or her profession or trade."  *Hatfill v. New York Times Co.*, 416 F.3d 320, 330-31 (4th Cir. 2005) (quoting *Carwile*, 196 Va. at 7, 82 S.E.2d at 591).  Plaintiffs alleging such business-related defamation *per se* claims must make a more rigorous showing, because "[n]ot every defamatory statement . . . is 'necessarily hurtful' to a plaintiff's business and touches the plaintiff in his special trade or occupation."  *Fleming v. Moore*, 221 Va. 884, 890, 275 S.E.2d 632, 636 (1981).  Rather, there must be a nexus between the alleged defamatory "sting" and the "skills or character" required for the plaintiff's profession.  *Id.*  Here, the requisite nexus between the alleged implication and any accusation about Plaintiff's professional competence is simply nonexistent.

#### 1.   Plaintiff Webb

The Complaint alleges that as a federally licensed firearms dealer, Webb must (and does) perform a background check for every gun she sells.  Compl. ¶ 19.  Examples of statements that might be defamatory *per se* would be allegations that she fails to perform, improperly performs,

19

or is ignorant about how to perform background checks.  But Couric's question did not seek information about performing background checks, and thus it had no bearing on Webb's fitness as a firearms dealer to perform background checks.

To the contrary, Plaintiffs allege that the film implies that Webb did not criticize or was unable to criticize a law she is obligated to follow.  It cannot possibly be defamatory of a firearms dealer to imply that they failed to effectively debunk a law with which they must comply.  Even more troubling, Webb's theory of liability implies that in order to be a competent gun store owner, one must share Webb's political views and oppose the very background check laws that firearms dealers are obligated to follow.  That suggestion has no foundation in the law of defamation or in public policy.

### 2.  Plaintiff Hawes

Portraying Hawes as hesitating in the face of Couric's question does not impugn his fitness as an attorney.  Generally, cases in which Virginia courts have found defamation *per se* of an attorney have involved accusations of misconduct that may be sanctioned by the bar or that otherwise accuse them of intentionally mistreating their clients.  *See, e.g.*, *Carwile*, 196 Va. at 9, 82 S.E.2d at 592 (implication that attorney "could and should be subjected to disbarment proceedings"); *Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 714, 636 S.E.2d 447, 450 (2006) (statements that implied "a combination of dishonesty, incompetence or the crimes of larceny by trick or obtaining money by false pretenses"); *Cretella v. Kuzminski*, 2008 WL 2227605, at *8 (E.D. Va. May 29, 2008) (statements that attorney "might be . . . closer to losing his license" and that he had been reported to state bar authorities).  The film implies nothing of the kind with respect to Hawes.

By contrast, Virginia courts have rejected efforts by attorneys to sue for defamation premised on less serious allegations, even where (unlike here) they imply some actual professional misfeasance.  For example, in *Spencer v. Am. Int'l Grp., Inc.*, 2009 WL 47111, at *6 (E.D. Va. Jan. 6, 2009) the court held that an allegation that an attorney had mistakenly failed to file a transcript, leading to his client's appeal being dismissed, was not defamatory.  The court cautioned that "[n]ot every statement that reflects poorly on one's ability to practice law constitutes defamation *per se*." *Id.*  Specifically, even assuming that a statement "d[oes] not reflect positively on the attorney's ability to represent his clients," it is not actionable unless it "necessarily impl[ies] an unfitness to practice law or constitute[s] an allegation of unethical or unprofessional conduct." *Id.*  Consistent with those principles, the Virginia Supreme Court held that it was not defamatory to allege that an attorney engaged in debt collection had failed to report to his client some of the debts he had collected on the client's behalf.  *Perk*, 253 Va. at 316, 485 S.E.2d at 143-44.

 It therefore stretches defamation law beyond reasonable recognition to construe *Under the Gun* as attacking Hawes' fitness to be an attorney.  Indeed, even the most competent attorneys and oral advocates do not necessarily have a ready answer for every question.  Here too, Hawes' real complaint is that the film implied that he behaved differently in response to Couric's question than he actually did, which offends him.  But that is quite different than defaming him.

Moreover, Hawes's actual answer to the question was that the Supreme Court has repeatedly held that the prior restraint doctrine bars the government from doing anything to try to "identif[y] bad guys before they do anything bad."  Compl. Ex. 2 at 37:40-38:04.  That response

was not an accurate statement of constitutional law.[5]  So it stretches the law even more to suggest that it would prefer that a jury decide whether the prior restraint doctrine applies to the Second Amendment, or whether it would be better for attorneys' reputations if they misstate the law rather than remain silent.

### 3.  VCDL

Even if the film could be construed to imply anything about the VCDL as an organization – which, as discussed in Part II below, it cannot – it certainly does not imply that the VCDL fails to defend the Second Amendment or oppose background checks.  The strongly pro-Second Amendment point of view of the members who participated in the panel is clearly articulated in the film as a whole, which contains several minutes of footage of the people in the group articulating their points in response to several of Couric's questions about background checks and other issues.  Compl. Ex. 1 at 18:51-20:55.  Nor does a few members being unable to quickly answer one of a half-dozen questions imply that the organization as a whole is unfit to advocate for gun rights.

---

[5] The Supreme Court has never applied the doctrine of prior restraint to any context other than the First Amendment's free speech and press clauses.  *See, e.g.*, *Hightower v. City of Boston*, 693 F.3d 61, 81 (1st Cir. 2012)  ("[T]he prior restraint doctrine is specific to the First Amendment and stems from the substantive First Amendment restrictions.").  For that very reason, every federal circuit to consider the issue since the Supreme Court's *Heller* decision has declined the invitation to apply the prior restraint doctrine to Second Amendment disputes. *Drake v. Filko*, 724 F.3d 426, 435 (3d Cir. 2013) ("we reject Appellants' invitation to apply First Amendment prior restraint doctrine rather than traditional means-end scrutiny" to Second Amendment challenges); *Woollard v. Gallagher*, 712 F.3d 865, 883 n.11 (4th Cir. 2013) ("Like the Second Circuit . . . we are hesitant to import substantive First Amendment principles wholesale into Second Amendment jurisprudence." (quoting *Kachalsky v. County of Westchester*, 701 F.3d 81, 91 (2d Cir. 2012))); *Hightower*, 693 F.3d at 81 ("The prior restraint doctrine is not a label that may be attached to allow any facial challenge, whatever the constitutional ground.").  And certainly no court has endorsed the even broader proposition that Hawes asserted:  that the prior restraint doctrine broadly restricts the state from trying to "prevent future crime by identifying bad guys before they do anything bad."  Security checks at airports, for example, are not unconstitutional prior restraints.

In fact, elsewhere in the film, individuals identified solely as members of the National Rifle Association (and not even by name) are also interviewed.  During the course of these interviews, most of them express opinions that are different from the NRA's formal policy positions on background checks, and at times appear unaware of those formal positions.  *See, e.g., id.* at 46:45-47:08.  Yet no reasonable viewer would construe those interview excerpts as statements that the NRA is unfit to advocate for gun rights.  The same is true with respect to the VCDL.  To conclude otherwise would require a political judgment as to what ideological litmus tests must be passed to qualify an organization as "pro Second Amendment."  That is not the province of defamation law.

## II.   VCDL'S CLAIMS ALSO FAIL AS A MATTER OF LAW BECAUSE THE FILM MAKES NO STATEMENT ABOUT IT

Even were this Court to find that the challenged pause conveys the defamatory meaning Plaintiffs allege, Plaintiff VCDL's claims nevertheless would fail for the additional reason that nothing defamatory was conveyed *about the VCDL.*  As a matter of common sense, one cannot render "silent" or "stump[]" an organization.  It was not the *organization* that did or did not respond to Couric's question.

To prevail on a defamation claim, a plaintiff must show that the allegedly defamatory assertion of fact was "of and concerning" him.  *See, e.g.*, *Schaecher*, 290 Va. at 99-100, 772 S.E.2d at 598; *see also, e.g.*, *AIDS Counseling & Testing Ctrs. v. Grp. W Television, Inc.*, 903 F.2d 1000, 1005 (4th Cir. 1990) ("'circumstances of the publication [must] reasonably give rise to the conclusion that there is a particular reference' to [this plaintiff]" (citation omitted)); 1 Robert D. Sack, *Sack on Defamation* § 2:9.1 (4th ed. 2016) (of and concerning "requirement has constitutional ramifications" (citing *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964))).

23

It is for this Court to determine, as a matter of law in the first instance, whether the Complaint alleges facts sufficient to demonstrate that the allegedly defamatory statement is "of and concerning" each plaintiff. *See, e.g., AIDS Counseling & Testing Ctrs.*, 903 F.2d at 1005 (affirming dismissal of claims by owners not individually defamed as "clearly proper" in light of "[c]ommon sense, as well as the law of defamation" (citation omitted)); *Schaecher*, 290 Va. at 99-100, 772 S.E.2d at 598 (sustaining demurrer where plaintiff failed to identify how challenged defamatory statement was about her individually); *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001) (whether a challenged statement is "of and concerning" the plaintiff "should ordinarily be resolved at the pleading stage").

Here, the Complaint fails to point to any allegedly defamatory statement of fact that was about the VCDL.  The law is clear that to be actionable, "a publication must contain some 'special application of the defamatory matter' to the individual" plaintiff.  *AIDS Counseling & Testing Ctrs.*, 903 F.2d at 1005 (citation omitted).  As the Complaint concedes, the only reference to the organization at all appears for three seconds at the beginning of the section of the film involving Plaintiffs, in which the participants in the group interview are identified generically as "MEMBERS OF THE Virginia Citizens Defense League."  Compl. ¶¶ 56-57 & Ex. 1 at 18:40-18:43.  As the interview proceeds, the participants are identified individually by name and profession only.  None of the participants is identified as a leader, spokesperson or employee of VCDL, nor does the film claim that any statement by any of the nine participants in the interview is a statement on behalf of the organization.[6]  *Id.* at 18:51-20:55.

_____

[6] Even if one were so identified, this would still not alone suffice, *see Schaecher*, 290 Va. at 99-100, 772 S.E.2d at 598 (a company cannot ordinarily proceed in defamation arising out of the libel of its employees, owners or shareholders), but the affirmative *absence* here of any indicia that the participants were speaking for the VCDL as an entity makes the inadequacy of the organization's claim all the more straightforward.

Not only is VCDL unable to show any defamatory matter with special application to it, any attempt by the organization to argue that it has a cause of action based on a statement in the film about two of its members would be meritless, even assuming, *arguendo*, that a statement about Hawes and Webb were otherwise actionable.  It is well-settled that an organization cannot state a claim for defamation based on defamatory statements about a member.  *See, e.g.*, *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 302 (4th Cir. 2008) (distinguishing between accusing individual contractors of committing an act and accusing the plaintiff employer in its corporate capacity of doing so).  As a court in the District of Columbia, in a widely cited opinion, has put it, "[d]efamation is personal . . . .  *Allegations of defamation by an organization and its members are not interchangeable.  Statements which refer to individual members of an organization do not implicate the organization.*"  *Provisional Gov't of Republic of New Afrika v. Am. Broad. Cos., Inc.*, 609 F. Supp. 104, 108 (D.D.C. 1985) (emphasis added) (citations omitted).  This rule has been applied consistently.  *See, e.g., Church of Scientology of California v. Flynn*, 578 F. Supp. 266, 268 (D. Mass. 1984) (dismissing claim by non-profit because defamatory content implicated its members, not the organization); *Darling v. Piniella*, 1991 WL 193524, at *3 (E.D. Pa. Sept. 27, 1991) (explaining that "for an organization to have a cause of action for defamation, the remarks must be *directed toward the organization*" and collecting cases); *Afftrex, Ltd. v. Gen. Elec. Co.*, 555 N.Y.S.2d 903, 905 (N.Y. 3d Dep't 1990) (allegedly defamatory statement about the owner and president of a company did not defame the company).

That a mere association with a defamed person or entity simply does not provide a cause of action is not only black letter law, it is also a matter of common sense.  For example, as previously noted, elsewhere in the film, individuals identified solely as members of the NRA are interviewed.  Yet no reasonable viewer would construe those interview excerpts as statements

about, or on behalf of, the NRA.  Because it is evident from the face of the film that any alleged statement being challenged is not about the VCDL, its claims fail as a matter of law and should accordingly be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, Defendants Atlas Films, LLC and Katie Couric respectfully request that their motion to dismiss be granted and the Complaint be dismissed, with prejudice.

Dated:  November 29, 2016               Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, LLP

By:      /s/ Matthew E. Kelley
         Nathan Siegel (admitted *pro hac vice*)
         Mara J. Gassmann (VSB No. 82131)
         Matthew E. Kelley (VSB No. 84045)

1899 L Street, NW, Suite 200
Washington, D.C. 20036-5514
Telephone:      (202) 508-1100
Facsimile:      (202) 861-9888
Email:          nsiegel@lskslaw.com

*Counsel for Defendant Atlas Films, LLC*

WILLIAMS & CONNOLLY LLP
Kevin T. Baine (admitted *pro hac vice*)
Thomas G. Hentoff (admitted *pro hac vice*)
Nicholas G. Gamse (admitted *pro hac vice*)
Emily A. Rose (VSB No. 89529)*
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
thentoff@wc.com

*Attorneys for Katie Couric*

*\*Admitted only in Virginia and the Eastern District of Virginia. Practice supervised by D.C. Bar members pursuant to D.C. Court of Appeals Rule 49(c)(8).*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of November, 2016, I electronically filed the foregoing Memorandum in Support of Defendants Atlas Films LLC and Katie Couric's Motion to Dismiss Complaint with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following counsel of record:

> Elizabeth Marie Locke
> libby@clarelocke.com
> Megan Lambart Meier
> megan@clarelocke.com
> Thomas Arthur Clare
> tom@clarelocke.com
> CLARE LOCKE LLP
> 902 Prince Street
> Alexandria, VA  22314
>
> *Counsel for Plaintiffs Virginia Citizens Defense League,*
> *Daniel L. Hawes, Esq., and Patricia Webb*

                         */s/ Matthew E. Kelley*
                         Matthew E. Kelley

27