## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

|  |  |  |
|---|---|---|
| **VIRGINIA CITIZENS DEFENSE LEAGUE, et al.,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 3:16-cv-00757-JAG** |
| **KATIE COURIC, STEPHANIE SOECHTIG, ATLAS FILMS LLC, and STUDIO 3 PARTNERS, LLC d/b/a EPIX,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT
## OF STUDIO 3 PARTNERS LLC D/B/A EPIX'S
## MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. RULE 12(b)(6)

Elizabeth A. McNamara (admitted *pro hac vice*)
Linda J. Steinman (admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY  10020-1104
Telephone: (212) 489-8230
Facsimile: (212) 489-8340
lizmcnamara@dwt.com
lindasteinman@dwt.com

Patrick J. Curran Jr. (VA Bar No. 86144)
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC  20006-3401
Telephone: (202) 973-4200
Facsimile:  (202) 973-4449
patcurran@dwt.com

*Attorneys for Defendant Studio 3 Partners LLC d/b/a EPIX*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................... 1

I.    SUMMARY OF FACTUAL ALLEGATIONS RELEVANT TO THIS MOTION .... 3

    A.    The Parties ........................................................................................................... 3

    B.    VCDL's Statement and the Parties' Responses ................................................... 3

    C.    Plaintiffs' Complaint ........................................................................................... 6

II.   PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS
    TO ALLEGE ACTUAL MALICE ON THE PART OF EPIX ................................... 7

    A.    Under *Iqbal*, Defamation Suits That Fail To Plausibly Plead Actual
        Malice Must Be Dismissed ................................................................................. 8

    B.    Plaintiffs Do Not Plausibly Allege Actual Malice ............................................. 9

        1.    Actual Malice Cannot Be Premised On A Decision Not to Retract
            The Work or Cease Promotion ........................................................... 11

        2.    The EPIX Press Comment Did Not Ratify or Adopt The Allegedly
            False Implication That Plaintiffs Had No Basis for Their Position
            on Universal Background Checks ....................................................... 14

    C.    Plaintiffs Cannot Avoid The Actual Malice Standard Pled In the
        Complaint ........................................................................................................... 19

CONCLUSION ..................................................................................................................... 22

DWT 30761362v10 0098567-000009

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
   367 F.3d 212 (4th Cir. 2004) ................................................................4

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................8

*Besen v. Parents & Friends of Ex-Gays, Inc.*,
   No. 3:12CV204-HEH, 2012 WL 1440183 (E.D. Va. Apr. 25, 2012) ....................20

*Bose Corp. v. Consumers Union of U.S., Inc.*,
   466 U.S. 485 (1984) ..................................................................12, 16

*CACI Premier Tech., Inc. v. Rhodes*,
   536 F.3d 280 (4th Cir. 2008) ......................................................10, 18

*Chapin v. Knight-Ridder, Inc.*,
   993 F.2d 1087 (1993) ......................................................................19

*Cretella v. Kuzminski*,
   No. 3:08-CV-109, 2008 WL 2227605 (E.D. Va. May 29, 2008) ....................20, 22

*D.A.R.E. Am. v. Rolling Stone Magazine*,
   101 F. Supp. 2d 1270 (C.D. Cal. 2000), *aff'd*, 270 F.3d 793 (9th Cir. 2001)..............13, 15, 16

*Dongguk Univ. v. Yale Univ.*,
   734 F.3d 113 (2d Cir. 2013)..............................................................14

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974)......................................................................9, 19

*Harte-Hanks Commc'ns v. Connaughton*,
   491 U.S. 657 (1989)........................................................................9

*Hatfill v. New York Times Co.*,
   416 F.3d 320 (4th Cir. 2005) ...........................................................17

*Hatfill v. New York Times Co.*,
   532 F.3d 312 (4th Cir. 2008) ...........................................................9

DWT 30761362v10 0098567-000009

*Henry v. Nat'l Ass'n of Air Traffic Specialists, Inc.*,
836 F. Supp. 1204 (D. Md. 1993), *aff'd*, 34 F.3d 1066 (4th Cir. 1994) ................................10

*Lerman v. Flynt Distrib. Co.*,
745 F.2d 123 (2d Cir. 1984)................................................................................................12

*McFarlane v. Esquire Magazine*,
74 F.3d 1296 (D.C. Cir. 1996) ...........................................................................................10

*McFarlane v. Sheridan Square Press, Inc.*,
91 F.3d 1501 (D.C. Cir. 1995)...........................................................................2, 12, 13, 14

*Michel v. NYP Holdings, Inc.*,
816 F.3d 686 (11th Cir. 2016) ..........................................................................................8, 9

*New Life Ctr., Inc. v. Fessio*,
229 F.3d 1143, 2000 WL 1157800 (4th Cir. 2000) .............................................................19

*New York Times Co. v. Connor*,
365 F.2d 567 (5th Cir. 1966) ...................................................................................12, 16, 17

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)....................................................................................9, 10, 11, 12, 17

*Parisi v. Sinclair*,
774 F. Supp. 2d 310 (D.D.C. 2011) ...................................................................................12

*Sec'y of State for Defense v. Trimble Navigation Ltd.*,
484 F.3d 700 (4th Cir. 2007) ...............................................................................................4

*Secord v. Cockburn*,
747 F. Supp. 779 (D.D.C. 1990) ........................................................................................12

*St. Amant v. Thompson*,
390 U.S. 727 (1968)............................................................................................................9

**State Cases**

*Gazette, Inc. v. Harris*,
229 Va. 1, 325 S.E.2d 713 (1985)..........................................................................20, 21, 22

*Jenkins v. Liberty Newspapers Ltd.*,
971 P.2d 1089 (Haw. 1999) ..............................................................................................13

*McCleary v. Keesling*,
Nos. CL90-89, CL90-90, 1992 WL 470712 (Va. Cir. Ct. Dec. 1, 1992) ...............................21

*Schaecher v. Bouffault*,
290 Va. 83, 772 S.E.2d 589 (2015)..................................................................................7, 17

**Rules**

Fed. R. Civ. P. Rule 12(b)(6) ................................................................................1, 8, 22

DWT 30761362v10 0098567-000009

Defendant Studio 3 Partners LLC d/b/a EPIX ("EPIX"), a premier entertainment television network and streaming service, respectfully submits this memorandum of law in support of its motion, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the Complaint against it in its entirety with prejudice and without leave to amend. As set forth below, Plaintiffs fail to state a defamation claim against EPIX because they do not plausibly allege actual malice on the part of EPIX. In addition, EPIX joins in the motion filed on behalf of Defendants Katie Couric, Stephanie Soechtig and Atlas Films LLC (the "Atlas Motion"), filed concurrently herewith, and seeks dismissal for the reasons set forth in that motion.

## PRELIMINARY STATEMENT

Plaintiffs are a gun owners' rights advocacy group and two of its executive members who agreed to be interviewed in connection with a documentary film advocating for stricter gun control. The Complaint alleges that Plaintiffs were libeled by the filmmakers' decision to omit their responses to one of several questions posed by Katie Couric and substitute in other footage of them. In their claims against EPIX, Plaintiffs seek to punish the film's distributor for this editorial decision although they do not—and cannot—allege that EPIX played any role in this edit or had any knowledge of it before the film's public release. Because it is a seminal principle of defamation law that the Plaintiffs must plead and prove that each defendant acted with knowledge of falsity or in reckless disregard of the truth at the time of the initial publication or distribution of the work, Plaintiffs' claims against EPIX are fatally flawed and should be dismissed.

Plaintiffs seek to circumvent this fundamental precept by asserting a "ratification" theory that finds no support in the case law. Plaintiffs first allege that EPIX "ratified and adopted" Atlas Film's "misconduct" after it came to light by continuing to distribute and promote the

work.  But under established law, a publisher or distributor's decision not to retract or cease publication of a work does not show actual malice.  "[B]ecause the actual malice inquiry is subjective—that is, concerned with the defendant's state of mind when he acted—the inference of actual malice must necessarily be drawn solely upon the basis of the information that was available to and considered by the defendant prior to publication."  *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1995).  (*See* Section II.B.1, *infra*.)

Plaintiffs' second attempt at "ratification"—based on EPIX's brief post-publication comment to the press supporting the filmmakers' discretion to exercise their "creative and editorial judgment"—fares no better.  No reasonable reader could conclude that EPIX's press comment repeated or adopted any substantive position, and certainly not the defamatory implication that Plaintiffs draw from the film, namely that Plaintiffs had no basis for their position on universal background checks for gun purchasers.  Rather, the statement simply made clear that EPIX, as distributor, was not going to second-guess the filmmakers' creative and editorial choices.  The Complaint also fails to plead any facts that would support the notion that EPIX affirmatively intended or endorsed the allegedly defamatory implication that Plaintiffs had no basis for their position on background checks, as required in a libel-by-implication case.  (*See* Section II.B.2, *infra*.)

Courts have long viewed with hostility claims that seek to penalize distributors for content that they played no role in creating, reasoning that the imposition of liability would turn distributors into censors and limit the free flow of information to the public.  These considerations are entitled to even greater weight here.  No distributor should be forced into the censorial position of having to cease continued distribution of a full-length film simply because it is notified that interviewees object to eight seconds of footage in which they remain silent and

2

appear thoughtful, which footage the distributor could never have detected as being potentially inaccurate prior to release.

In sum, even accepting as true the allegations advanced by Plaintiffs, the Complaint fails to state any claim against EPIX as a matter of law, and should promptly be dismissed, in its entirety, with prejudice.

## I.   SUMMARY OF FACTUAL ALLEGATIONS RELEVANT TO THIS MOTION

### A.   The Parties

This action arises out of the film "Under the Gun" (the "Film").  As the Complaint alleges, the Film was directed by defendant Stephanie Soechtig and produced by defendant Atlas Films LLC.  Defendant Katie Couric served as an executive producer and the narrator of the Film.[1]  The Film premiered to critical acclaim at the Sundance Film Festival in January 2016. (Compl. ¶ 69 n.6.)

Shortly after Sundance, EPIX acquired the right to distribute the Film.  The Complaint alleges that EPIX showed the Film via limited screenings (*Id.* ¶ 53), and in mid-May "published the film" "to a worldwide audience on cable television and for free on" epix.com (*id.* ¶ 54).[2]

### B.   VCDL's Statement and the Parties' Responses

After the Film's public release, on or about May 23, 2016, the President of the Virginia Citizens Defense League ("VCDL"), Philip Van Cleave, released a statement in which he

---

[1] *See* Compl. ¶ 21 ("Defendant Katie Couric is a journalist and author … [and] was the executive producer of—and narrated, produced, edited, and published—*Under the Gun*."); *id.* ¶ 22 ("Defendant Stephanie Soechtig is a filmmaker who … directed, edited, and published *Under the Gun* and the defamatory content related to the VCDL, Hawes, and Webb."); *id.* ¶ 23 ("Defendant Atlas Films LLC … is responsible for *Under the Gun*, and it created and published the false and defamatory footage concerning the VCDL, Hawes, and Webb.").

[2] Although the Complaint makes a brief mention of the distribution of the Film "[t]hereafter" through third-party transactional vendors, such as iTunes (Compl. ¶¶ 97, 121), EPIX had caused the Film to be delivered to third-party transactional vendors weeks prior to the premiere showing on the EPIX's cable channel and epix.com.

3

accused Atlas, Soechtig and Couric of making an inappropriate edit in one of the several scenes featuring an interview with several VCDL members. (Compl. ¶ 78.) More particularly, after the VCDL members expressed opposition to universal background checks, Couric had asked them, "If there are no background checks for gun purchasers, how do you prevent felons or terrorists from walking into, say, a licensed gun dealer and purchasing a gun?" (the "Felons Question"). In his statement, Van Cleave reported that, rather than showing the actual responses that followed, the Film shows a few interviewees sitting silently for about eight seconds. (Compl. ¶¶ 14, 78.) Van Cleave "also posted an unedited audio recording of the exchange between Couric and the VCDL members." (Compl. ¶ 78.) Over the days that followed, a number of niche and mainstream media outlets published articles detailing the VCDL's allegations. (*Id.* ¶¶ 79-81, 91, nn. 13, 15, 17.) The Complaint focuses specifically on a May 25, 2016 article published on CNN's website titled "Katie Couric stands by 'Under the Gun' as director apologizes for misleading edit." (*Id.* ¶ 79 n.13 (hereinafter, the "CNN Article"), annexed hereto as Exhibit A.)[3]

As the lede of the CNN Article makes clear, the article placed the VCDL's allegations in context, and also detailed Soechtig and Couric's responses to the same:

> The director of a new documentary about gun violence says she is sorry for a misleading scene that makes gun rights activists seems stumped by one of interviewer Katie Couric's questions.

---

[3] Plaintiffs' ratification argument is made in reliance on the CNN Article, which is incorporated by reference in, and integral to, the Complaint and may therefore be considered by the Court on a motion to dismiss. *See* Compl. ¶ 79 n.13 (providing hyperlink to CNN Article, http://money.cnn.com/2016/05/25/media/katie-couric-guns-stephanie-soechtig); *see also Sec'y of State for Defense v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (in evaluating a motion to dismiss, the court "may consider documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic") (citation omitted); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) ("[W]e have held that when a defendant attaches a document to its motion to dismiss, a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.") (citation and internal quotation marks omitted).

(*Id.*)  The CNN Article explained that "'Under the Gun,' like many documentaries, comes from a clear point of view.  It highlights the death toll from gun violence in America and questions why more hasn't been done to enact gun safety reforms."  (*Id.*)  It went on to describe both the short complained-of scene in the Film and the substance of the VCDL's concerns:

> Couric, an executive producer of the film, also acts as an interviewer. At a gathering of the Virginia Citizens Defense League, a staunch pro-gun group, she is heard asking this question:
>
> "If there are no background checks for gun purchasers, how do you prevent felons or terrorists from walking into, say, a licensed gun dealer and purchasing a gun?"
>
> The documentary shows the group members quietly looking at Couric, each other and toward the ground, as if no one has an answer to the question. This goes on for about eight seconds, and then there's a transition to an explanation of background checks. …

(*Id.*)  The CNN Article further explained that: "Soechtig and the editors apparently stitched together Couric's question with video from another part of the interview session, when the activists sat quietly."  (*Id.*)

As the CNN Article recounts, Soechtig responded to VCDL's allegations with a statement that acknowledged that the Film was edited such that it did not include an excerpt from any of the VCDL members' responses, but rather incorporated footage from elsewhere in the interview to create a longer "pause."  (*Id.*)  Soechtig explained that "There are a wide range of views expressed in the film . . . .  My intention was to provide a pause for the viewer to have a moment to consider this important question before presenting the facts on Americans' opinions on background checks.  I never intended to make anyone look bad and I apologize if anyone felt that way."  (*Id.*)  The CNN Article reported that Couric issued a public statement indicating that she "support[ed] Stephanie's statement and [is] very proud of this Film." (*Id.*)

5

Lastly, the CNN Article reported that EPIX, "a television network and streaming service," had issued a three-sentence comment responding to the allegations and the statements made by Soechtig and Couric, as follows:

> UNDER THE GUN is a critically-acclaimed documentary that looks at the polarizing and politicized issue of gun violence, a subject that elicits strong reactions from people on both sides. EPIX stands behind Katie Couric, director Stephanie Soechtig, and their creative and editorial judgment. We encourage people to watch the film and decide for themselves.

(*Id.* (hereinafter "EPIX Press Comment").)  Plaintiffs contend that by making this three-sentence statement, EPIX "ratified" the complained-of "conduct" (the edit) and thus adopted the Film's supposed implication that Plaintiffs have no basis for their views on universal background checks for gun purchasers.  (*See, e.g.*, Compl. ¶¶ 24, 79 n.13, 108(p), 111, 132(p), 135.)

The Complaint further alleges that Couric issued a second statement on or about May 30, 2016 in which she acknowledged the omission of the Plaintiffs' responses and provided a transcript of that portion of the interview.  (Compl. ¶ 84.)

### C.    Plaintiffs' Complaint

Not satisfied by Couric's and Soechtig's separate acknowledgements of the edit, or by the widespread press coverage of their statements, Plaintiffs initiated this action on September 13, 2016, seeking compensatory damages of $12 million, plus punitive damages of $350,000 per plaintiff, as well as fees, costs and an injunction prohibiting defendants from further distributing the film.  The Complaint states two duplicative counts against all defendants for defamation (Compl. ¶¶ 94-118) and defamation by implication (*id.* ¶¶ 120-142).  The claims turn on Plaintiffs' repeated allegation that the above-described edit created the false implication "that the VCDL members had been stumped and had no basis for their position on background checks." (Compl. ¶ 6; *see also id.* ¶¶ 15, 63-67, 104, 106-108, 112-14, 132, 136-38.)  In order to satisfy

the required element of "intent" in a libel action, the Complaint pleads that Defendants acted with actual malice.  (Compl. ¶¶ 108, 111, 132, 135.)

## II.     PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO ALLEGE ACTUAL MALICE ON THE PART OF EPIX

Plaintiffs' claims should be dismissed for failure to state a claim for all the grounds set forth in the Atlas Motion, which EPIX joins, and because Plaintiffs fail to plausibly allege actual malice.

*First,* as the Atlas Motion outlines, the Film is not reasonably capable of the defamatory meaning alleged by Plaintiffs and, as reasonably construed, does not rise to the level of being defamatory.  *See Schaecher v. Bouffault*, 290 Va. 83, 92, 772 S.E.2d 589, 594 (2015) (defamation requires that the work "in the common estimation of mankind [] throw contumely, shame, or disgrace upon [the plaintiff]").  (*See* Atlas Motion Section I.)  Further, VCDL's claims also fail as a matter of law on the independent ground that the Film makes no statement about it. (*See* Atlas Motion Section II.)

*Second*, as detailed below, Plaintiffs' claims against EPIX should also be dismissed for failure to state a claim because their "ratification" theory—which is based on EPIX's continued distribution of the Film and its run-of-the-mill press comment expressing support for the filmmakers' editorial discretion—fails to plausibly allege actual malice.   In Virginia, the elements of defamation are: "(1) publication of (2) an actionable statement with (3) the requisite intent."  *Schaecher,* 290 Va. at 91, 772 S.E.2d at 594.  Plaintiffs acknowledge in the Complaint that they have to establish actual malice as the requisite level of intent.  (*See, e.g.*, Compl. ¶¶ 108, 111, 132, 135.)

7

### A.      Under *Iqbal*, Defamation Suits That Fail To Plausibly Plead Actual Malice Must Be Dismissed

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation and internal quotation marks omitted). Determining whether a claim is plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  Where "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.*

"[A]fter *Iqbal* and *Twombly*, every circuit that has considered the matter"—including the Fourth Circuit—"has applied the *Iqbal/Twombly* standard and held that a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice." *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) (citing *Biro v. Condé Nast*, 807 F.3d 541, 544-45 (2d Cir. 2015); *McDonald v. Wise*, 769 F.3d 1202, 1220 (10th Cir. 2014); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013); *Mayfield v. NASCAR, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012); and *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012)).  Indeed, as the Eleventh Circuit explained in *Michel:*

> [A]pplication of the plausibility pleading standard makes particular sense when examining public figure defamation suits. In these cases, there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation. Indeed, the actual malice standard was designed to allow publishers the "breathing space" needed to ensure robust reporting on public figures and events. Forcing publishers to defend inappropriate suits through expensive discovery proceedings in all cases would constrict that breathing space in exactly the manner the actual malice standard was intended to prevent.  The costs and efforts required to defend a lawsuit through that stage of litigation could chill free speech nearly as effectively as the absence of the actual malice standard altogether.

816 F.3d at 702.  Dismissal is warranted here because Plaintiffs' unprecedented ratification theory is patently insufficient to meet their burden of pleading facts sufficient to give rise to a reasonable inference of actual malice.

### B.    Plaintiffs Do Not Plausibly Allege Actual Malice

Plaintiffs' claims against EPIX fail because they do not plausibly allege the requisite level of intent.  The First Amendment mandates that plaintiffs who, as here, are public figures "may recover for injury to reputation only on clear and convincing proof of 'actual malice,'" *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974), a state of mind the Supreme Court has defined as "knowledge [of] fals[ity] or [] reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).  "[A]lthough the concept of 'reckless disregard' cannot be fully encompassed in one infallible definition, . . . the defendant must have made the false publication with a 'high degree of awareness … of probable falsity,' or must have 'entertained serious doubts as to the truth of his publication ...." *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667 (1989) (citations omitted).  Actual malice is a subjective test as to the defendant's knowledge at the time it acted. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *see also Hatfill v. New York Times Co.*, 532 F.3d 312, 317 (4th Cir. 2008) ("The standard

requires that the defendant have a 'subjective awareness of probable falsity' of the publication."). Further, actual malice must be specific as to each defendant. *Henry v. Nat'l Ass'n of Air Traffic Specialists, Inc.*, 836 F. Supp. 1204, 1212 (D. Md. 1993), *aff'd*, 34 F.3d 1066 (4th Cir. 1994). "The standard of actual malice is a daunting one," *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996), but this high barrier to recovery by public figure libel plaintiffs is necessary to ensure that debate on issues of public policy—such as gun violence prevention— remains "uninhibited, robust, and wide-open …." *New York Times Co. v. Sullivan*, 376 U.S. at 270; *see also CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 294 (4th Cir. 2008) (commenting on "the importance of the actual malice standard to a wide-open and vigorous discussion of critical public issues").

Plaintiffs do not—because they could not—assert the traditional argument made in most defamation cases, namely that EPIX had knowledge of falsity or acted in reckless disregard of the truth when it released the Film. Indeed, Plaintiffs admit that EPIX played no role in the creation or editing of the Film. (*See, e.g.*, Compl. ¶¶ 11, 21-24, 28, 32, 43-49, 108, 132.) And Plaintiffs make no claim that, prior to the objection lodged by VCDL's president on May 23, 2016, EPIX had any knowledge of the edit at issue. Thus, there are no facts pled that could conceivably support actual malice at the time the Film was released.[4]

---

[4] At times, the Complaint uses the term "Defendants" in a sloppy fashion, implying that each of the named defendants was an active participant in each act alleged in the Complaint. But by comparing Paragraphs 111 and 135 (the allegations specific to EPIX) and Paragraphs 108 and 132 (the sum total of the actual malice allegations), it becomes clear that Plaintiffs are referring almost entirely to actions by other defendants in these general references to "Defendants." *See, e.g.*, Compl. ¶¶ 59-61; *id.* ¶¶ 108(a-h) & 132(a-h) (taking issue with conduct prior to and during the filming of the interview at issue); *id.* ¶¶ 108(h) &132(h) (alleging that film used dark and shadowy room to "portray VCDL members as sinister and untrustworthy"); *id.* ¶¶ 108(f) & 132(f) (alleging that other defendants "surreptitiously recorded b-roll footage in order to use it to misrepresent [Plaintiffs'] perspectives in the film."); *id.* ¶¶ 108(k) &132(k) (alleging that Atlas told VCDL that they would have an opportunity to preview the Film, but then didn't follow

Rather, Plaintiffs pin their theory of actual malice solely on a post-release ratification argument, alleging that:

> EPIX knowingly and intentionally ratified and adopted Couric's, Soechtig's and Atlas Films' misconduct when, even after the unedited audio of the VCDL interview was released and the films' executive produced admitted that the footage of the VCDL was misleading and inaccurate – EPIX: (1) publicly announced that it was standing by the filmmakers' editing choices; (2) continued to publish and promote the film including the defamatory exchange; and (3) exploited the media firestorm surrounding the controversy to promote the film.

(Compl. ¶¶ 111, 135; *see also id.* ¶¶ 24, 79, 108(p), 132(p).)  While Plaintiffs couch this as three points, it is really two:  (1) EPIX continued to distribute and promote the Film, allegedly taking advantage of the media storm, after the edit came to light; and (2) the EPIX Press Comment purportedly ratified the alleged misconduct.  As set forth below, both points fail as a matter of law.

### 1.    Actual Malice Cannot Be Premised On A Decision Not to Retract The Work or Cease Promotion

Under long-standing principles of defamation law, Plaintiffs cannot premise actual malice on the allegation that, after the edit came to light, EPIX "continued to publish and promote the Film," "taking advantage of the media storm."[5]  In case after case, beginning with *New York Times Co. v. Sullivan*, courts have rejected attempts to use a later failure to retract or correct an allegedly defamatory statement, or other similar "ratification" theories, to do an end run around the seminal principle that actual malice focuses solely on the distributor's subjective

---

through, allegedly because Defendants did not want to give "VCDL the opportunity to realize and publicize that fact that the film was misleading … prior to the film's release").

[5] Notably, the Complaint does not allege that any of EPIX's promotional materials, in and of themselves, contained false and defamatory statements regarding Plaintiffs.

state of mind and the facts and information available to the distributor before he acted.  376 U.S. at 286.

As the U.S. Supreme Court established in *New York Times Co. v. Sullivan*, and its progeny, actual malice must be shown "at the time of the publication."  376 U.S. at 286; *see also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984) (evidence must establish that defendant "realized the inaccuracy at the time of publication").[6]  "[B]ecause the actual malice inquiry is subjective—that is, concerned with the defendant's state of mind when he acted—the inference of actual malice must necessarily be drawn ***solely upon the basis of the information that was available to and considered by the defendant prior to publication [or distribution].***"  *McFarlane*, 91 F.3d at 1508 (emphasis added);  *Secord v. Cockburn*, 747 F. Supp. 779, 792-93 (D.D.C. 1990) ("[I]t is hornbook libel law that post-publication events have no impact whatever on actual malice as it bears on this lawsuit since the existence or non-existence of such malice must be determined as of the date of publication."); *Parisi*, 774 F. Supp. 2d at 321 ("[P]ost-publication/post-distribution correspondence cannot establish a dispute as to actual malice.").

In accord with these fundamental constitutional principles, courts repeatedly have rejected efforts to use a defendant's decision not to retract or correct a published statement later learned to be erroneous to establish actual malice and thus to ground a libel claim.  *See New York Times Co.*, 376 U.S. at 286 (*New York Times*' failure to retract false statement did not constitute

---

[6] The law is the same for both publishers and distributors.  As one court explained:  "Our Circuit's precedent [] requires that actual malice by a *publisher* exist at the time of publication. Obviously that requirement can be no *less* stringent for a distributor."  *Parisi v. Sinclair*, 774 F. Supp. 2d 310, 320-21 (D.D.C. 2011).  If anything, courts have expressed particular concern about cases that seek to penalize distributors based on the substance of the content that they make available, but did not themselves create.  *See*, *e.g.*, *id.* at 318-20; *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 139-41 (2d Cir. 1984).

12

actual malice).   The Fifth Circuit in *New York Times Co. v. Connor* rejected just such an argument, holding that, "[t]he Supreme Court in *Sullivan* specifically held that 'failure to retract … is … not adequate evidence of actual malice for constitutional purposes …' and expressed doubt about 'whether or not a failure to retract may ever constitute such evidence.'"   365 F.2d 567 (5th Cir. 1966); *see also Anderson v. Rocky Mountain News*, 15 Media L. Rptr. 2058, 2060 (10th Cir. 1988) (affirming district court's finding that "defendants' refusal to retract the statement does not show malice"); *D.A.R.E. Am. v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270, 1287 (C.D. Cal. 2000) ("There is no authority to support Plaintiffs' argument that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast after publication."), *aff'd*, 270 F.3d 793 (9th Cir. 2001); *Jenkins v. Liberty Newspapers Ltd.*, 971 P.2d 1089, 1099 (Haw. 1999) (holding that failure to promptly retract is not adequate evidence of actual malice because, "'It is proof of guilty knowledge prior to publication that demonstrates that the First Amendment immunity does not apply'") (citation omitted).

In *McFarlane*, the D.C. Circuit likewise held that a book publisher's failure to retract or insert corrections in further distributions of a book after a section was "thoroughly discredited" post publication was not evidence of actual malice.   91 F.3d at 1515.   Unlike the facts and circumstances alleged here, the defendant book publisher had been highly involved in the story from its inception, and knew that others had questioned the credibility of the source that the author had relied on in making the challenged statements.   *Id.* at 1511-12.   It was not until four months after initial publication, however, that a government investigation determined that there was "no credible evidence" to support the source's story.   *Id.* at 1513.   The court held that these after-discovered facts were irrelevant to the issue of actual malice, which focuses on the facts

13

available to the defendant "before [it] published [the Book]," stating that "we [are] aware of [no authority] for the proposition that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast after publication." *Id.* at 1515.[7]

As these cases plainly illustrate, no legal obligation compelled EPIX to cease distributing the Film or stop promoting it after the edit at issue was publicly identified—and its failure to do so cannot be used to retroactively establish actual malice. Indeed, from a public policy perspective, it would significantly impair the free flow of speech if every publisher and distributor were required to cease continued distribution of a work on an important topic of pressing public concern because of editorial choices involving eight seconds of a film, or eight words in a book or magazine.

In sum, Plaintiffs cannot premise liability on this discredited theory.[8]

### 2. The EPIX Press Comment Did Not Ratify or Adopt The Allegedly False Implication That Plaintiffs Had No Basis for Their Position on Universal Background Checks

Plaintiffs' attempt to premise liability on the EPIX Press Comment should likewise be rejected. Critically, Plaintiffs do not contend that the EPIX Press Comment, on its face,

---

[7] While a small number of state courts have considered a failure to correct an earlier misstatement as circumstantial evidence suggestive of "reckless disregard of the truth" prior to publication, such an approach is contrary to the weight of authority and "has only been applied in circumstances where there was some evidence of actual malice at the time the statements were made." *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 126 (2d Cir. 2013) (rejecting plaintiff's argument that Yale's failure to expeditiously correct its earlier misstatement "provides any further support that any official at Yale acted with actual malice."). Here, there are no such allegations that EPIX, as the distributor, had any awareness of the contested edit at the time of the Film's initial public release.

[8] These same legal principles regarding post-publication events likewise doom Plaintiffs' effort to ground actual malice on their allegations that when Katie Couric issued a "Message" on May 30, 2016 regarding the edit, she included only a truncated portion of the VCDL responses. (*See* Compl. ¶¶ 80-89.) Such post-publication actions cannot demonstrate knowledge of falsity prior to initial publication of the Film—especially by EPIX. Moreover, as the Court can see from comparing Paragraphs 37-40 of the Complaint to Couric's Message (Compl. Ex. 4), Couric's Message included the full response to the Felons Question up through her next question.

contained any false and defamatory statements about the Plaintiffs.  Rather, the Complaint's sole theory is that the EPIX Press Comment "ratified" the "misconduct" of the other defendants and that by "ratifying" the "misconduct," EPIX should be deemed to have endorsed or adopted the Film's allegedly false and defamatory implication, namely "that the VCDL members had been stumped and had no basis for their position on background checks."  (Compl. ¶ 6.)

As a preliminary matter, there is a fundamental flaw in Plaintiffs' argument because the Film itself cannot be reasonably construed to imply that the VCDL members had no basis for their position on background checks of gun owners.  As further explained in the Atlas Motion, Plaintiffs are depicted in the Film replying at length to a question from Couric on universal background checks, clearly stating the basis for their objections to such measures.  (*See id*. § I.) The contested edit instead followed Couric's later, much narrower, and challenging public policy question, namely "If there are no background checks for gun purchasers, how do you prevent felons or terrorists from purchasing a gun?"  (Compl. ¶ 1 & Ex. 1; *see also* Ex. A hereto.)  If the Film itself is not capable of the allegedly defamatory implication that Plaintiffs had no basis for their opposition to universal background checks, then EPIX's brief Press Comment expressing support for the filmmakers' editorial discretion certainly cannot carry that implication.

Further, Plaintiffs' ratification theory finds no support in the law, and rests on a highly strained, unreasonable reading of the Press Comment.  As a legal matter, courts have routinely rejected ratification arguments that rely on a defendant's post-release statements, with the possible exception of those that specifically restate or append the allegedly libelous statement.[9]

---

[9] Where the alleged falsity is discovered post-publication, in some limited circumstances courts have suggested that liability may be found where a defendant expressly restates and reaffirms the allegedly defamatory statements, or attaches the allegedly libelous material to a new publication. Whether or not those cases are correctly decided, those facts are not present here. *See, e.g.*, *D.A.R.E. Am.*, 101 F. Supp. 2d at 1287 (finding editor's note did not evidence actual malice

*D.A.R.E. Am.* is instructive.   There, the plaintiff took issue with a series of eight statements critical of its organization in a magazine article, some of which were later shown to be fabrications invented by the reporter.   To support its position on actual malice, the plaintiff pointed to two *Rolling Stone* editor's notes, the first of which noted that the reporter's "accuracy had come into question, and that *Rolling Stone* was re fact-checking [sic] his work, but had found nothing to contradict the essence of" the allegations in the article.   101 F. Supp. 2d at 1286.   A second editor's note again reaffirmed the gist of the article, but noted that certain statements had been found to be fabrications and set forth three such factual allegations.   *Id.*   The plaintiff pressed a ratification theory, arguing that "*Rolling Stone* further libeled D.A.R.E. in the Editor's Notes by 'acknowledging that only three specific threats were invented,' and thus 'purposely conveyed to its readers that the remainder of the 1998 Article was truthful, accurate, and documented....'"   *Id.* at 1276, 1286-87.   Even on these facts, the court applied the precedent described above and dismissed plaintiff's attempt to use "grave doubt ... cast after publication" and general statements defending the article as evidence of actual malice when *Rolling Stone* released the story.   *Id.* at 1287. [10]   The court further rejected any argument based on ratification, noting that "[n]either Note republished or referred to any of the statements Plaintiffs allege are libelous."   *Id.*

---

where it reaffirmed the accuracy of the "gist" of the article, but did not "republish[] or refer[] to any of the statements Plaintiffs allege are libelous").

[10] *Bose Corp.* presents a different although analogous situation.   There, after clear evidence had established that an article contained a false statement of fact and after plaintiff had brought suit, the defendant "refused to admit [that the article contained any false statements] and steadfastly attempted to maintain that no mistake had been made—that the inaccurate was accurate."   466 U.S. at 512.   The Court rejected the plaintiff's attempt to use the writer's after-the-fact "rationalization" and "attempt[s] to defend [himself]" as evidence of knowledge of falsity or reckless disregard for the truth, finding them incapable of establishing that "he realized the inaccuracy at the time of publication."   *Id.*

Similarly, *New York Times Co. v. Connor*, 365 F.3d 567 (5th Cir. 1966), also concerned an article that came under fire after publication.  In an editor's note, *The New York Times* stated that "[s]hould further investigation by The Times indicate that any statement in [the Article] is incorrect or inaccurate in any respect, The Times will publish an appropriate correction."  365 F.2d at 575.  No correction was published.  The plaintiff then attempted to argue actual malice based on *The New York Times*' failure to correct after promising to do so, given that it was then on "notice of falsity."  *Id.*  The court again rejected this argument under the fundamental principles regarding actual malice established in *New York Times Co. v. Sullivan*.  *Id.* at 576-77.

For similar reasons, the EPIX Press Comment cannot bear the enormous weight that Plaintiffs seek to place on that brief, three-sentence remark.  First, as earlier explained, post-publication actions cannot show actual malice at the time EPIX began to distribute the film.  Second, no reasonable reader could conclude that the EPIX Press Comment ratifies or adopts the alleged implications in the Film that Plaintiffs were stumped by the Felons Question and had no basis for their views on universal background checks.   When assessing the meaning of a statement, "the publication must be taken as a whole" and viewed from the perspective of a reasonable reader.  *Schaecher*, 290 Va. at 93-94, 772 S.E.2d at 595 (quoting *Farah v. Esquire Magazine*, 736 F.3d 528, 535 (D.C. Cir. 2013) ("[T]he publication must be taken as a whole, and in the sense in which it would be understood by the readers to whom it was addressed.")).  And evaluation of this issue is a question of law for the court to decide.  *Hatfill v. New York Times Co.*, 416 F.3d 320, 330 (4th Cir. 2005) ("The question whether a statement is capable of having a defamatory meaning is a question of law to be decided by the court.").

Viewed in context, it is clear that the EPIX Press Comment was nothing more than a general statement of support for the Film's creators and their exercise of creative and editorial

judgment—and not an endorsement or ratification of the allegedly false implications that Plaintiffs contend the edit creates. As the many press citations in the Complaint suggest, VCDL's allegations sparked intense national media coverage, much of which was critical of the editorial decision at issue. The Complaint does not and could not plead that EPIX (or any other defendant) denied that the VCDL members' verbal responses to Couric's Felons Question had not been included in the film, or that the film incorporated other footage to lengthen the pause— indeed, that was both acknowledged and widely-reported. In fact, the CNN Article that is the sole cite in the Complaint for the EPIX Press Comment begins with an acknowledgement by Soechtig that she is "sorry for a misleading scene that makes gun rights activists seem stumped by one of the interviewer Katie Couric's question." (*See* Ex. A, hereto; *see also* Compl. ¶ 79 n.13 (linking to same).) Thus, as the CNN Article makes plain, the only reasonable reading of the EPIX Press Comment is that EPIX was merely standing behind Couric's and Soechtig's "creative and editorial judgment" to omit the Plaintiffs' actual responses and "provide a pause for the viewer to have a moment to consider this important question" (*id.*)—rather than in any way suggesting the Plaintiffs made no response to the Felons Question or had no basis for their opposition to universal background checks. Indeed, by definition, the phrase "editorial judgment" suggests that something was edited.

Further, the invitation to "people to watch the film and decide for themselves" only makes sense as an invitation to viewers to form their own opinion about the filmmakers' creative decision to create a pause rather than including a verbal response. (*Id.*) [11] In short, EPIX was

_____

[11] Of course, any view on the propriety of the edit is protected opinion, not a statement of fact, under settled libel law. *See, e.g.*, *CACI*, 536 F.3d at 293-94. The media stories surrounding the VCDL's contentions centered around opinions on that very issue—both for and against. Whether a statement can reasonably be interpreted as stating facts about an individual, as opposed to opinion, is a question of law for the Court. *Id.* (citing *Hatfill*, 416 F.3d at 330).

merely recognizing that filmmakers are in the best position to make discretionary creative editorial decisions. The EPIX Press Comment cannot be reasonably read to ratify the allegedly false implications pled in the Complaint and accordingly cannot serve as the basis for a claim against EPIX.

Finally, the Complaint does not plead facts to support the notion that EPIX, in issuing the Press Comment, affirmatively intended or endorsed the alleged inference that Plaintiffs were stumped by the Felons Question and had no basis for their views on universal background checks.  As the Fourth Circuit established in *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092-93 (1993):  "[B]ecause the constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true.  The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference." (footnote omitted).  Here, both of Plaintiffs' claims against EPIX are defamation-by-implication claims.  Plaintiffs baldly allege that EPIX "knowingly and intentionally" ratified Couric's and Soechtig's "misconduct" in the EPIX Press Comment, but that is not sufficient.  (*See* Compl. ¶¶ 111, 135.) The Complaint pleads no ***facts*** that affirmatively suggest that EPIX intended or endorsed any alleged defamatory inference.  The Constitution demands more.  On this ground as well, the Complaint should be dismissed.

## C.      Plaintiffs Cannot Avoid The Actual Malice Standard Pled In the Complaint

Faced with their fatally-flawed claims against EPIX, Plaintiffs may argue that they need not plead actual malice—and thus should be permitted to amend their complaint.  Any such contention should be rejected, for multiple reasons.  Based on their pleadings, it is apparent why Plaintiffs pled actual malice—and only actual malice—as the applicable standard of fault.  They readily appear to be public figures. As the pleadings indicate, Plaintiffs have "thrust themselves

19

to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345; *see also New Life Ctr., Inc. v. Fessio*, 229 F.3d 1143, 2000 WL 1157800 (4th Cir. 2000) (Table) (*per curiam*); *Besen v. Parents & Friends of Ex-Gays, Inc.*, No. 3:12CV204-HEH, 2012 WL 1440183, at *1 (E.D. Va. Apr. 25, 2012).[12]  As self-described public figures, Plaintiffs should not be permitted to abandon their pleading in an effort to avoid the actual malice standard.

But even if they were private figures, Plaintiffs still would be required to plead actual malice here.  When the Supreme Court of Virginia adopted a negligence standard for private figures, it did so with an important caveat, stating in pertinent part that:

> The application of this negligence standard is expressly limited, however, to circumstances where the defamatory statement makes substantial danger to reputation apparent.  The trial judge shall make such determination as a matter of law.  If, on the other hand, no substantial danger to reputation is apparent from the statement in issue, *New York Times* malice must be established to recover compensatory damages.

*Gazette, Inc. v. Harris*, 229 Va. 1, 15, 325 S.E.2d 713, 725 (1985); *see also Cretella v. Kuzminski*, No. 3:08-CV-109, 2008 WL 2227605, at *9 (E.D. Va. May 29, 2008) ("In *Harris*, the Virginia Supreme Court held that the negligence standard applies *only* if the allegedly

---

[12]  As the Complaint alleges, VCDL is a public advocacy organization: "a non-partisan, grassroots organization dedicated to advancing the rights of responsible gun owners under the Second Amendment and the Virginia Constitution.  Founded in 1994, VCDL's stated mission is 'Defending Your Right to Defend Yourself.'  …  VCDL also lobbies lawmakers in Virginia at state and local levels to oppose anti-Second Amendment measures, and it opposes universal background checks." (Compl. ¶¶ 18, 113, 137.)  Plaintiff Patricia Webb "is a longtime Executive Member of VCDL" and a member of its Board of Directors.  She owns and operates Gadsden Guns, Inc., which "has partnered with the VCDL to promote legislation protecting the right to bear arms and to educate the public about issues relating to Second Amendment Rights." (Compl. ¶ 19.)  As for Plaintiff Daniel L. Hawes, "[f]or years, [he] has been an Executive Member of the VCDL and a member of the VCDL Legal Advisory Council;" he is an attorney who "practices litigation involving firearms and personal defense;" and he has "represented individuals and gun stores against attacks from anti-gun activists."  (Compl. ¶ 20.)

DWT 30761362v10 0098567-000009

defamatory statement 'makes substantial danger to reputation apparent'; otherwise, the plaintiff must show that the defendant acted with 'actual malice,' as the United States Supreme Court explicated that concept in *New York Times Co. v. Sullivan*.").

"The threshold determination to be made by a trial judge on the question whether there is substantial danger to reputation apparent from the content of a publication resembles the determination traditionally made by the court on the question whether a statement is libelous *per se*." *Gazette, Inc.*, 229 Va. at 22-23, 325 S.E.2d at 729. That is, the "trial judge must decide, viewing the circumstances objectively, whether a reasonable and prudent editor should have anticipated that the words used contained an imputation necessarily harmful to reputation." *Id*. "What must be apparent from the statement is not just *a* danger to reputation but a *substantial* danger to reputation." *McCleary v. Keesling*, Nos. CL90-89, CL90-90, 1992 WL 470712, at *2 (Va. Cir. Ct. Dec. 1, 1992).

Here, there is nothing about the scene at issue in the Film that would have made substantial danger to Plaintiffs' reputation apparent to EPIX. The 8-second moment in the Film flashes by extremely quickly. Moreover, there is nothing about Plaintiffs' ruminative silence in response to an extremely difficult public policy question—how the country will be able to keep guns out of the hands of terrorists and felons without universal background checks—that would set off the alarm bells for substantial reputational damage. In fact, in the scene, it is unclear whether Plaintiffs were simply composing their responses or were perhaps waiting for one of the other VCDL members to answer first. One could at most fairly characterize these few seconds in the Film as "confusing [and] unclear"—"conditions which ordinarily would not create defamatory potential." *Gazette, Inc.*, 229 Va. at 23, 325 S.E.2d at 730. Further, as detailed in the Atlas Motion, the edit does not impact Hawes and Webb in their stated professions. (Atlas

21

Motion § I.)  Likewise, as detailed in the Atlas Motion, it is a leap to argue that the reactions of the handful of VCDL members to Couric's question would cause substantial danger of reputational harm to the VCDL organization.  (*Id.* § I.)  In sum, this situation is akin to those cases in which the Virginia courts have required a showing of actual malice rather than those requiring mere negligence.[13]

For all these reasons, Plaintiffs' claims against EPIX should be dismissed with prejudice.

## CONCLUSION

For the reasons set forth above, defendant Studio 3 Partners LLC d/b/a EPIX respectfully requests that this Court dismiss all claims against it with prejudice pursuant to Fed. R. Civ. P. Rule 12(b)(6).

Dated: New York, New York
      November 29, 2016        Respectfully submitted,

                    DAVIS WRIGHT TREMAINE LLP

                    /s/ Elizabeth A. McNamara
                    Elizabeth A. McNamara (admitted *pro hac vice*)
                    Linda J. Steinman (admitted *pro hac vice*)

                    1251 Avenue of the Americas, 21st Floor
                    New York, NY  10020
                    Telephone: (212) 489-8230
                    Facsimile: (212) 489-8340
                    Email: lizmcnamara@dwt.com
                    Email: lindasteinman@dwt.com

---

[13] *Compare id.* (finding a "substantial danger to the reputation of the plaintiffs, would **not** have been apparent to a reasonable and prudent editor exercising ordinary care" where letter to editor "wonder[ed]" and "asks a question which might be interpreted as an indirect statement that the plaintiff teacher had a drug problem") *with Gazette, Inc.*, 229 Va. at 22-23, 325 S.E.2d at 729 (applying negligence standard to statements that, on their face, accused plaintiffs of the crimes of "aggravated sexual battery," "fornication," or murder); *see also Cretella*, 2008 WL 2227605, at *9-10 (applying negligence standard to statements that, on their face, accused plaintiff-attorney of the crime of extortion and of "breaking the law and rules of professional ethics").

/s/ Patrick J. Curran Jr.
Patrick J. Curran Jr., Esq. (VA Bar No. 86144)

1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC  20006-3401
Telephone: (202) 973-4200
Facsimile:  (202) 973-4449
Email:  patcurran@dwt.com

*Attorneys for Defendant Studio 3 Partners LLC d/b/a EPIX*

23

# EXHIBIT A

DWT 30761362v10 0098567-000009

# Katie Couric stands by 'Under the Gun' as director apologizes for misleading edit

 by Brian Stelter  @brianstelter

May 25, 2016: 6:15 PM ET

   

Social Surge - What's Trending

Patagonia's B
Friday sales h
million -- and
donate it all

The U.K.'s nev
money has a s
ingredient: An

Obamacare c
Trump's pick t
secretary



Katie Couric and Stephanie Soechtig

The director of a new documentary about gun violence says she is sorry for a misleading scene that makes gun rights activists seem stumped by one of interviewer Katie Couric's questions.

"I never intended to make anyone look bad and I apologize if anyone felt that way," director Stephanie Soechtig said after conservative blogs and media outlets exposed the editing.

Epix, the distributor of the documentary, "Under the Gun," defended Soechtig and Couric's work and urged people to watch it for themselves. But the National Rifle Association cited the controversy as proof that the documentary is a "fraud," and conservative groups seized on it as a powerful illustration of liberal media bias.

Others quickly weighed in. Washington Post media critic Erik Wemple said the edit was "just plain wrong."

"Under the Gun," like many documentaries, comes from a clear point of view. It highlights the death toll from gun violence in America and questions why more hasn't been done to enact gun safety reforms.

Related: Katie Couric is renewing her Yahoo contract

Couric, an executive producer of the film, also acts as an interviewer. At a gathering of the Virginia Citizens Defense League, a staunch pro-gun group, she is heard asking this question:





Advertisement

Newsletter

"If there are no background checks for gun purchasers, how do you prevent felons or terrorist from walking into, say, a licensed gun dealer and purchasing a gun?"

The documentary shows the group members quietly looking at Couric, each other and toward the ground, as if no one has an answer to the question. This goes on for about eight seconds, and then there's a transition to an explanation of background checks.

The documentary had its TV premiere on May 15. One week later, the Ammoland blog published the audio from the group interview, demonstrating that the activists started responding to Couric's question right away.

**Related: New surge in gun background checks reported by FBI**

In the documentary, Ammoland said, "The clear implication is that none of the group had an answer for that question and was being evasive and avoiding eye contact. The truth is... that the group responded to Katie immediately, with answers to her question! Yet the video shows no one responding."

Ammoland's Monday blog post was amplified by the Washington Free Beacon web site on Wednesday. That's when Soechtig and Couric apparently became aware of the online controversy.

Most of the reactions centered on Couric, who is already distrusted by many conservatives. One conservative group, the Independent Women's Forum, issued a statement that compared her to "serial fabricator Brian Williams" and said she "should be fired."

But Soechtig indicated that she, not Couric, had editorial control. In a statement Wednesday afternoon, Soechtig explained the edit this way: "My intention was to provide a pause for the viewer to have a moment to consider this important question before presenting the facts on Americans' opinions on background checks."

**Related: Gun sales surge 26% at Sturm Ruger**

Soechtig and the editors apparently stitched together Couric's question with video from another part of the interview session, when the activists sat quietly.

While documentaries are not necessarily held to the same standards as television newscasts, the edit left viewers with the clear impression that the activists had no idea what to tell Couric.

Couric also issued a statement on Wednesday afternoon. She said, "I support Stephanie's statement and am very proud of the film."

Epix — a television network and streaming service — said that it "stands behind Katie Couric, director Stephanie Soechtig, and their creative and editorial judgment. We encourage people to watch the film and decide for themselves."

As the controversy erupted, Epix promoted ways to watch the documentary for free on the web.

CNNMoney (New York)
First published May 25, 2016: 6:15 PM ET



RELIABLE SOUR

Big personalities. Big controve
exclusives.

Sign up for the tip sheet of the media i
brought to you by Brian Stelter, Dylan B
the best media team in the business.

Enter email address

**Subscribe** ›

**Paid Content**



Brooklinen Sh
Always Feel Li
Cool Side of th
Apartment Therapy |



Try Not To Gas
You See What
Bernadette Pe
TomorroWoman



15 best laptop
can buy in 20:
Tech Radar



How To Fix Yo
Fatigue (Do Th
Day)
EnergyAtAnyAge.cor

**CNNMoney Sponsors**

We don't Nickel and Dime

**Partner Offers**



How 1 Man Tur
$50,000 into $
Million
(Investing Daily)



Rates are goin
Refinance befo
too late!
(GuideToLenders.com)

10 Of The Best

CNN Money  U.S. ›    Business  Markets  Tech  **Media**  Personal Finance  Small Biz  Luxury    stock tickers



Forget REITs. Invest in Real Estate with Crowdfunding
RealtyShares



Homeowners Born Before 1985 Are Getting a Huge Reward
FetchRate



Don't Spend a Fortune on a Car: The 10 Most Affordable Vehicles of 2016
Kelley Blue Book

NextAdvisor

Transferring your balance to a month 0% APR is ingenious

7 outrageous credit cards if y excellent credit

A proven method to stop pay credit card interest

Jaw-dropping cards charging interest until 2018

The 10 best balance transfer cards of 2016



Low Testosterone Symptoms and Treatments
Yahoo Search

How To: Fix Crepey Skin [Watch]
Health Headlines



A Look at the Personal rag & bone Style of Actor Mark Hamill
rag & bone Official

## Paid Content

Stop Eating These 'Digestive Destroyers' *Probiotic America*

Forget Botox. Vogue Just Voted This Skincare Device A "Game-Changing" Product To Own in 2015 *FabOverFifty.com*

The Overall Best Buy 2017 Cars According to Kelley Blue Book *Kelley Blue Book*

Economist Warns "This is Just the Beginning" *Economy and Markets*

## More from CNN Money

Russell 2000 Index - CNNMoney.com

Billion Dollar Startups

Here's the salary you need to afford a home in these 27 cities

This Is Birth with Lisa Ling

Recommended by Outbrain

Paid Links

1. 5% INTEREST SAVINGS ACCOUNT  >
2. BEST SAVINGS ACCOUNT RATES  >
3. RETIREMENT ANNUITY RATES  >
4. REVERSE MORTGAGE CALCULATOR  >
5. TOP RATED MEDICARE PLANS  >
6. HIGH INTEREST CD RATES  >
7. DENTAL PLANS FOR SENIORS  >
8. TOP 5 SHARES TO BUY  >



A GOOD HOLIDAY SWEA IS HARD TO FIN GOOD BOOTS AREN'T.

SHOP NOW

Justin

Advertisement

**CNN** Money

**Content**

Contact Us

Advertise with Us

Business

Markets

**CNN** Money   U.S. +

**Tools**

Site Map

Interactive

**Connect**

Loan Center

Calculators

Personal Finance

Small Business

My Account

Mobile Site & Apps

YouTube

RSS Feed

Business   Markets   Tech   Media   Personal Finance   Small Biz   Luxury

stock tickers

Tech

Video

News Alerts

LinkedIn

Most stock quote data provided by BATS. Market indices are shown in real time, except for the DJIA, which is delayed by two minutes. All times are ET. Disclaimer. Morningstar: © 2016 Mornings Rights Reserved. Factset: FactSet Research Systems Inc. 2016. All rights reserved. Chicago Mercantile Association: Certain market data is the property of Chicago Mercantile Exchange Inc. and

All rights reserved. Dow Jones: The Dow Jones branded indices are proprietary to and are calculated, distributed and marketed by DJI Opco, a subsidiary of S&P Dow Jones Indices LLC and have been licensed for use to S&P Opco, LLC and CNN. Standard & Poor's and S&P are registered trademarks of Standard & Poor's Financial Services LLC and Dow Jones is a registered trademark of Dow Jones Trademark Holdings LLC. All content of the Dow Jones branded indices © S&P Dow Jones Indices LLC 2016 and/or its affiliates.

© 2016 Cable News Network. A Time Warner Company. All Rights Reserved. Terms under which this service is provided to you. Privacy Policy.   AdChoices



CNN Money    U.S. +    Business    Markets    Tech    **Media**    Personal Finance    Small Biz    Luxury    stock tickers

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of November 2016, I electronically filed the foregoing memorandum of law and its accompanying Exhibit A with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following counsel of record:

> Elizabeth Marie Locke
> libby@clarelocke.com
> Megan Lambart Meier
> megan@clarelocke.com
> Thomas Arthur Clare
> tom@clarelocke.com
> CLARE LOCKE LLP
> 902 Prince Street
> Alexandria, VA  22314
>
> *Counsel for Plaintiffs*

/s/ Patrick J. Curran, Jr.
    Patrick J. Curran, Jr.

25