UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

VIRGINIA CITIZENS DEFENSE LEAGUE,
DANIEL L. HAWES, ESQ., and PATRICIA
WEBB,

                   Plaintiffs,

      v.

KATIE COURIC, STEPHANIE SOECHTIG,
ATLAS FILMS LLC, and STUDIO 3 PARTNERS,
LLC d/b/a EPIX,

                 Defendants.

No. 3:16cv757-JAG

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE
## MOTION TO DISMISS FILED BY ATLAS FILMS, LLC AND KATIE COURIC

Thomas A. Clare (VSB # 39299)
Elizabeth M. Locke (VSB # 71784)
Megan L. Meier (VSB # 88720)
CLARE LOCKE LLP
902 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: tom@clarelocke.com
Email: libby@clarelocke.com
Email: megan@clarelocke.com

*Attorneys for Plaintiffs*
*Virginia Citizens Defense League,*
*Daniel L. Hawes, Esq., and*
*Patricia Webb*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... i

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ............................................................................................................................. 2

I.     THE EXCHANGE IS REASONABLY CAPABLE
OF A DEFAMATORY  MEANING. ............................................................................... 2

     A.     Falsely Portraying People as Ridiculous and Incompetent in Relation to  Their
Businesses or Professions Is Defamatory *Per Se*......................................................2

     B.     The Exchange Is Defamatory Because It Holds the Plaintiffs up to Ridicule,
Conveys That They Are Unfit and Incompetent to Perform Their Duties as
Second Amendment Activists and in Their Professions, and Prejudices Them in
Their Businesses. ....................................................................................................5

     C.     The Exchange Is Reasonably Capable of the Defamatory Meaning That the
Plaintiffs Have No Basis for Opposing Background Checks. ...............................13

     D.     Even if the Exchange Is Not Reasonably Capable of the Defamatory Meaning
That the Plaintiffs Have No Basis for Opposing Background Checks, It Is
Reasonably Capable of the Other Three Defamatory Meanings Alleged in the
Complaint...............................................................................................................15

     E.     The Complaint Sufficiently Alleges a Claim for Defamation and, in the
Alternative, a Claim for Defamation by Implication. ...........................................15

II.     THE DEFAMATORY EXCHANGE IS OF AND CONCERNING THE VCDL........... 17

CONCLUSION........................................................................................................................ 22

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Pages**

*Afftrex, Ltd. v. Gen. Elec. Co.*,
    555 N.Y.S.2d 903 (N.Y. 3d Dep't 1990) ........................................................................ 22

*AIDS Counseling & Testing Ctrs. V. Grp. W Television, Inc.*,
    903 F.2d 1000 (4th Cir. 1990) ..................................................................................... 21

*Andrews v. Va. Union Univ.*,
    No. 3:07CV447, 2008 WL 2096964 (E.D. Va. May 16, 2008)........................................ 4

*Battle v. A&E Television Networks, LLC*,
    837 F. Supp. 2d 767 (M.D. Tenn. 2011) ......................................................................... 5

*Bay Tobacco, LLC v. Bell Quality Tobacco Prod., LLC*,
    261 F. Supp. 2d 483 (E.D. Va. 2003) ................................................................... 3, 9, 14

*CACI Premier Tech., Inc. v. Rhodes*,
    536 F.3d 280 (4th Cir. 2008) ...................................................................................... 20

*Carwile v. Richmond Newspapers*,
    196 Va. 1, 82 S.E.2d 588 (Va. 1954) ............................................................................. 4

*Cashion v. Smith*,
    286 Va. 327, 749 S.E.2d 526 (Va. 2013) ................................................................. 3, 14

*Church of Scientology Int'l v. Behar*,
    238 F.3d 168 (2d Cir. 2001).......................................................................................... 22

*Church of Scientology of California v. Flynn*,
    578 F. Supp. 266 (D. Mass. 1984) ................................................................................ 22

*Corporate Training Unlimited, Inc. v. NBC, Inc.*,
    868 F. Supp. 501 (E.D.N.Y. 1994) ............................................................................. 6, 8

*Cretella v. Kuzminski*,
    640 F. Supp. 2d 741 (E.D. Va. 2009) ....................................................................... 9, 11

*D.A.R.E America v. Rolling Stone Magazine*,
    101 F. Supp. 2d 1270 (C.D. Cal. 2000) ........................................................................ 19

*D.A.R.E. America v. Rolling Stone Magazine*,
    270 F.3d 793 (9th Cir. 2001) ....................................................................................... 20

*Darling v. Piniella*,
    No. 91-5219, 1991 WL 193524 (E.D. Pa. Sept. 27, 1991).............................................. 22

*Eslami v. Glob. One Communications, Inc.*,
    48 Va. Cir. 17 (Va. Cir. 1999) ........................................................................ 4

*Fuste v. Riverside Healthcare Ass'n, Inc.*,
    265 Va. 127, 575 S.E.2d 858 (Va. 2003) .......................................................... 4

*Gilbertson v. Jones*,
    No. 3:16CV255, 2016 WL 4435333 (E.D. Va. Aug. 18, 2016) .......................... 3

*Hatfill v. New York Times Co.*,
    416 F.3d 320 (4th Cir. 2005) ........................................................................... 2

*Pendleton v. Newsome*,
    290 Va. 162, 772 S.E.2d 759 (Va. 2015) ........................................................ 18

*Provisional Gov't of Republic of New Afrika v. Am. Broad. Companies, Inc.*,
    609 F. Supp. 104 (D.D.C. 1985) ..................................................................... 21

*Schaecher v. Bouffault*,
    290 Va. 83, 772 S.E.2d 589 (Va. 2015) ..................................... 2, 13, 19, 24

*Tronfeld v. Nationwide Mut. Ins. Co.*,
    272 Va. 709, 636 S.E.2d 447 (Va. 2006) .......................................................... 9

*U.S. v. Apfelbaum*,
    445 U.S. 115 (1980) ....................................................................................... 11

*U.S. v. Shabani*,
    513 U.S. 10 (2014) ......................................................................................... 11

*Vaile v. Willick*,
    No. 6:07CV00011, 2008 WL 2754975 (W.D. Va. July 14, 2008) ..................... 3

*Webb v. Virginian-Pilot Media Companies, LLC*,
    287 Va. 84, 752 S.E.2d 808 (Va. 2014) .......................................................... 17

*Wells v. Liddy*,
    186 F.3d 505 (4th Cir. 1999) ........................................................................... 2

**Other Authorities**

Court Order,
    *CACI v. Rhodes,* No. 05-111, (E.D. Va. filed Jan. 6, 2016) .................... 20, 21

Defs.' Mem. of Law in Support of Mot. to Dismiss,
    *CACI v. Rhodes*, No. 05-111, (E.D. Va. filed Dec. 8, 2005) .......................... 21

Oliver Wendell Holmes, THE COMMON LAW 3 (1881) ....................................... 11

## PRELIMINARY STATEMENT

The Virginia Citizens Defense League ("VCDL"), Patricia Webb, and Daniel L. Hawes did not bring this suit because they disagree with the Defendants about the Second Amendment. The Plaintiffs welcome the opportunity to engage in robust and honest debates with those who disagree with them.  The Plaintiffs would not have filed this defamation action if the film had simply omitted the VCDL interview entirely.   If the Defendants had accurately presented Couric's interview of VCDL by including the VCDL's responses, then the film as a whole might still have been unfair, inaccurate, and misleading, but the Plaintiffs might not have filed this action.  None of that describes what the Defendants did here.

Here, the Defendants intentionally made the Plaintiffs look ridiculous by affirmatively misrepresenting to viewers that the Plaintiffs had been stumped and that the lengthy and painful **non-answer** portrayed in the film was the Plaintiffs' actual response to a question about firearms. Context is crucial, to be sure.  It is not necessarily always defamatory to say that someone was stumped.  But where, as here, the film falsely represents that the Plaintiffs were stumped in direct response to a question about the very subject to which the Plaintiffs have dedicated their organizational mission and professional lives, the portrayal is not only defamatory, it is defamatory *per se*.  And because the film expressly identifies the panelists as members of the VCDL and defames them in direct relation to the VCDL's mission as a Second Amendment advocacy organization, the defamatory exchange is "of and concerning" the VCDL.   The Defendants' motion should therefore be denied.

**ARGUMENT**

## I. THE EXCHANGE IS REASONABLY CAPABLE OF A DEFAMATORY MEANING.

### A. Falsely Portraying People as Ridiculous and Incompetent in Relation to Their Businesses or Professions Is Defamatory *Per Se.*

Defendants assert that "Virginia law is clear that to qualify as potentially defamatory, a false statement must accuse the plaintiff of conduct that society regards as 'odious' or 'contemptible.'" (Mem. of Law in Support of Atlas Films' and Couric's Mot. to Dismiss at 3 (Nov. 29, 2016) [Dkt. 26] ("Atlas Mem.").) Not so. The Defendants misconstrue Virginia law and substantially overstate the Plaintiffs' burden. As an initial matter, at this juncture, the role of the Court is not to make the ***final*** determination as to whether the exchange is defamatory. Instead, while considering a motion to dismiss, the Court must decide whether the exchange is "***reasonably capable*** of defamatory meaning" and, in making that initial determination, must make "all inferences in favor of the plaintiff." *Schaecher v. Bouffault*, 290 Va. 83, 93, 772 S.E.2d 589, 594-95 (Va. 2015); *see also Hatfill v. New York Times Co.*, 416 F.3d 320, 331 (4th Cir. 2005); *see also Wells v. Liddy*, 186 F.3d 505, 523 (4th Cir. 1999).[1]  Under Virginia law—as articulated in the very case cited by the Defendants—language is defamatory if it "tends to injure one's reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon him, ***or*** which tends to hold him up to scorn, ridicule, ***or*** contempt, ***or*** which is calculated to render him infamous, odious, ***or*** ridiculous." *Schaecher,* 290 Va. at 92. As such, while accusing a plaintiff of conduct that society regards as odious or contemptible is certainly defamatory, it is ***also*** defamatory "to hold [someone] up to . . . ridicule" and "to render him . . . ridiculous." *Id.*

---

[1] All emphasis added unless otherwise noted.

Under Virginia law, statements that "cast aspersion on" a corporation's "prestige or standing in its field of business" are defamatory *per se*. *Bay Tobacco, LLC v. Bell Quality Tobacco Prod., LLC*, 261 F. Supp. 2d 483, 501 (E.D. Va. 2003). Similarly, it is defamatory *per se* to make false statements that "prejudice a person in his or her profession or trade" or "impute that a person is unfit to perform the duties of an office or employment." *See Vaile v. Willick*, No. 6:07CV00011, 2008 WL 2754975, at *3 (W.D. Va. July 14, 2008) (statements suggesting that a law student was unfit to continue his studies were defamatory *per se*).

State and federal courts applying Virginia law have repeatedly determined that statements suggesting incompetence or poor performance in one's trade or profession are defamatory *per se*. *See, e.g., Cashion v. Smith*, 286 Va. 327, 337, 749 S.E.2d 526, 531–32 (Va. 2013) (accusations suggesting that anesthesiologist acted incompetently were defamatory *per se*); *Gilbertson v. Jones*, No. 3:16CV255, 2016 WL 4435333, at *1 (E.D. Va. Aug. 18, 2016) (statements that school lunch administrator had been suspended and that suspensions usually resulted from poor performance were defamatory *per se*); *Andrews v. Va. Union Univ.*, No. 3:07CV447, 2008 WL 2096964, at *11 (E.D. Va. May 16, 2008) (accusation that professor had "misadvised" students was defamatory *per se* because it posited that the professor was unfit to perform her duties); *Eslami v. Glob. One Communications, Inc.*, 48 Va. Cir. 17, at *1 (Va. Cir. 1999) (overruling demurrer because statements that business manager "did not fit in" and "lost his temper" could be defamatory *per se* as impugning his skills needed to perform his duties as a manager); *Fuste v. Riverside Healthcare Ass'n, Inc.*, 265 Va. 127, 133, 575 S.E.2d 858, 861 (Va. 2003) (statements that there were "concerns about the[] competence" of two doctors were defamatory *per se* because they prejudiced the doctors in their profession).

3

A defendant does not need to **_directly_** charge a plaintiff with incompetence in order for the statement to be defamatory *per se*.  A statement is defamatory *per se* even if it prejudices the plaintiff in his profession **_by implication_**.  *See Carwile v. Richmond Newspapers*, 196 Va. 1, 2, 82 S.E.2d 588, 589 (Va. 1954).  In *Carwile*, an attorney charged a police department with graft, but the grand jury declined to return an indictment.  *Id.* at 3.  A newspaper reported that two city officials had declined to comment on whether they were considering a recommendation to the state bar that the attorney be disciplined for making the charge, and that the state bar could disbar an attorney for violating the ethical code governing professional conduct of attorneys.  *Id.*  Even though the newspaper did not argue explicitly that the state bar **_should_** take action, the Supreme Court of Virginia found that the newspaper's statements were defamatory *per se* because "it is a reasonable **_implication_** of this language, read in connection with the whole article, that the plaintiff is guilty of unethical and unprofessional conduct for his charges made against the Police Department; for which conduct the [newspaper] suggests in a veiled but pointed way that the [attorney] could and should be subjected to disbarment proceedings . . . While the defamatory language does not in express terms charge the plaintiff with a breach of his professional honor, yet, when aided by the innuendo, operating within the scope of its legitimate functions, it does impute conduct tending to injure him in his profession."  *Id.* at 9.

Finally, in assessing the defamatory content of a publication via video, "a court and jury cannot confine their analysis to the words alone" but "are necessarily required to also consider the impact of the video portion of the program since the television medium offers the publisher the opportunity, through visual presentation, to emphasize and convey ideas in ways that cannot be ascertained from a mere reading of the words in a written transcript."  *Battle v. A&E Television Networks, LLC*, 837 F. Supp. 2d 767, 772 (M.D. Tenn. 2011).  "The defendant's

defamatory words, standing alone, cannot readily be identified in isolation without also considering the accompanying visual images, the tone of voice of the announcer or reporter, along with the combined audio and video editing effects." *Id.* The Court "must scrutinize the juxtaposition of the audio and video portions" and "should be sensitive to the possibility that a transcript which appears relatively mild on its face may actually be, when the total mix of creative ingredients are considered, ***highly toxic***" because "a clever amalgamation of half-truths and opinion-like statements, adorned with orchestrated images and dramatic audio accompaniment, ***can be devastating when packaged in the powerful television medium***." *Corporate Training Unlimited, Inc. v. NBC, Inc.,* 868 F. Supp. 501, 507 (E.D.N.Y. 1994).

**B.    The Exchange Is Defamatory Because It Holds the Plaintiffs up to Ridicule, Conveys That They Are Unfit and Incompetent to Perform Their Duties as Second Amendment Activists and in Their Professions, and Prejudices Them in Their Businesses.**

The Complaint alleges that Defendants set out to—and did in fact—use deceptive editing techniques to make the Plaintiffs look ridiculous, incompetent, and ignorant in direct relation to firearms: a subject to which the VCDL has dedicated its mission (Compl. ¶ 18), to which Hawes has dedicated his profession (*id.* ¶ 20), and to which Webb has dedicated her business (*id.* ¶ 19). As alleged in the Complaint, Couric and Soechtig "joined forces to create an advocacy film supporting more restrictive anti-gun legislation and background checks," and "set out to portray opposition to background checks as rare and baseless." (*Id.* ¶ 32.) To that end, the Defendants recruited members of the VCDL to participate in on-camera interviews" by "[c]oncealing the[] [Defendants'] true intentions" and an Atlas Films employee represented to the VCDL's president that Couric "was eager to include all perspectives in th[e] discussion." (*Id.* ¶ 33.)

On the day of the interview, after the Defendants had "intentionally closed the window blinds, dimmed the lighting, and used other lighting and editing techniques to cast literal shadows upon the VCDL members' faces and to portray them as sinister and untrustworthy," (*id.* ¶ 108(h)) Couric herself represented to the VCDL that "we want to get all different points of view." (*Id.* ¶ 108(c).) Later, Couric and an Atlas Films cameraman "instructed the Plaintiffs to sit in silence," and "then surreptitiously and quietly recorded b-roll footage of the Plaintiffs sitting in silence." (*Id.* ¶ 108(f).)

During the interview, Couric asked the VCDL, "If there are no background checks, how do you prevent—***I know how you all are going to answer this,*** but I'm asking anyway—if there are no background checks for gun purchasers, how do you prevent felons or terrorists from walking into say a licensed gun dealer and purchasing a gun?" (*Id.* ¶ 11.) The Plaintiffs "spent nearly six minutes responding to Couric's question and another three minutes engaging in a related discussion." (*Id.* ¶ 10.)

After the interview ended, Soechtig and Atlas Films "cut all of the responses that had ***actually*** followed Couric's question, and spliced in nine seconds of the silent b-roll footage," (*id.* ¶ 11) intentionally deceiving viewers into believing that Plaintiffs' response to the pending question consisted of "appearing silent and stumped in the background," (*id.* ¶ 4) "sitting silently and shifting his gaze toward the floor," (*id.* ¶ 5) "looking up, blinking, and then looking away," (*id.* ¶ 3) and "silently look[ing] at the floor and then away." (*Id.* ¶ 4.)

   

In their brief, the Defendants repeatedly attempt to minimize the defamatory import of this scene by mischaracterizing the exchange as containing a "pause," as displaying "hesitation"

by the Plaintiffs, showing that the Plaintiffs "could not *quickly* respond," "had difficulty *immediately* answering," did "not have a *ready* retort," "not *promptly* responding," being "*temporarily* stumped," and the like.  (*See* Atlas Mem. at 2, 3, 14-16, 20-23.)  That does not accurately characterize the film.  The defamatory exchange does not contain a "pause."  The lengthy awkward silence was *not* followed by *any* of the Plaintiffs' answers to Couric's question.  (*See* Compl. Ex. 1.)  Instead, immediately after the stumped silence, the film cuts to footage of someone closing the cylinder of a fully-loaded revolver, driving home the point that the exchange was over and that the VCDL and its representatives had been stumped.  (*Id.* ¶ 6.)



The film does not *ever* present *any* of the Plaintiffs' *actual* answers to the question, but cleverly juxtaposes unrelated footage, voiceover, and b-roll footage of a revolver to affirmatively misrepresent to viewers that Plaintiffs' ridiculous non-response *was* their answer—*i.e.*, that they had been totally befuddled and stumped by Couric's ultimate question.  (*See id.* Ex. 1.)

In sum, the Defendants used visual images and editing effects to manufacture footage that packaged "highly toxic" content in the "powerful television medium."  *Corporate Training*, 868 F. Supp. 501.  The defamatory import of that footage is clear and unmistakable.  As alleged in the Complaint, at least one viewer, the Washington Post's Erik Wemple observed—"[t]he artistic 'pause' provides the viewer *not* a 'moment to consider the important question"; it provides viewers a moment *to lower their estimation of gun owners*.  That's it."  (Compl. ¶ 81, n.15 (Ex. 1).)  As such, the Complaint alleges facts showing not only that the exchange is "reasonably

capable" of a defamatory meaning, but that a specific third-party viewer of the exchange actually interpreted it as having a defamatory meaning.

The defamatory scene touches each of the Plaintiffs in their respective firearms-related businesses in slightly different ways.  As a Second Amendment advocacy organization whose mission is "***defending*** your right to defend yourself," the VCDL is in the business of advocating, and advocacy skills are necessarily required for that business.  (*Id.* ¶ 18.)  Therefore, the manipulated footage is defamatory *per se* as to the VCDL because it falsely conveys that in response to a pointed question based on an anti-gun premise, ***the VCDL failed to deliver on its mission***, thereby casting aspersion on the VCDL's prestige and standing in its field as a Second Amendment advocacy organization.  (*Id.* ¶ 137); *Bay Tobacco,* 261 F. Supp. 2d at 501.

Similarly, because Hawes is an attorney who practices litigation involving firearms and personal defense, his profession requires that he employ oral advocacy skills to articulate the legal and practical bases for his clients' right to defend themselves, their homes, and their families.  (Compl. ¶ 141.)  Falsely conveying that Hawes was stumped by a loaded question based on an anti-gun premise is defamatory *per se* because it conveys that Hawes is incompetent in his profession.  *See Cretella v. Kuzminski*, 640 F. Supp. 2d 741, 763 (E.D. Va. 2009); *Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 714, 636 S.E.2d 447, 450 (Va. 2006).  Defendants cite an unpublished case from the Eastern District of Virginia and an almost ***twenty***-year-old case from the Supreme Court of Virginia for the proposition that "Virginia courts have rejected efforts by attorneys to sue for defamation . . . even where . . . they imply some actual professional malfeasance."  (Atlas Mem. at 21.)  ***More recently***, however, both the Eastern District of Virginia (in a ***published*** decision) and the Supreme Court of Virginia have found that statements impugning an attorney's competence ***were*** defamatory *per se*.  *See Cretella*, 640 F. Supp. 2d at

763 (statements suggesting that an attorney was incompetent "[o]bviously . . . directly and adversely affected Plaintiff's reputation as a professional" and were defamatory *per se*); *Tronfeld*, 272 Va. at 714, 636 S.E.2d at 450 (statements that an attorney "just takes people's money" and that his clients receive less for their claims because of the attorney's services are defamatory *per se* because they imply a combination of dishonesty, ***incompetence,*** or the crimes of larceny by trick or obtaining money by false pretenses).

The Defendants have the temerity to suggest that they ***helped*** Hawes's reputation by removing his response to Couric's question because, they claim, the answer he provided "was not an accurate statement of constitutional law."  (Atlas Mem. at 21-22.)  Nonsense.  That argument is just another example of the Defendants' willingness to distort the truth and malign the Plaintiffs for their own ends.  Although the manipulated version of Couric's question that was presented in the film was ***not*** limited to purchases from "licensed gun dealers," in reality, Couric had asked: "[I]f there are no background checks for gun purchasers, how do you prevent felons or terrorists from ***walking into say a licensed gun dealer and*** purchasing a gun?"  (Compl. ¶ 37.)  Since Hawes was responding to the question that was actually asked—and ***not*** the manipulated version of the question that the Defendants ultimately included in the film— Hawes "rebutted the premise of Couric's question," and explained that laws are already in place that prohibit certain groups of people from buying guns from licensed gun dealers.  (*Id.* ¶ 39.)  Because Couric's pending question was based on a false factual premise, Hawes posed a ***different*** question to cut to the heart of the matter, suggesting that "what we're ***really*** asking about is a question of prior restraint.  How can we prevent future crime by identifying bad guys before they do anything bad?"  Hawes goes on to explain that "under the legal system we have in the United States," the government is not allowed to punish people or take away their liberty

9

"[u]ntil there is an overt act," because "there are a lot of Supreme Court opinions that say, 'No prior restraint is something that the government does not have the authority to do." (*Id.*)

The Defendants seize on the words "prior restraint," disregard the context in which Hawes used those words, and falsely assert that Hawes referred to the "prior restraint *doctrine*." (Atlas Mem. at 21.)  He did not.  As the context of his comments makes plain, Hawes was not referring to the "*doctrine* of prior restraint" as the Defendants assert, but was simply using the words "prior restraint" colloquially to describe the concept that the government "can't punish" someone "until there is an overt act" (Compl. ¶ 39), which *is* an accurate statement of constitutional law.  *See generally U.S. v. Apfelbaum*, 445 U.S. 115, 131 (1980) (rejecting punishment of anticipatory conduct, explaining "both a culpable *mens rea* and a criminal *actus reus* are generally required for an offense to occur."); *U.S. v. Shabani*, 513 U.S. 10, 11 (2014) (the law does not punish mere thought and instead requires *actus reus*); Oliver Wendell Holmes, THE COMMON LAW 3 (1881).  Depicting Hawes in stumped silence following Couric's question is defamatory *per se* because it falsely conveyed that lacked knowledge of the law *and* was an incompetent oral advocate, which touches him directly in his special occupation as a trial attorney.  *See Cretella*, 640 F. Supp. 2d at 763.

Finally, the Defendants assert that "[i]t cannot possibly be defamatory of a firearms dealer to imply that they failed to effectively debunk a law with which they must comply" and that Webb's theory of liability is "troubling" because it "implies that in order to be a competent gun store owner, one must share Webb's political views and oppose the very background check laws that firearms dealers are obligated to follow."  (Atlas Mem. at 20.)  This argument reveals how little the Defendants understand the gun rights community generally and Webb's business in particular.  Gun store customers are different than customers of department stores or grocery

10

stores, which attract people of all political stripes and views.  As alleged in the Complaint, "[s]ince Webb is in the business of selling firearms to individuals, *her customers and prospective customers—by definition—support the right of individuals to purchase firearms*." (Compl. ¶ 115.)  As a result, "[h]er business requires her to be knowledgeable," not only about *how* to perform background checks, but also about "the right of individuals to purchase firearms."  (*Id.*)  By falsely representing that Webb had *no response* to Couric's question about background checks, the Defendants have prejudiced Webb in her trade by conveying to her customers that, when given a public platform to advocate for their individual right to purchase firearms from her without governmental interference, she failed to do so, and that "she lacks knowledge regarding integral aspects of her business," *i.e.*, background checks and the right of individuals to purchase firearms.  (*Id.*)  While Defendants may take issue with the fact that Webb's existing and potential customers are gun rights supporters who care whether their dealer supports the Second Amendment, the factual allegations supporting that inference must be accepted as true at this stage.

The Defendants cite a recent case from the Supreme Court of Virginia for the proposition that "[i]f violating contractual obligations toward one's community and being less-than-truthful to a government agency is not defamatory, then surely being depicted as not *promptly* responding to just one of Couric's multiple questions falls well below the requisite threshold of reprehensibility."  (*See* Atlas Mem. at 15 citing *Schaecher*, 290 Va. at 95.)  In so doing, Defendants misstate the law—and the very case they cite—in multiple ways.  *First*, *Schaecher* did *not* involve accusations that the plaintiffs were "actively violating covenant restrictions," but that they had submitted a special use permit application to build a dog kennel, which the defendant claimed would violate covenant restrictions if it were ultimately built.  *Schaecher,* 290

11

Va. at 95-97.  This was a key fact and the court explained that "a reader could equally or more reasonably infer that the proposed plans simply needed to be amended . . . *Proposing* a plan for a dwelling that does not comply with residential dwelling requirements is not a violation of a law." *Id.* at 97.  *Second*, *Schaecher* did *not* hold that there is a "threshold of reprehensibility" for a statement to be defamatory, but merely that "[t]he *potential* violation of an easement . . . does not as a general principle carry the 'sting' of a reprehensible crime." *Id.* at 95.  Although falsely accusing someone of a reprehensible crime is certainly defamatory *per se* under Virginia law, so too is it defamatory *per se* to impugn someone in his business or to prejudice him in his profession; no additional "threshold of reprehensibility" requirement attaches to such accusations.  *Third*, the statement that the plaintiff "was not totally truthful" did not rise to the level of defamation because it was made in relation "to a single and relatively benign particular fact," but the court expressly acknowledged that "[t]he Supreme Court of the United States has also explained that, in the proper context, an accusation that one is a liar *is* grounds for defamation." *Id.* at 101.  *Finally*, suggesting that the film portrays the Plaintiffs as "not *promptly* responding to just one of Couric's multiple questions" mischaracterizes the exchange because: (i) the film falsely represents that the Plaintiffs *only* responded with ridiculous, stumped silence, *not* that they merely failed to respond "promptly;" and (ii) it was not "just one of Couric's multiple questions," but the Defendants' ultimate sit-down point and grand finale around which the entire VCDL segment was built.

Equally irrelevant is the Defendants' straw man that "refusing to answer reporters' questions" is not "odious or disgraceful."  (Atlas Mem. at 15.)  That argument misses the mark entirely because the film does *not* convey that the Plaintiffs declined to comment.  Instead, the fact that the Plaintiffs are featured in the VCDL segment conveys that they *agreed* to comment

on—and purported to be knowledgeable about—the issue at hand, but that, when push came to shove, they lacked the competence to do so.  The Defendants also cite two cases from other jurisdictions for the proposition that being accused of supporting a particular political party or having a particular voting record is not defamatory (*id.* at 16), and the Defendants then engage in an extended discussion of the tort of "false light" (*id.* at 17-18).  Both are beside the point. Plaintiffs here have not alleged a "false light" claim, nor have they alleged that the Defendants falsely portrayed them as supporting background checks.  Instead, the Complaint alleges that the Defendants falsely conveyed that the Plaintiffs were stumped in response to Couric's question, have no basis for their position, are ignorant and unfit in their trades, and are uninformed notwithstanding their expertise in the areas of gun regulations and gun rights.  Under well-settled Virginia law, such accusations are not only defamatory, they are defamatory *per se* as to the Plaintiffs because they cast aspersions on the VCDL's prestige and standing in its field of Second Amendment rights advocacy and because they impugn Hawes's and Webb's competence as VCDL Executive Members and in their respective professions as an attorney whose practice includes advocating for gun owners and as a firearms dealer.  *See Bay Tobacco,* 261 F. Supp. 2d at 501; *Cashion,* 286 Va. at 337.  Because the manipulated footage impugns the Plaintiffs' competence in their profession and businesses, it is defamatory *per se* and granting the Defendants' motion to dismiss would constitute reversible error.  *See Cashion,* 286 Va. at 337 (reversing trial court's grant of demurrer for lack of defamatory meaning, and finding that a surgeon's statement criticizing an anesthetist's competence was defamatory *per se*).

## C.     The Exchange Is Reasonably Capable of the Defamatory Meaning That the Plaintiffs Have No Basis for Opposing Background Checks.

The Defendants claim that the film, taken as a whole, does not convey that the Plaintiffs "have no basis for their opposition to background checks" because it portrays some of the

panelists answering *other* questions about background checks before the defamatory exchange at issue.  (Atlas Mem. at 13.)  Their argument is misplaced for three reasons.  *First*, the set-up to Couric's "gotcha" question does not convey that the Plaintiffs have a basis for opposing background checks.  Instead, it presents purported experts to "invalidate" an answer offered by one of the panelists (not Webb or Hawes) that he opposes background checks because it could lead to the confiscation of firearms.[2]  Viewed in context, this misleading juxtaposition of responses does not offer the Plaintiffs' bases for opposing background checks, but sets the stage for the main point and grand finale of the VCDL segment: that Plaintiffs do not have any such basis and can only sit ridiculously in stumped silence in response to Couric's ultimate question.

*Second*, Couric's "gotcha" question is the cornerstone of the Complaint, is described in great detail in the Complaint, and—for the sake of word economy and readability—is short-handed at various points in the Complaint.  The allegation in paragraph 108 must be read in this context, which makes clear that one of the defamatory meanings of the exchange is that the Plaintiffs have no basis for opposing background checks that would prevent terrorists and felons from obtaining guns.

*Third*, even if the answer regarding confiscation could be interpreted as offering one basis for opposing background checks—which the film's experts swiftly and misleadingly purport to debunk—that answer was *not* given by Hawes or Webb.  As such, even if the film could be interpreted to provide one basis for opposing background checks—and it cannot—the defamatory and deceptively edited exchange with Couric would still falsely convey that Hawes and Webb offered no basis for their opposition.

---

[2] One of the purported experts informs viewers that the government could "never" confiscate firearms because of the *Heller* decision.  The expert fails to acknowledge that the *Heller* decision was decided 5-4 and that the appointment of new Justices to the Supreme Court could result in the reversal of *Heller*.

**D.    Even if the Exchange Is Not Reasonably Capable of the Defamatory Meaning That the Plaintiffs Have No Basis for Opposing Background Checks, It Is Reasonably Capable of the Other Three Defamatory Meanings Alleged in the Complaint.**

The Defendants imply that the Complaint alleges that the exchange at issue has only ***one*** defamatory meaning—that the Plaintiffs "have no basis for their opposition to background checks." (Atlas Mem. at 13.)  As set forth above, the defamatory exchange ***does*** in fact convey that defamatory meaning.  But even if the exchange did not convey that particular defamatory meaning, the Defendants' motion should still be denied because the Complaint alleges that the exchange has ***three*** additional defamatory meanings—that the Plaintiffs: (1) are ignorant and unfit in their trades; (2) are uninformed notwithstanding their expertise in the areas of gun regulations and gun rights; and (3) were stumped by Couric's question.  (Compl. ¶ 112.)

**E.    The Complaint Sufficiently Alleges a Claim for Defamation and, in the Alternative, a Claim for Defamation by Implication.**

Defendants argue that "both Counts allege the same theories of defamation by implication" and that "a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true.  The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference." (Atlas Mem. at 9; Epix Mem. at 19.)

The Defendants are mistaken for two reasons.  ***First***, Count I states a claim for defamation (as opposed to defamation by implication) because it alleges that the exchange is ***not*** literally true.  *See Webb v. Virginian-Pilot Media Companies, LLC*, 287 Va. 84, 89, 752 S.E.2d 808, 811 (Va. 2014) (explaining that Virginia law recognizes a cause of action for defamation by implication when a plaintiff alleges that he "has been defamed not by statements of fact that are literally true but by an implication arising from them").  Count I of the Complaint alleges

specifically why the exchange is ***actually false***, as opposed to merely "implying" something false.  Count I alleges:

> The Defendants did not merely imply that the Plaintiffs had no response to Couric's question by, for example, cutting away to a different scene.  Instead, the Defendants spliced in nine seconds of silent footage of the Plaintiffs immediately following Couric's edited question—and then ended the exchange with the image of a cylinder being closed—to affirmatively represent that the Plaintiffs had ***no*** answer and ***no*** basis for their opposition to background checks.  In reality, the VCDL, Hawes, and Webb did ***not*** sit silently, as the Defendants made it appear. Rather, they promptly answered and provided numerous bases supporting their position, for approximately six minutes, and engaged in a related discussion for an additional three minutes.

(Compl. ¶ 107.)  If the scene had shown Couric's question and then immediately cut away to an unrelated scene, that might have "implied" that the VCDL had no response; but the manipulated footage affirmatively represents, in direct terms, that the VCDL was stumped, without the need to resort to implications, inferences, or insinuations.   Indeed, the footage makes that false accusation even more directly and more forcefully than if the Defendants had issued a statement saying "the Plaintiffs were stumped by Couric's question," because the Defendants tricked viewers into believing that they were actually witnessing—***with their own eyes***—the Plaintiffs being stumped and avoiding eye contact in direct response to a question about firearms.  This footage makes the false charge in more direct terms than a written statement because it deceives viewers into believing that they are witnessing the Plaintiffs being stumped ***first-hand***, rather than hearing about it ***second-hand***.  As such, because the exchange portrayed in the film directly conveys that the Plaintiffs were stumped, Count I of the Complaint properly alleges a cause of action for defamation (as opposed to defamation by implication).[3]

---

[3] Count II alleges defamation by implication ***in the alternative***.  Although the Defendants conflate allegations from Count I and Count II in attempting to argue that they are both "defamation by implication" claims, the Complaint speaks for itself.

***Second***, the Supreme Court of Virginia has expressly considered—***and rejected***—the heightened showing that Epix claims libel-by-implication plaintiffs must make.  *See Pendleton v. Newsome*, 290 Va. 162, 173–74, 772 S.E.2d 759, 764–65 (Va. 2015).  The court explained:

> Our decisions in defamation cases do ***not*** include a requirement that "a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true." The plaintiff's burden is proof by a preponderance of the evidence. . . . Nor have we held that the defendant's words must, by themselves, suggest that the author intends or endorses the allegedly defamatory inference. Such a holding would immunize one who intentionally defames another by a careful choice of words to ensure that they state no falsehoods if read out of context but convey a defamatory innuendo in the circumstances in which they were uttered.

*Id.*  As such, Epix's attempt to impose a "heightened showing" on the Plaintiffs is wrong as a matter of law and must be rejected.

## II.    THE DEFAMATORY EXCHANGE IS OF AND CONCERNING THE VCDL.

In arguing that the defamatory exchange is not "of and concerning" the VCDL, the Defendants disregard the well-pled allegations of the Complaint and misstate Virginia law and its application by federal courts within the Fourth Circuit.  Although the Defendants lift a quote from the controlling Virginia case on point (*see* Atlas Mem. at 23-24 n.6 citing *Schaecher*, 290 Va. 83 at 90, 772 S.E.2d 589 at 598), they omit the applicable rule of law the Supreme Court of Virginia articulated in that case: while "a company cannot ***ordinarily*** proceed in defamation out of the libel of its employees," it "may bring a defamation action on its own behalf" for a defamatory statement made about its representatives when there is "a sufficient nexus between the alleged defamatory nature of the statement and the business." *Schaecher*, 290 Va. 83 at 90. In other words, an organization may bring a defamation action when a defamatory statement is made "in direct relation to [its] trade or business."  *Id.*  Applying this rule, the Supreme Court of Virginia found that a statement that a kennel employee had difficulties paying the mortgage on

her home because of a break-up with her boyfriend was not of and concerning the kennel business for which she worked because the statement had no bearing on the kennel's business of caring for dogs.

The Virginia rule makes sense: since organizations can *only* act through their representatives, defaming an organization's representatives in relation to the trade or business of the organization likewise defames the organization. As acknowledged in a case cited by one of the ***Defendants***, "[w]ithout some countervailing explanation, references to actions taken by an organization's supporters imply that such actions were undertaken at the behest, or certainly with the approval, of the organization itself." *See D.A.R.E America v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270, 1290 (C.D. Cal. 2000), *aff'd sub nom. D.A.R.E. America v. Rolling Stone Magazine*, 270 F.3d 793 (9th Cir. 2001). The Eastern District of Virginia and the Fourth Circuit have implicitly acknowledged this. *See* Court Order, *CACI v. Rhodes,* No. 05-111, (E.D. Va. filed Jan. 6, 2016) ("Court Order") (Attached hereto as Ex. A); *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 302 (4th Cir. 2008).

While the Defendants claim that *CACI* "distinguish[es] between accusing individual contractors of committing an act and accusing the plaintiff employer in its corporate capacity of doing so" and stands for the proposition that "an organization cannot state a claim for defamation based on defamatory statements about a member" (Atlas Mem. at 25), the case suggested exactly the opposite. *CACI* involved allegedly defamatory accusations implying that ***employees*** of CACI and other government contractors had tortured detainees at Abu Ghraib.[4]  *CACI,* 536 F.3d

---

[4] The decision and procedural history of the case implicitly distinguish between statements concerning the actions allegedly taken by individuals ***before*** they were representatives of the organizational defamation plaintiff (which are not accusations about the organization in its corporate capacity), *see CACI,* 536 F.3d at 302, and statements concerning the actions allegedly taken by individuals ***while*** they were representatives of the organizational defamation plaintiff (which ***are*** accusations about the organization), *id.* at *passim*; Court Order at 2 (Ex. A).

at 291-92.  If Defendants were correct that an organization cannot be defamed by statements about its representatives, the case would have been dismissed for failure to state a claim.  It was not.  Notably, the defendants in that case effectively conceded that statements referring to "CACI personnel" would have been "of and concerning" CACI, arguing instead that certain statements were not "of and concerning" CACI because the statements did not "mak[e] any specific reference to CACI *personnel* has having committed these crimes."  Defs.' Mem. of Law in Support of Mot. to Dismiss at 16-19, *CACI v. Rhodes*, No. 05-111, (E.D. Va. filed Dec. 8, 2005) (Attached hereto as Ex. B).  The United States District Court for the Eastern District of Virginia *denied* the defendants' motion to dismiss for failure to state a claim and the case proceeded to discovery.  *See* Court Order at 2 (Ex. A).  After discovery, the district court granted the defendants' motion for summary judgment—and the Fourth Circuit affirmed—based on a lack of actual malice and lack of a statement of fact (*i.e.*, that the statement was rhetorical hyperbole)— *not* because the statements implying that CACI's employees had tortured detainees were not "of and concerning" CACI.  *CACI,* 536 F.3d at 304.  As such, *CACI* effectively repudiates the Defendants' premise that the defamatory exchange in the film is not of and concerning the VCDL because "one cannot render 'silent' or 'stump[]' an organization."  (Atlas Mem. at 23.) If, as *CACI* implicitly recognized, an organization can be accused of rape and murder, an organization can certainly be accused of being rendered "silent" or "stumped."

Defendants fail to cite a single case that would alter the result compelled by *Schaecher* and suggested by *CACI*, that the defamatory exchange is "of and concerning" the VCDL. Instead, they cite inapposite cases in which *individuals'* claims were dismissed because the defamatory statements did not reference those individuals[5] and a case that *survived* a motion to

---

[5] *See* Atlas Mem. at 23-25 citing *AIDS Counseling & Testing Ctrs. V. Grp. W Television, Inc.*, 903 F.2d 1000, 1005 (4th Cir. 1990) (applying Maryland law and affirming dismissal of claims

dismiss and was later disposed of on summary judgment because of a lack of actual malice and under the subsidiary meaning doctrine (***not*** because statements were not "of and concerning" the plaintiff).[6]

Defendants' other cases are likewise distinguishable, both on the facts and on the applicable governing law.  *See* Atlas Mem. at 25 citing *Church of Scientology of California v. Flynn*, 578 F. Supp. 266, 268 (D. Mass. 1984); *Darling v. Piniella*, No. 91-5219, 1991 WL 193524, at *3 (E.D. Pa. Sept. 27, 1991); *Afftrex, Ltd. v. Gen. Elec. Co.*, 555 N.Y.S.2d 903, 905 (N.Y. 3d Dep't 1990).  Specifically, *Flynn* is distinguishable because the defamatory accusation was not in direct relation to the trade or business of the organization, as is the case here.  *Piniella* has no bearing because the defendant in that case neither named nor referred to the organizational defamation plaintiff and because the defamatory remarks could only be read to ***dissociate***—not associate—the defamed individual from the organization.  And *Afftrex* does not apply here because the defamatory statements in that case—that an individual was "an evil ***man***" and "was fired from ***his*** job"—were plainly not statements about an organization.  Finally, not a single one of these decades-old cases cited by the Defendants applied Virginia law.

Defendants' litigation position—that the defamatory exchange is not "of and concerning" the VCDL—is at odds with Virginia law, the film, the Defendants' actions, and common sense.  The Defendants did not simply feature footage of individuals who just so happened to be members of the VCDL.  They reached out to the ***president*** of the VCDL to select panelists to be the face of the VCDL on film.  The Complaint alleges that Couric and Soechtig "recruited

---

of individuals who were not referenced in the allegedly defamatory statements); *Provisional Gov't of Republic of New Afrika v. Am. Broad. Companies, Inc.*, 609 F. Supp. 104, 108 (D.D.C. 1985) (dismissing claims of individuals who were not referenced in the allegedly defamatory statements).

[6] *See* Atlas Mem. at 24 citing *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001) (affirming grant of summary judgment because statements were not made with actual malice or were not actionable under subsidiary meaning doctrine).

members of the Virginia Citizens Defense League to participate in on-camera interviews" and that a producer for Atlas Films "emailed Virginia Citizens Defense League President Philip Van Cleave (a Virginia resident) on behalf of the Defendants to ask **the VCDL** to be interviewed for *Under the Gun*," and "scheduled interviews with **VCDL** and its members . . ." (Compl. ¶¶ 26, 33.)  As a result of that request, Patricia Webb—a VCDL director and Executive Member—and Dan Hawes—a VCDL Executive Member and a member of the VCDL Legal Advisory Council—were selected, among other VCDL members, to be on the VCDL panel. (*Id.* ¶¶ 19-20, 26, 35.)  The film identifies the Virginia Citizens Defense League **expressly and by name**, introducing the panelists as "MEMBERS OF THE VIRGINIA CITIZENS DEFENSE LEAGUE." (*Id.* ¶ 56.)  The Complaint further alleges that "[t]he Defendants intended to and did expressly refer to the Virginia Citizens Defense League." (*Id.* ¶ 104.)



The Complaint further alleges that "those who watched *Under the Gun* understood the defamatory exchange to concern the VCDL." (*Id.* ¶ 104.)  This allegation is supported by the admissions of one of the Defendants themselves.  After the deceptive editing had come to light,

Couric issued a public statement, writing: "My question **to the VCDL** regarding the ability of convicted felons on the terror watch list to legally obtain a gun, was followed by an extended pause, making the participants appear to be speechless." (*Id.* ¶ 85.)  At the end of her statement, Couric provided what she represented was the "Transcript with **VCDL** Response." (*Id.*)  In light of these admissions, there can be no reasonable dispute that the defamatory exchange was of and concerning the VCDL.   Virginia law compels that result because the Defendants' representation—that "members of the Virginia Citizens Defense League" that were selected to speak on the VCDL panel for the film sat in dumbfounded silence in response to a question about firearms—is "in direct relation to the trade or business of" the VCDL, a Second Amendment advocacy organization with a stated mission of "defending your right to defend yourself." *Schaecher,* 290 Va. at 99-100; Compl. ¶ 18.

## CONCLUSION

For the foregoing reasons, Plaintiffs the Virginia Citizens Defense League, Dan L. Hawes, and Patricia Webb respectfully request that the Court deny the motion to dismiss filed by Defendants Atlas Films, LLC and Katie Couric.


Dated: December 16, 2016                    Respectfully Submitted,

                                             */s/ Megan L. Meier*

Thomas A. Clare (VSB # 39299)
Elizabeth M. Locke (VSB # 71784)
Megan L. Meier (VSB # 88720)
CLARE LOCKE LLP
902 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: tom@clarelocke.com
Email: libby@clarelocke.com
Email: megan@clarelocke.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing document was filed with the Clerk of the Court using the CM/ECF system on December 16, 2016, which will send notification of such filing to the following:

Kevin T. Baine
Thomas G. Hentoff
Nicholas G. Gamse
Emily A. Rose
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
Email: kbaine@wc.com
Email: thentoff@wc.com
Email: ngamse@wc.com
Email: erose@wc.com

*Counsel for Defendant Katie Couric*

Nathan E. Siegel
Mara J. Gassmann
Matthew E. Kelley
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1899 L Street, NW, Suite 200
Washington, DC  20036
Telephone: (202) 508-1100
Facsimile: (202) 861-9888
Email: nsiegel@lskslaw.com
Email: mgassmann@lskslaw.com
Email: mekelley@lskslaw.com

*Counsel for Defendant Atlas Films, LLC*

Elizabeth McNamara
Linda Steinman
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Telephone: (212) 489-8230
Facsimile: (212) 489-8340
Email: lizmcnamara@dwt.com
Email: lindasteinman@dwt.com

Patrick J. Curran Jr.
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006-3401
Telephone: (202)973-4200
Facsimile: (202)973-4449
Email: patcurran@dwt.com

*Counsel for Defendant Studio 3 Partners, LLC d/b/a Epix*

By: */s/ Megan L. Meier*
Megan L. Meier