UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

---

VIRGINIA CITIZENS DEFENSE LEAGUE,
DANIEL L. HAWES, ESQ., and PATRICIA
WEBB,

               Plaintiffs,

   v.

KATIE COURIC, STEPHANIE SOECHTIG,
ATLAS FILMS LLC, and STUDIO 3 PARTNERS,
LLC d/b/a EPIX,

               Defendants.

No. 3:16cv757-JAG

---

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO THE MOTION TO DISMISS FILED BY STUDIO 3 PARTNERS, LLC D/B/A EPIX**

                                     Thomas A. Clare (VSB # 39299)
                                     Elizabeth M. Locke (VSB # 71784)
                                     Megan L. Meier (VSB # 88720)
                                     CLARE LOCKE LLP
                                     902 Prince Street
                                     Alexandria, VA 22314
                                     Telephone: (202) 628-7400
                                     Email: tom@clarelocke.com
                                     Email: libby@clarelocke.com
                                     Email: megan@clarelocke.com

                                     *Attorneys for Plaintiffs*
                                     *Virginia Citizens Defense League,*
                                     *Daniel L. Hawes, Esq., and*
                                     *Patricia Webb*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ i

PRELIMINARY STATEMENT ........................................................................................................1

SUMMARY OF FACTUAL ALLEGATIONS .................................................................................1

ARGUMENT .......................................................................................................................................5

CONCLUSION ..................................................................................................................................11

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Bank of Am.*,
  61 Va. Cir. 131 (2003) ............................................................................................... 5, 6, 7

*Eramo v. Rolling Stone, LLC*,
  No. 3:15-CV-23, 2016 WL 5234688 (W.D. Va. Sept. 22, 2016) ................................. 8

*Foman v. Davis*,
  371 U.S. 178 (1962) ................................................................................................... 10

*Keeton v. Hustler Magazine, Inc.*,
  465 U.S. 770 (1984) ..................................................................................................... 6

*Laber v. Harvey*,
  438 F.3d 404 (4th Cir. 2006) ..................................................................................... 10

*Michel v. NYP Holdings, Inc.*,
  816 F.3d 686 (11th Cir. 2016) ................................................................................... 10

*Morrissey v. William Morrow & Co.*,
  739 F.2d 962 (4th Cir. 1984) ....................................................................................... 5

*Semida v. Rice*,
  863 F.2d 1156 (4th Cir. 1988) ..................................................................................... 5

*Weaver v. Beneficial Fin. Co.*,
  199 Va. 196 (1957) ............................................................................................... 7, 8, 9

**Rules**

Fed. R. Civ. P. 15(a)(2) .................................................................................................. 10

**Other Authorities**

Restatement (Second) of Torts § 577A……………………………………………….5, 6, 7

i

**PRELIMINARY STATEMENT**

Studio 3 Partners, LLC d/b/a EPIX ("Epix") fundamentally misconstrues the well-pled allegations of the Complaint and ignores outright controlling law regarding the republication of defamatory falsehoods. In cases like this one where there are multiple publications and republications of defamatory content, actual malice is measured at the time of *each* publication. The Complaint alleges that Epix, the distributor of *Under The Gun*, published the film after publicly acknowledging that it knew that Atlas Films had—with Katie Couric's knowledge and acquiescence—intentionally edited footage of the Plaintiffs to manufacture the false and misleading interview scene at issue. That is textbook actual malice. Epix's motion must therefore be denied.

**SUMMARY OF FACTUAL ALLEGATIONS RELEVANT TO THIS MOTION**

The Complaint alleges numerous publications of the film, including: (1) publications at various film festivals and other venues beginning in January 2016; (2) publication via the Epix website on April 15, 2016; (3) publication on cable television on May 13, 2016; (4) publication for free at https://www.epix.com on May 13, 2016; (5) release to the general public on May 15, 2016; (6) publications after May 15, 2016, on cable television, iTunes, Amazon Video, Vudu, YouTube and Google Play, Fandango Now, FIOS by Verizon, CinemaNow, and PlayStation; (7) publications via dozens of screenings across the country from mid-April through early June 2016; (8) thousands of republications after Couric reviewed the VCDL footage and knew that it had been intentionally manipulated and was misleading; and (9) additional publications to this day, accepting Defendants' invitation to have viewers host screening parties and invite the filmmakers to their events. (Compl. ¶¶ 53-54, 92, 94-97.)

1

On May 23, 2016, Philip Van Cleave posted a statement online entitled "Unethical Journalism: Couric Alters Words of VCDL Members." (*Id*. ¶ 78.) In addition to describing the defamatory content in the film, Van Cleave also posted the unedited audio recording of the actual exchange between Couric and the VCDL. (*Id.*)

On May 25, 2016, the film's director, Stephanie Soechtig, issued a statement admitting that the scene portraying the VCDL had been intentionally edited, writing, "I never intended to make anyone look bad and I apologize if anyone felt that way . . . ***My intention was to provide a pause*** for the viewer to have a moment to consider this important question before presenting the facts on Americans' opinions on background checks." (Compl. ¶¶ 80, 12.)[1] At the same time, the film's executive producer, Katie Couric, issued an accompanying statement, writing, "I support Stephanie's statement and am very proud of the film." (*Id*. ¶ 83.) Moments after those statements were released, the Washington Post published an article titled *Audiotape: Katie Couric documentary **falsely** depicts gun supporters as 'idiots*,*'* and made the following observations regarding Soechtig's statement:

> In the years we've covered and watched media organizations, we've scarcely seen a thinner, more weasely excuse than the one in the block above. For starters, it appears to count as an admission that this segment of the documentary was edited. The artistic "pause" provides the viewer not a "moment to consider the important question"; it provides viewers a moment to lower their estimation of gun owners. That's it. As far as the rest of the statement, adults in 2016 may no longer write the phrase "apologize if anyone felt that way" and preserve their standing as professionals.[2]

---

[1] Emphasis added unless otherwise noted.
[2] Compl. ¶ 81 n.15 citing Eric Wemple, *Audiotape: Katie Couric documentary falsely depicts gun supporters as 'idiots,'* The Washington Post (May 25, 2016), https://www.washingtonpost.com/blogs/erik-wemple/wp/2016/05/25/audiotape-katie-couric-documentary-falsely-depicts-gun-supporters-as-idiots/?utm_term=.e890a0e12ff9 (Ex. A). The Washington Post article should be considered at this stage. As Epix acknowledges, articles that are incorporated by reference in, and integral to the Complaint may be considered by the Court on a motion to dismiss. (*See* Mem. of Law in support of Studio 3 Partners, LLC D/B/A Epix's Mot. to Dismiss at 4 n.3 (Nov. 29, 2016) [Dkt. 28] ("Epix Mem.").)

The Washington Post concluded, "Many of those who sampled the discrepancy between the video and the audiotape were already enraged by the depiction of these gun owners. The statements from Soechtig and Couric will surely intensify the backlash, as well they should. An apology, retraction, re-editing, whatever it is that filmmakers do to make amends—*all of it needs to happen here*." (*Id.*)

After the close of business on May 25, 2016, CNN Money published an article titled *Katie Couric stands by "Under the Gun" as director apologizes for **misleading** edit*.³ The article begins with a lede that says, "The director of a new documentary about gun violence says she is sorry for a ***misleading scene that makes gun rights activists seem stumped by one of interviewer Katie Couric's questions***." (Ex. B) The CNN Money article goes on to quote Soechtig's and Couric's statements, and then a statement from Epix that it "stands behind Katie Couric, director Stephanie Soechtig, and their creative and editorial judgment," and "encourage[s] people to watch the film and decide for themselves." (*Id.*) The CNN Money article concludes by observing that "[a]s the controversy [about the misleading edit] erupted, Epix promoted ways to watch the documentary for free on the web." (*Id.*)

On May 30, 2016, Katie Couric issued a second public statement, this time expressly admitting that the film "***misrepresented*** an exchange [she] had with members of the Virginia Citizens Defense League" and that those eight seconds of silence added to the interview "were ***misleading***." (Compl. ¶ 85.) Couric further stated:

> My question to the VCDL regarding the ability of convicted felons and those on the terror watch list to legally obtain a gun, was followed by an extended pause, making the participants appear to be speechless.

---

³ Compl. ¶ 79, n.13 citing Brian Stelter, *Katie Couric stands by "Under the Gun" as director apologizes for misleading edit*, CNN Money (May 25, 2016), http://money.cnn.com/2016/05/25/media/katie-couric-guns-stephanie-soechtig/ (Ex. B). As Epix acknowledges, the CNN Money article is incorporated by reference into the Complaint and should therefore be considered at this stage. (*See* Epix Mem. at 4 n.3.)

3

> When I screened an early version of the film with the director, Stephanie Soechtig, I questioned her and the editor about the pause and was told that a "beat" was added for, as she described it, "dramatic effect," to give the audience a moment to consider the question. When VCDL members recently pointed out that they had in fact immediately answered this question, I went back and reviewed it and **agree that those eight seconds do _not_ accurately represent their response**.

(*Id.*)

Even though Epix knew the scene of the VCDL interview was false, misleading, and misrepresented the VCDL, Epix chose to republish the film to new audiences numerous times *after* May 25. Specifically, the Complaint alleges that "[e]ven after Couric admitted that the footage at issue was intentionally manipulated, is misleading, and misrepresented her exchange with the VCDL members, **Epix continued to publish** and promote the false and defamatory footage." (Compl. ¶ 24.) It further alleges that "**the film was published and republished thousands of times** across the country after Couric reviewed the VCDL footage and knew that it had been intentionally manipulated and was misleading. Indeed, the film's own promotional website reveals that it was screened dozens of times across the country . . . from mid-April **through early June 2016**." (*Id.* ¶ 53.) It also alleges that, **"[t]o this day, the Defendants continue to** promote and **publish** the film. Indeed, on the film's own promotional website, it invites viewers to host a screening party and invite the filmmakers to the event." (*Id.* ¶ 92.) The Complaint further alleges the film was released to the general public on May 15, 2016, and that "**[t]hereafter**, the Defendants have broadcast the film . . . on cable television, iTunes, Amazon Video, Vudu, YouTube and Google Play, Fandango Now, FIOS by Verizon, CinemaNow, and PlayStation." (*Id.* ¶¶ 96-97; 120-121.)

The Complaint alleges that Epix not only made these post-May 25 republications **knowing** that the film was false and misleading (*see above*), but that Epix "deliberately used the controversy surrounding the film's inaccuracy to promote the film and 'encourage people to

4

watch the film'" and "to entice people to watch the film." (*Id*. ¶¶ 79, 108(q), 132(q).) Specifically, on May 25, in response to Soechtig's and Couric's statements about edits that reputable news outlets had characterized as "false" and "misleading," Epix said that it "encourage[d] people to watch the film and decide for themselves." (*Id*. ¶ 79.) Finally, the Complaint alleges that "Epix knowingly and intentionally ratified and adopted Couric's, Soechtig's, and Atlas Films' misconduct when—even ***after*** the unedited audio of the VCDL interview was released and the film's executive producer admitted that the footage of the VCDL was misleading and inaccurate—Epix: (1) publicly announced that it was standing by the filmmakers' editing choices; (2) continued to publish and promote the film including the defamatory exchange; and (3) exploited the media firestorm surrounding the controversy to promote the film." (*Id*. ¶¶ 111, 135.)

## ARGUMENT

The Complaint alleges that on May 25, 2016, Epix issued a public statement standing behind the intentionally edited footage of the Plaintiffs and encouraging new audiences to watch the film. It further alleges that Epix published and republished the film to new audiences on separate occasions after May 25. Under Virginia law, Epix's republications of the film to new audiences after May 25 are separate causes of action, and actual malice is measured from the date of each such publication. Since the Complaint alleges facts establishing that Epix knew the film's portrayal of the VCDL was false and misleading no later than May 25, Epix's motion should be denied.

As explained in Restatement (Second) of Torts § 577A—which has been adopted in Virginia[4]—when determining if defamatory communications constitute separate publications,

---

[4] *See, e.g.*, *Semida v. Rice*, 863 F.2d 1156, 1161 n.2 (4th Cir. 1988) ("The single publication rule set forth in Restatement (Second) Torts § 577A is followed in Virginia." (citing *Morrissey v.*

courts apply the commonsense rule that "each of several communications to a third person by the same defamer is a separate publication." Restatement (Second) of Torts § 577A(1). Moreover, as explained by the U.S. Supreme Court and the Restatement, that is true even where the same defamatory communication is repeated on separate occasions: the "'general rule [is] that each communication of the same defamatory matter by the same defamer, whether to a new person or to the same person, is a separate and distinct publication, for which a separate cause of action arises.'" *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 n.3 (1984) (quoting Restatement (Second) of Torts § 577A cmt. a.). Thus, under this long-standing and commonsense rule, when a defendant publishes a defamatory statement and subsequently republishes that same defamatory statement, those publications give rise to separate causes of action.[5]

Each of the film's releases, broadcasts, online postings, and screenings—including those ***after*** May 25, 2016—constitute a separate "publication" because each was published at a separate time to a separate audience. *See Keeton*, 465 U.S. at 773. This conclusion is not affected by the "single publication rule." As the United States Supreme Court and Virginia courts have explained, the single publication rule constitutes a narrow exception to the general rule that "each communication of the same defamatory matter by the same defamer, whether to a new person or to the same person, is a separate and distinct publication, for which a separate cause of action arises." *Id.* at 774 & n.3; *accord Armstrong v. Bank of Am.*, 61 Va. Cir. 131, at *1 (2003). Under the single publication rule, "[a]ny one . . . exhibition of a motion picture or

---

*William Morrow & Co.*, 739 F.2d 962, 967 (4th Cir. 1984)); *Armstrong v. Bank of Am.*, 61 Va. Cir. 131, at *1-2 (2003) (observing that section 577A "has been cited favorably by this and other Virginia Circuit Courts").

[5] The Restatement provides a clear illustration of the operation of this rule: "On one occasion A says to B that C is a murderer. On a later occasion A repeats the same statement to B. On a third occasion A makes the same statement to D. Each of the three communications is a separate publication and C has three causes of action against A." Restatement (Second) of Torts § 577A illus. 1.

similar aggregate communication is a single publication," *Armstrong*, 61 Va. Cir. 131, at *1, and "[a] single communication heard *at the same* time by two or more third persons is a single publication." Restatement (Second) of Torts § 577A(2). The purpose of the rule is "to protect 'defendants and the courts from the numerous suits that might be brought for the same words if each person reached by such a large-scale communication could serve as the foundation for a new action.'" *Armstrong*, 61 Va. Cir. 131, at *1. In other words, if 200 people viewed the film at the Sundance Film Festival in January 2016, the Plaintiffs would still have only *one* cause of action—not 200 causes of action—arising out of the January 2016 exhibition of the film at the Sundance Film Festival.

Notably, and consistent with its purpose, the single publication rule does *not* apply to "separate [] publications *on different occasions*" or "republications" of a defamatory statement. Restatement (Second) of Torts § 577A cmt. d. "In these cases, the publication reaches a new group and the repetition justifies a new cause of action." *Id.* Accordingly, the Supreme Court of Virginia has held that "each time defamatory matter is brought to the attention of a third person there is a new publication constituting a separate cause of action against the person responsible for such new publication." *Weaver v. Beneficial Fin. Co.*, 199 Va. 196, 200 (1957). As the court recognized, "'[i]t would seem plain on principle that no matter on how many separate occasions one may utter slanderous words about another (though all may refer to the same transaction) each slander constitutes a new cause of action.'" *Id.* (quoting *Irvine v. Barrett*, 119 Va. 587, 591 (1916)). Thus, as noted in the Restatement, the paradigmatic example of a republication is that of a newspaper with morning and evening editions: "[I]f the same defamatory statement is published in the morning and evening editions of a newspaper, each edition is a separate single publication and there are two causes of action." Restatement (Second) of Torts § 577A cmt. d;

*see Cox Enters., Inc. v. Gilreath*, 235 S.E.2d 633, 634 (Ga. Ct. App. 1977) (same); *see also Lehman v. Discovery Communications, Inc.*, 332 F. Supp. 2d 534, 539 (E.D.N.Y. 2004) ("[r]ebroadcast of the defamation over radio or television or a second run of a motion picture on the same evening . . . [is a separate publication] that reaches a new group and the repetition justifies a new cause of action.").

As alleged in the Complaint, Epix published the film on separate occasions to separate audiences. By definition, publications of the film that occurred *before* May 25 happened on separate occasions from publications of the film that occurred *after* May 25. The Complaint alleges that Epix's post-May 25 publications of the film were made to different audiences, including individuals who attended screening events in their respective cities on various dates between April and June 2016, as well as cable television subscribers, FIOS subscribers, and users and customers of iTunes, Amazon Video, Vudu, YouTube and Google Play, Fandango Now, CinemaNow, and PlayStation to whom the Defendants published the film on various dates after May 15, 2016.[6] (Compl. ¶¶ 53, 121.) Because Epix republished the defamatory exchange on multiple different occasions to multiple different audiences after May 25, 2016, each of those publications is a separate cause of action. *See Weaver*, 199 Va. at 200 ("[E]ach time defamatory matter is brought to the attention of a third person there is a new publication constituting a separate cause of action against the person responsible for such new publication.").

The Western District of Virginia recently imposed an additional requirement for republication: the defendant must "redistribute[] the [defamatory] material with the goal of reaching a new audience." *Eramo v. Rolling Stone, LLC*, No. 15-CV-23, 2016 WL 5234688, at

---

[6] It is axiomatic that publication to iTunes subscribers reaches a different audience than publication to Amazon Video subscribers, YouTube users, and the like. Indeed, that is the very reason why distribution companies like Epix release films like *Under the Gun* through various channels, to reach different audiences.

8

\*11 (W.D. Va. Sept. 22, 2016), on reconsideration, W.D. Va. No. 15-CV-23, 2016 WL 5942328 (W.D. Va. Oct. 11, 2016) (denying motion for summary judgment because "[re]publication is a factual [question] for the jury."). "Stated differently," the court continued, "republication occurs when the speaker has 'affirmatively reiterated' the statement." *Id.* Although this additional requirement—affirmatively reiterating the statement by intending to publish it to a new audience—has *not* been adopted by the Supreme Court of Virginia, it is nevertheless satisfied here by the May 25 statement from Epix and subsequent publications of *Under The Gun* via the various distribution channels it selected to promote and monetize the film.

The Complaint alleges that, in response to the controversy over the deceptive editing, Epix issued a statement saying that it "stands behind Katie Couric, director Stephanie Soechtig, and their creative and editorial judgment. We encourage people to watch the film and decide for themselves." (Compl. ¶ 79.) At that point, anyone who had already seen the film would have *already* "decide[d] for themselves" what they thought about the editing. As such, Epix's May 25 statement is targeted at people who had not yet seen the film—*i.e.*, new audiences—and expressly encourages those new audiences to watch the film. By publicly announcing that it "stands behind" the "editorial judgment" that manipulated the footage of the VCDL, Epix affirmatively reiterated the deceptive footage of the VCDL, in an attempt to reach those new audiences. Epix's statement was not one of general support for the filmmakers. To the contrary, it was made in direct response to—and support of—the deceptive editing. Epix even *admits* that "the CNN Article makes plain" that "the only reasonable reading of the EPIX Press Comment is that EPIX was merely standing behind *Couric's and Soechtig's 'creative and editorial judgment' to omit the Plaintiffs' actual responses* [to Couric's interview question] and 'provide a pause . . .'" (Epix Mem. at 18.)

9

Because each publication gives rise to a separate cause of action, actual malice is measured at the time of *each* publication.  *See Weaver* 199 Va. at 200; Special Verdict Form Number Two Rolling Stone, LLC, *Eramo v. Rolling Stone, LLC,* No. 15-cv-23, 2016 WL 5234688 (W.D. Va. Sept. 22, 2016) [Dkt. 366] (Ex. C) (finding that while Rolling Stone did not act with actual malice with respect to the original publication of the defamatory statements, it did act with actual malice with respect to its republication of the defamatory statements).  There can be no serious dispute that the Complaint alleges facts establishing that Epix acted with actual malice for all publications occurring after May 25, 2016.[7]  Specifically, the Complaint alleges that Epix knew at least by May 25, 2016, that: (i) the unedited audio recording of the VCDL interview proved that the VCDL had provided numerous detailed responses to Couric's question; (ii) Soechtig had intentionally edited the exchange with the VCDL; (iii) the Washington Post had observed that the film "*falsely* depicted gun supporters as 'idiots'; (iv) in the years the Washington Post had covered and watched media organizations, it had "scarcely seen a thinner, more weasely excuse" than the one offered by Soechtig for the film's false depiction of gun supporters; (v) the Washington Post had called for an apology and retraction of the film; and (vi) CNN Money had observed that the film contained "a *misleading* scene that makes gun rights activists seems stumped by one of interviewer Katie Couric's questions." (Compl. ¶¶ 78-83; Ex. A.)  Despite this knowledge, Epix used the controversy over the deceptive editing to encourage

---

[7] Epix's decision to issue a public statement supporting the "editorial judgment" behind the film's deceptive portrayal of the VCDL suggests that Epix almost certainly had investigated the circumstances leading to the deceptive edit—and had other involvement behind the scenes—prior to May 25.  For this reason, the Plaintiffs anticipate that discovery will reveal additional evidence of Epix's actual malice with respect to publications of the film before May 25.

...

new audiences to watch forthcoming publications of the film. In sum, it is difficult to imagine a more clear-cut case of actual malice and Epix's motion should be denied.[8]

## CONCLUSION

For the foregoing reasons, Plaintiffs the Virginia Citizens Defense League, Dan L. Hawes, and Patricia Webb respectfully request that the Court deny the motion to dismiss filed by Studio Three Partners, LLC d/b/a Epix.

Dated: December 16, 2016

Respectfully Submitted,

*/s/ Megan L. Meier*
Thomas A. Clare (VSB # 39299)
Elizabeth M. Locke (VSB # 71784)
Megan L. Meier (VSB # 88720)
CLARE LOCKE LLP
902 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: tom@clarelocke.com
Email: libby@clarelocke.com
Email: megan@clarelocke.com

*Attorneys for Plaintiffs*

---

[8] Even if the factual allegations in the Complaint regarding Epix's actual malice or republication required additional detail, granting Epix's request to dismiss the complaint "with prejudice and without leave to amend" would be reversible error. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend a complaint] when justice so requires."); *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc) (Rule 15(a) is a "liberal rule" which gives effect to the "federal policy in favor of resolving cases on their merits instead of disposing them on technicalities."); *Foman v. Davis*, 371 U.S. 178, 182 (1962) ("If the underlying facts or circumstances relied upon by a [party] may be a proper subject of relief, [that party] ought to be afforded an opportunity to test [its] claim on the merits."); *Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016) ("A dismissal based on the failure to plead facts giving rise to an inference of actual malice should be **without prejudice** and the plaintiff should have the opportunity to amend his complaint.").

11

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the forgoing document was filed with the Clerk of the Court using the CM/ECF system on December 16, 2016, which will send notification of such filing to the following:

Kevin T. Baine
Thomas G. Hentoff
Nicholas G. Gamse
Emily A. Rose
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
Email: kbaine@wc.com
Email: thentoff@wc.com
Email: ngamse@wc.com
Email: erose@wc.com

*Counsel for Defendant Katie Couric*

Nathan E. Siegel
Mara J. Gassmann
Matthew E. Kelley
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1899 L Street, NW, Suite 200
Washington, DC 20036
Telephone: (202) 508-1100
Facsimile: (202) 861-9888
Email: nsiegel@lskslaw.com
Email: mgassmann@lskslaw.com
Email: mekelley@lskslaw.com

*Counsel for Defendant Atlas Films, LLC*

Elizabeth McNamara
Linda Steinman
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Telephone: (212) 489-8230
Facsimile: (212) 489-8340
Email: lizmcnamara@dwt.com
Email: lindasteinman@dwt.com

Patrick J. Curran Jr.
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006-3401
Telephone: (202)973-4200
Facsimile: (202)973-4449
Email: patcurran@dwt.com

*Counsel for Defendant Studio 3 Partners, LLC d/b/a Epix*

By: /s/ *Megan L. Meier*
Megan L. Meier