IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

|  |  |
|---|---|
| **VIRGINIA CITIZENS DEFENSE LEAGUE, ET AL.,**<br><br>                    **Plaintiffs,**<br><br>      **vs.**<br><br>**KATIE COURIC, ET AL.,**<br><br>                    **Defendants.** | **Civil No.:  3:16-cv-00757-JAG** |

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COMPLAINT
OF DEFENDANTS ATLAS FILMS, LLC AND KATIE COURIC**

Nathan Siegel (admitted *pro hac vice*)
Mara J. Gassmann (VSB No. 82131)
Matthew E. Kelley (VSB No. 84045)
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1899 L Street, NW, Suite 200
Washington, DC 20036
Telephone:     (202) 508-1100
Facsimile:      (202) 861-9888
Email:          nsiegel@lskslaw.com

*Counsel for Defendant Atlas Films, LLC*

WILLIAMS & CONNOLLY LLP
Kevin T. Baine (admitted *pro hac vice*)
Thomas G. Hentoff (admitted *pro hac vice*)
Nicholas G. Gamse (admitted *pro hac vice*)
Emily A. Rose (VSB No. 89529)*
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone:     (202) 434-5000
Facsimile:      (202) 434-5029
Email:          thentoff@wc.com

*Attorneys for Katie Couric*

*\*Admitted only in Virginia and the Eastern District of Virginia. Practice supervised by D.C. Bar members pursuant to D.C. Court of Appeals Rule 49(c)(8).*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT ................................................................................................................................ 2

   I.   *UNDER THE GUN* CANNOT REASONABLY BE INTERPRETED TO
      CONVEY THE DEFAMATORY MEANINGS PLAINTIFFS ALLEGE ........................ 2

      A.    The Film Does Not Imply Plaintiffs are "Ridiculous" ............................................ 3

      B.    The Film Does Not Impugn Plaintiffs' Professional Competence ......................... 6

           1.    VCDL ........................................................................................................ 6

           2.    Plaintiff Hawes ......................................................................................... 8

           3.    Plaintiff Webb ......................................................................................... 11

      C.    The Film Cannot Be Reasonably Understood to Imply Plaintiffs Had
          No Basis for Their Opposition to Background Checks .......................................... 12

      D.    Plaintiffs' Claims Are for Defamation by Implication ......................................... 13

   II.  THE FILM IS NOT "OF AN CONCERNING" VCDL .................................................... 14

CONCLUSION ........................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*CACI  Premier Technology v. Rhodes,*
536 F.3d 280 (4th Cir. 2008) ............................................................................15

*Cashion v. Smith,*
286 Va. 327, 749 S.E.2d 526 (2013)..................................................................9

*Chapin v. Knight-Ridder, Inc.,*
993 F.2d 1087 (4th Cir. 1993) .......................................................................4, 14

*Church of Scientology of California v. Flynn,*
578 F. Supp. 266 (D. Mass. 1984) .....................................................................15

*Cook, Heyward, Lee, Hopper, & Feehan, P.C. v. Trump Virginia Acquisitions
LLC,*
2012 WL 1898616 (E.D. Va. May 23, 2012) .....................................................9

*Coots v. Payton,*
280 S.W.2d 47 (Mo. 1955) .................................................................................4

*Corman v. Blanchard,*
27 Cal. Rptr. 327 (Cal. App. 2d Dist. 1962) ......................................................7

*Cox v. Hatch,*
761 P.2d 556 (Utah 1988)..............................................................................4, 7

*Cretella v. Kuzminski,*
2008 WL 2227605 (E.D. Va. May 29, 2008) .....................................................9

*D.A.R.E. America v. Rolling Stone Magazine,*
101 F. Supp. 2d 1270 (C.D. Cal. 2000) ............................................................16

*D.A.R.E. America v. Rolling Stone Magazine,*
270 F.3d 793 (9th Cir. 2001) ............................................................................16

*Desnick v. American Broadcasting Companies, Inc.,*
44 F.3d 1345 (7th Cir. 1995) ..............................................................................2

*Fey v. King,*
190 N.W. 519 (Iowa 1922) .................................................................................4

*Janklow v. Newsweek, Inc.,*
788 F.2d 1300 (8th Cir. 1986) ..........................................................................13

*Lamberti v. Sun Printing & Publishing Association*,
  97 N.Y.S. 694 (N.Y.A.D. 2d Dep't 1906) ...........................................4

*McCullagh v. Houston Chronicle Publishing Company*,
  211 F.2d 4 (5th Cir. 1954) .................................................................4

*Miller v. Tony & Susan Alamo Foundation*,
  748 F. Supp. 695 (W.D. Ark. 1990)..................................................12

*Moss v. Harwood*,
  102 Va. 386, 46 S.E. 385 (1904)........................................................8

*Mullins v. Brando*,
  13 Cal.App.3d 409 (1970) ...............................................................16

*Reuber v. Food Chemical News, Inc.*,
  925 F.2d 703 (4th Cir. 1991) ...........................................................12

*Sassower v. New York Times Company*,
  852 N.Y.S.2d 180 (N.Y.A.D. 2d Dep't 2008) ..................................12

*Schaecher v. Bouffault*,
  290 Va. 83, 772 S.E.2d 589 (2015)...........................................3, 5, 6

*Spencer v. American International Group, Inc.*,
  2009 WL 47111 (E.D. Va. Jan. 6, 2009) .........................................5, 9

*Tatur v. Solsrud*,
  498 N.W.2d 232 (Wisc. 1993) .........................................................4, 7

*Tronfeld v. Nationwide Mutual Insurance Company*,
  272 Va. 709, 636 S.E.2d 447 (2006)..................................................9

*Warfaa v. Ali*,
  811 F.3d 653 (4th Cir. 2016) ...........................................................14

*Webb v. Virginian-Pilot Media Companies*,
  287 Va. 84, 752 S.E.2d 808 (2014).................................................2, 5

*West Virginia State Board of Education v. Barnette*,
  319 U.S. 624 (1943) ...........................................................................8

## Other Authorities

1 Rodney A. Smolla, *Law of Defamation* § 4.1 (2d ed. 2016).......................................3

W. Prosser and W. Keeton, *The Law of Torts* § 111 (5th ed. 1984))..........................3, 4

## PRELIMINARY STATEMENT

Plaintiffs' Opposition underscores why this motion presents the Court with a threshold issue of law, because there is much upon which Plaintiffs and Defendants agree.  The Parties basically agree on the general outlines of defamation law.  They agree that *Under the Gun* must be considered as a film, not just as a dry transcript or an isolated eight seconds of footage.  The Parties also agree, at least for purposes of this motion, that the film can be construed to imply that the participants in the group Couric interviewed did not respond to her question about felons and terrorists.  And we further agree that portraying someone as being stumped by a question, including Couric's question, is not necessarily defamatory.

The Parties disagree, however, about whether it may be defamatory to show these Plaintiffs sitting in silence after Couric's question.  The fundamental point this motion raises is that it is not defamatory to be falsely portrayed as unable to answer on the spot one of several questions in a political interview about gun rights.  That is so for two related reasons.  First, defamation law requires an accusation of conduct that is odious or disgraceful to society at large, which this is not.  Second, in the political arena, defamation law is especially loath to permit value judgments about which views are legitimate for persons of different political stripes or views to hold.

Plaintiffs' Opposition never really addresses this critical point.  To the contrary, their efforts to flesh out the alleged defamatory meaning(s) further underscore those deficiencies.  For example, Plaintiffs ask the Court to find that Couric's question was based on an "anti-gun premise"; that any competent "Second Amendment activist" must disagree with her question and be poised to refute it; and that every gun store owner and even gun consumer necessarily opposes

background checks.  The Court need not and should not reach any of those propositions, because they are properly matters for the court of public opinion, not a defamation suit in a court of law.[1]

## ARGUMENT

## I.   *UNDER THE GUN* CANNOT REASONABLY BE INTERPRETED TO CONVEY THE DEFAMATORY MEANINGS PLAINTIFFS ALLEGE

Plaintiffs open their Opposition with the proposition that under Virginia law, the Court does not make a "final determination" of defamatory meaning at the pleading stage.  Plaintiffs' Mem. in Opp. to the Mot. to Dismiss Filed By Atlas Films, LLC and Katie Couric ("Opp.") (Dkt. 34) at 2.  That is something of an overstatement.  The Court is obliged to decide now, as a matter of law, whether a challenged publication is reasonably capable of conveying the defamatory meaning alleged by the plaintiff.  *Webb v. Virginian-Pilot Media Cos.*, 287 Va. 84, 89, 752 S.E.2d 808, 811 (2014); *see also* Mem. of Law in Support of Mot. to Dismiss Compl. of Defendants Atlas Films, LLC and Katie Couric ("Atlas Mot.") (Dkt. 27) at 3.  That *is* a final determination in the only relevant sense – *i.e.,* the case will either go forward, or not, depending on the answer.  To that end, Plaintiffs' Opposition articulates roughly a half-dozen alleged

---

[1] Beyond their legal arguments, much of Plaintiffs' Opposition, like their Complaint, is dedicated to portraying the Defendants as vicious, hatchet-job artists who manipulate light to make their subjects look sinister and use room tone breaks to record footage for other nefarious purposes.  The not-so-subtle implication appears to be that the Defendants are just bad documentarians who deserve to be punished through the vehicle of defamation law.  To say the least, Defendants reject those allegations, which do not appear to have a basis in any facts that could be known to the Plaintiffs.  Nonetheless, we of course accept that, for purposes of this motion only, the Court must accept as true the Complaint's factual allegations.  Nevertheless, all that matters for purposes of this motion is what meaning(s) the film itself reasonably conveys, and whether those meanings are defamatory, regardless of how the film was constructed.  Courts have long cautioned that attacks on the techniques or character of journalists and filmmakers, whether true or false, should not be confused with the question of whether the actual speech they produce is actionable.  *See, e.g., Desnick v. Am. Broad. Cos., Inc.*, 44 F.3d 1345, 1355 (7th Cir. 1995) ("If the broadcast itself does not contain actionable defamation, and no established rights are invaded in the process of creating it  . . .  then the target has no legal remedy even if the investigatory tactics used by the network are surreptitious, confrontational, unscrupulous, and ungentlemanly.").

defamatory meanings, though many seem to essentially repeat the same theory.  We address all of them in turn.

### A.      The Film Does Not Imply Plaintiffs are "Ridiculous"

Plaintiffs argue that the few seconds in which the film shows Couric's question make them look "ridiculous," and they claim that Atlas and Couric left that term out of their motion's lexicon of potentially defamatory meanings.  Opp. at 1-2, 5-8.  We do not think that is a fair criticism of the motion (*see, e.g.*, Atlas Mot. at 12, 15), but that is beside the point.  Rather, what matters here is that Plaintiffs take the word "ridiculous" out of the context of the precedent they cite.

"Ridiculous" in the context of defamation law means more than merely silly or bumbling, and none of the cases plaintiffs cite suggest otherwise.  As the Virginia Supreme Court explained in the case on which Plaintiffs primarily rely, a statement is not defamatory if "[i]t does not so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him . . . such as by making the plaintiff appear odious, infamous, or ridiculous, or subjecting her to contempt, scorn, shame, or disgrace." *Schaecher v. Bouffault*, 290 Va. 83, 95, 772 S.E.2d 589, 595-96 (2015) (internal quotations and citation omitted).  Thus, the essence of actionable defamation is a statement that would make people want to shun and avoid the plaintiff, which is why "ridiculous" is used alongside adjectives such as "infamous" and "odious."  Going back more than a century, authorities have long emphasized that defamation necessarily involves *disgrace*, not simply "ridicule" in some generic sense.  *See, e.g.*, 1 Rodney A. Smolla, *Law of Defamation* § 4:1 (2d ed. 2016) ("The failing must be one significant enough to alter one's standing [in the community], and not a triviality that would be routinely shrugged off."); W. Prosser and W. Keeton, *The Law of Torts* §

111, at 773 (5th ed. 1984) (defamation "necessarily . . . involves the idea of disgrace"); *Coots v. Payton*, 280 S.W.2d 47, 54 (Mo. 1955) ("a communication is not defamatory solely because it may expose one to ridicule in the sense, at least, that it exposes him to jests or injured personal feelings.").[2]

That is why a leading treatise says: "[W]hile a statement that a person is a Republican may very possibly arouse adverse feelings against him in the minds of many Democrats, and even diminish him in their esteem, it cannot be found in itself to be defamatory, since no reasonable person could consider that it reflects upon his character." *The Law of Torts* § 111 at 773. And that is so even though a Democrat falsely accused of being a Republican might well look silly or foolish to others. Similarly, the plaintiffs in cases like *Cox v. Hatch*, 761 P.2d 556 (Utah 1988), and *Tatur v. Solsrud*, 498 N.W.2d 232, 234 (Wisc. 1993), who were accused of holding party membership or voting contrary to their professed beliefs, surely thought that made them look silly and even hypocritical. *See* Atlas Mot. at 15-16. But that is not the same thing as being defamatory. *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) ("Merely offensive or unpleasant statements are not defamatory.").

---

[2] *See also McCullagh v. Houston Chronicle Publ'g Co.*, 211 F.2d 4,5 (5th Cir. 1954) (although Texas law defines defamation as "tending to injure the reputation of one who is alive, and thereby expose him to public hatred, contempt or ridicule, or financial injury", dismissal of the complaint was affirmed because "[i]t may be that [plaintiff] had been made the subject of some ridicule but, according to Texas law, this does not give rise to a cause of action for libel."); *Fey v. King*, 190 N.W. 519, 521 (Iowa 1922) ("It was contended for the plaintiff that the publication of such matter tended to provoke the plaintiff to wrath and to bring him into disrepute and ridicule. This was manifestly so. We held, however, that it was not defamatory, in that he was accused only of doing that which he had a right under the law to do. Such an accusation could not be deemed as an attack upon his integrity or moral character."); *Lamberti v. Sun Printing & Publ'g Ass'n*, 97 N.Y.S. 694, 696 (N.Y.A.D. 2d Dep't 1906) ("Mere ridicule, not such as is yoked in the various definitions with 'hatred, obloquy, or contempt,' but such as may be sportive and thoughtless, that may beget laughter, that leaves the temporary victim unaffected in his reputation and his business, is not necessarily libelous.").

For the same reasons, the fact that a media commentator thinks the exchange in the film could, to paraphrase Prosser, "diminish [gun owners] in their esteem," Opp. at 7, does not make it actionable in defamation.  To underscore this point, the Virginia Supreme Court recently concluded that even sworn testimony by witnesses that they held the plaintiff in lower esteem was wholly irrelevant to the question of whether, as a legal matter, the words at issue were capable of a defamatory meaning. *See Webb*, 287 Va. at 90-91, 752 S.E.2d at 812 (holding article not capable of conveying defamatory meaning as a matter of law despite testimony from witnesses and a jury verdict that interpreted it as defamatory).

And while the Virginia Supreme Court never has had occasion to specifically analyze the term "ridiculous," it has made clear that defamation law requires some threshold "level of harm to one's reputation required for defamatory 'sting,'" and that "language that is insulting, offensive, or otherwise inappropriate" will not necessarily qualify.  *Schaecher*, 290 Va. at 92, 772 S.E.2d at 594 (internal marks omitted).  Plaintiffs criticize Defendants' characterization of *Schaecher*, pointing out that one of the allegedly defamatory statements there concerned the potential violation of easements and covenants, not an actual present violation.  Their reading of those facts is correct, but that distinction has no bearing on the import of the case.  The larger point remains that *Schaecher* acknowledged that, while accusations like potentially violating an easement or being "not totally truthful" with a government agency might be negative and unpleasant, they nonetheless "d[id] not rise to the level of defamation." *Id.* 290 Va. at 90, 95, 772 S.E.2d at 593, 595.  *See also Spencer v. Am. Int'l Grp., Inc.*, 2009 WL 47111, at *6 (E.D. Va. Jan. 6, 2009) (granting a motion to dismiss because none of the alleged statements reached the "thresholds for actionable defamatory statements.").

Thus, the relevant question is not simply whether the film could be reasonably construed to make the Plaintiffs look like they did not answer Couric's question, but rather whether it made them look "ridiculous" in such a disgraceful manner that it could, reasonably viewed, rise to the level of defamation.  Indeed, Plaintiffs themselves acknowledge that "[i]t is not necessarily always defamatory to say that someone was stumped."  Opp. at 1.  As discussed below, none of Plaintiffs' specific theories identifies a meaning that is "sufficiently defamatory," as the law defines that term, to survive a motion to dismiss.  *Schaecher*, 290 Va. at 89, 772 S.E.2d at 592. It is simply not "ridiculous" to be—at worst—a member of a group of interviewees "stumped" by one of about a half-dozen questions posed to it.  The edit at issue does not make the Plaintiffs seem "odious, infamous, or ridiculous" or worthy of "contempt, scorn, shame, or disgrace" in the sense that any of those terms are defined in the law of defamation.  *Schaecher*, 290 Va. at 95, 772 S.E.2d at 595-96.

### B.       The Film Does Not Impugn Plaintiffs' Professional Competence

The theory the Opposition emphasizes the most is not that the film made Plaintiffs look ridiculous in and of itself, but rather that it did so in a manner that allegedly impugns their professional competence and is thus defamatory *per se*.  Opp. at 3, 8-11.  But their *per se* contentions merely serve to highlight why the film does not rise to the level of defamation under any theory.

### 1.       VCDL

Plaintiffs concede that it is not necessarily defamatory to be stumped by Couric's question.  Opp. at 1.  But VCDL argues that it is *per se* defamatory as to it, because the footage allegedly "falsely conveys that in response to a pointed question based on an anti-gun premise,

the VCDL failed to deliver on its mission, thereby casting aspersion on the VCDL's prestige and standing in its field as a Second Amendment advocacy organization." *Id.* at 8.

As a threshold matter, Plaintiffs fundamentally fail to connect the dots and explain how the mere fact that certain individual persons identified as VCDL members may have been stumped by one of Couric's multiple questions means that VCDL as a whole "failed" in its overall mission.  But beyond that, Plaintiffs' theory is the same as the one advanced by the politician in *Tatur*, 498 N.W.2d at 234, who alleged that falsely accusing him of supporting a tax increase implied he failed in his stated anti-tax mission, or by the postal employees in *Hatch*, 761 P.2d at 561-62, who claimed that being portrayed as endorsing a Republican senator meant they failed in both their mission of being Democrats personally and their professional obligations to be neutral publicly.  *See* Atlas Mot. at 15-16; *see also Corman v. Blanchard*, 27 Cal. Rptr. 327, 332 (Cal. App. 2d Dist. 1962) (it was not defamatory to falsely attribute multiple left-of-center political positions to a congressional candidate because "[w]hile the principles, attitudes, policies and philosophies reflected in these points of view may be acceptable to some and wholly unacceptable to others, popular or unpopular, some or all of them have nevertheless been prevalent among many well-informed, law-abiding, loyal Americans.").  Such implications are simply not defamatory.

It is telling that Plaintiffs attempt to distinguish such cases on the grounds that the Complaint never "alleged that the Defendants falsely portrayed them as supporting background checks." Opp. at 13.  But that distinction makes no sense.  Surely it would be far *worse*, and it would make Plaintiffs look more "ridiculous," to falsely accuse VCDL of actually supporting background checks than to imply, at worst, that it could not respond to one of the multiple questions Couric posed to them within the time frame of a media interview.  If, as Plaintiffs

implicitly concede, the former is not actionable, than the latter cannot possibly be. Yet that is now the theory of their case.

At bottom, that theory requires the Court to make political judgments consistent with the VCDL's political orientation, not, as defamation law requires, "the common estimation of mankind." *Schacher*, 290 Va. at 92, 772 S.E.2d at 594 (quoting *Moss v. Harwood*, 102 Va. 386, 46 S.E. 385, 386 (1904)). Thus, VCDL asks that the Court conclude the exchange is potentially defamatory because Couric's question is based on an "anti-gun premise." Opp. at 8. This assumes that anyone who asks whether felons and terrorists might purchase guns without background checks is "anti-gun." Taken another way, VCDL seeks to have the Court declare that, in order to be a competent "Second Amendment activist[]," *id.* at 5, or "advocacy organization," *id.* at 8, one must disagree with the "anti-gun premise" of Couric's question and be able to refute it. Needless to say, there are doubtless plenty of citizens who consider themselves to be "pro-gun", but believe that felons and terrorists should not be permitted to purchase firearms. Determining what "politically correct" views one must hold in such a debate is not within this (or any) Court's purview. *See W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion"). Rather than wading into political debates about guns, the Court need only determine that society does not deem it to be disgraceful to remain silent in the face of Couric's question.

## 2. Plaintiff Hawes

Plaintiffs claim the footage defamed Hawes because it "falsely conveyed that [he] lacked knowledge of the law and was an incompetent oral advocate." Opp. at 10. Even at first blush, this assertion cannot be sustained because Hawes was not held out to be acting as an attorney for

8

anyone; he was simply one of nine people participating in a group media interview.  Even ignoring that, Plaintiffs point to no case or rule of professional ethics suggesting that an attorney who remains silent in the face of a single political question posed by a reporter to a group is thereby "necessarily . . . unfit to practice law." *Spencer*, 2009 WL 47111, at *6.

To the contrary, the cases Plaintiffs cite for the proposition that "statements suggesting incompetence or poor performance in one's trade or profession are defamatory *per se*," Opp. at 3, involve statements imputing much more serious misconduct than simply being stumped by one of several questions about the merits of one's political views.  For example, *Cashion v. Smith*, 286 Va. 327, 337, 749 S.E.2d 526, 531-32 (2013), involved statements that did more than merely "suggest" that the plaintiff anesthesiologist "acted incompetently," as Plaintiffs state – the allegation was that the doctor had deliberately let a patient die.  And the two cases they cite involving attorneys concern accusations of ethical violations, criminal conduct, and misappropriating clients' money.  Opp. at 8-9.  Both cases actually support Defendants' point, which is that being stumped by a single question does not remotely rise to the level of an accusation that is defamatory *per se* with respect to an attorney.  *See* Atlas Mot. at 20 (citing *Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 714, 636 S.E.2d 447, 450 (2006) (statements that implied "a combination of dishonesty, incompetence or the crimes of larceny by trick or obtaining money by false pretenses") and *Cretella v. Kuzminski*, 2008 WL 2227605, at *8 (E.D. Va. May 29, 2008) (statements that attorney "might be . . . closer to losing his license" and that he had been reported to state bar authorities)); *see also, e.g.*, *Cook, Heyward, Lee, Hopper, & Feehan, P.C. v. Trump Virginia Acquisitions LLC*, 2012 WL 1898616, at *5 (E.D. Va. May 23, 2012) ("In general, statements of unsatisfactory job performance do not rise to the level of defamation.").

Rather, here too, Plaintiffs ask the Court to accept their political view that any "attorney who practices litigation involving firearms and personal defense" must necessarily disagree with and rebut the premise of Couric's question, and do so in the context of a media interview with members of a political group in order to represent competently "his clients' right to defend themselves, their homes, and their families." *Id.* at 8. That stretches the rules of professional responsibility beyond reasonable recognition.

Plaintiffs also offer what can only be described as a tortured attempt to claim that Hawes did not misstate the law in his response to Couric's question. They claim that, when Hawes twice used the term "prior restraint", and specifically said that "there are a lot of Supreme Court opinions that say, 'No, prior restraint is something that the government does not have the authority to do,'" Atlas Mot. at 7, he was not talking about the Supreme Court's prior restraint doctrine. Rather, he was supposedly referring to some other "colloquial" concept. Opp. at 9-10. In order to even present that argument, Plaintiffs literally reorder the sequence of Hawes' words, and even then the logic of their argument is difficult to follow.[3]

Hawes obviously views background checks (the subject of Couric's question) as an effort to "prevent future crime by identifying bad guys before they do anything bad" and as a form of prior restraint imposed in the absence of an "overt act." Compl. Ex. 2 at 37:40-38:04. He is of course free to believe and advocate for that position, but it does not change the reality that every court in the nation presented with the argument that background checks or other gun regulations constitute unlawful prior restraints has rejected it. See Atlas Mot. at 22 n.5. Nor does it affect

---

[3] Hawes actually discussed the "overt act" concept after he mentioned prior restraints; Plaintiffs re-order his words to make it look like his prior restraint point flowed from his discussion of overt acts. Opp. at 10.

the larger point, which is that none of this remotely rises to the level of accusations about an attorney that are defamatory *per se*.

### 3.    Plaintiff Webb

It cannot possibly be the law that to be a competent gun dealer, one must refute a premise of a question concerning the very background check laws gun dealers are obligated to follow. Atlas Mot. at 19-20.  That is not only a political judgment but one that would run counter to sound public policy.  Plaintiffs offer no response at all to that common-sense point.  And on an even more basic level, it is simply not reasonable to consider Webb to be "incompetent" at her job simply because she was momentarily visible in the blurry background after Couric's question on background checks.

Instead, to try to assert a *per se* claim by Webb, Plaintiffs go even farther in asking the Court to make sweeping judgments to the effect that one must necessarily share her political views in order to competently run a gun store or even buy a gun.  Thus, Plaintiffs ask the Court to hold that all gun store customers (1) hold monolithic "political stripes and views"; (2) "support the right of individuals to purchase firearms without governmental interference"; (3) oppose background checks, (4) think felons should be able to buy guns; (5) think Couric's question was "anti-gun"; and (6) believe that anyone who deviates from those views in any way, or merely remains silent when asked about preventing terrorists and felons from buying guns, is not someone who "supports the Second Amendment."  Opp. at 10-11.

Those are not, as Plaintiffs suggest, merely "factual allegations" that must be accepted as true. *Id.* at 11.  Rather, they are an invitation for the Court to hold that, as part and parcel of the skills attendant to running the business, gun store owners must share Webb's political views and it would be defamatory to suggest any owner does not think as she does.  But defamation law is

11

not a forum for courts to become "instruments of orthodoxy charged with the responsibility of keeping citizens on the ideological straight and narrow." *Miller v. Tony & Susan Alamo Found.*, 748 F. Supp. 695, 698 (W.D. Ark. 1990).

### C. The Film Cannot Be Reasonably Understood to Imply Plaintiffs Had No Basis for Their Opposition to Background Checks

In the Complaint, the allegation that the film implies that Plaintiffs "had no basis for their position on background checks", Compl. at ¶6, is clearly the cornerstone of their claims, and is repeated numerous times. Yet in their Opposition, Plaintiffs only briefly attempt to defend that alleged meaning, and only towards the end of their brief. Opp. at 13-15. Plaintiffs now acknowledge that the film does provide, indeed at some length, examples of why members of the group oppose background checks. *See* Compl. Ex. 1 at 20:18-20:57.

Nonetheless, they contend *Under the Gun* still implies there was no basis for that opposition because the film also presented opposing views of gun safety advocates. Opp. at 14. This argument reduces to the proposition that the film is defamatory because it does not present Plaintiffs' views uncritically. Plaintiffs cite no cases in support of this idea, because it is not and cannot be the law. *See ,e.g., Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 716 (4th Cir. 1991) (en banc) ("[M]any publications set out to portray a particular viewpoint or even to advance a partisan cause. Defamation judgments do not exist to police their objectivity; the First Amendment presupposes that a veritable medley of opposing voices is better suited to the search for truth."); *Sassower v. N.Y. Times Co.*, 852 N.Y.S.2d 180, 181 (N.Y.A.D. 2d Dep't 2008) (claim that the defendant "failed to include and recount certain information as desired by the plaintiff" was not actionable).

Plaintiffs also claim that, because the basis for opposing background checks was provided by someone other than Hawes and Webb, the film can be interpreted to defame those

two individuals by implying *they* had no basis for their own opposition to background checks. Opp. at 14.  Not only does this undercut their argument that the VCDL members' responses must be interpreted as representing the group as a whole, it makes no sense.  There is no requirement that a news or documentary program which conducts a group interview must show each of the participants in that interview answering a question, on pain of defamation liability.  *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1306 (8th Cir. 1986) ("Accounts of past events are always selective, and under the First Amendment the decision of what to select must almost always be left to writers and editors. It is not the business of government.").

In the last analysis, Plaintiffs are suing because they believe that their disagreement with what they call the "anti-gun premise" of Couric's question was not accurately presented by the film – even though the views they contend Couric implicitly expressed in her question are neither ridiculous nor contemptible.  Despite Plaintiffs' protestations to the contrary, Opp. at 13, that is the essence of an attempt to state a cause of action for false light invasion of privacy, which Virginia does not recognize, rather than defamation.  *See* Atlas Mot. at 17-18.

Finally, beyond the point about background checks, Plaintiffs allege the film carries other defamatory meanings: that Plaintiffs "(1) are ignorant and unfit in their trades; (2) are uninformed notwithstanding their expertise in the areas of gun regulations and gun rights; and (3) were stumped by Couric's question."  Opp. at 15.  Defendants agree that is what the Complaint alleges, but all of those alleged meanings simply restate the same theories of defamation and defamation *per s*e that have already been addressed here.

### D.    Plaintiffs' Claims Are for Defamation by Implication

Plaintiffs argue that their Count I does not allege defamation by implication because it asserts that the footage at issue was literally false – that what it depicted did not actually happen.

13

Opp. at 15-16.  That assertion is not accurate.  Taken literally, the film showed Webb and Hawes not responding to Couric's question for a total of eight seconds, when in fact it took them both longer to respond.  *See* Atlas Mot. at 16.  Plaintiffs' real assertion is that the eight seconds implied that they did not answer the question during the interview, a proposition that for purposes of this motion is not disputed.  Where the parties differ is whether it is defamatory to suggest that the Plaintiffs did not answer the felons question, and to resolve that question it does not matter whether Plaintiffs' theory is characterized as implied defamation, direct defamation, or both.[4]

## II.    THE FILM IS NOT "OF AND CONCERNING" VCDL

VCDL does not have a legal basis to complain about the eight-second pause because it, as an organization, was not defamed.  This point is not complicated.  The premise of VCDL's claim is that a "non-profit . . . grassroots", membership organization appeared to be "stumped" because a few people briefly identified only as "members" had difficulty answering a question in an interview.  That proposition defies common sense, as well as the law of defamation.

Most of Plaintiffs' response focuses on the proposition that a corporation can, at least in some circumstances, be defamed when employees working on its behalf are allegedly defamed for executing their official duties.  Plaintiffs cite *Schaecher*, among other cases, in support of that proposition, and Defendants take no issue with it.  But it is beside the point here.  VCDL is not a

---

[4] Plaintiffs also are mistaken when they argue, Opp. at 17, that the Virginia Supreme Court invalidated the Fourth Circuit's requirement that a defamation by implication plaintiff show that the defendant intended or endorsed the allegedly defamatory inference. *Chapin*, 993 F.2d at 1092-93.  Because this case is in federal court, and because *Chapin*'s intent/endorsement requirement is a matter of First Amendment law, not state law, this Court is bound to follow Fourth Circuit precedent. *Warfaa v. Ali*, 811 F.3d 653, 661 (4th Cir. 2016).  Nonetheless, since Atlas and Couric did not raise the intent/endorsement requirement as a basis for this motion , it is not relevant here.

corporation, Webb and Hawes were not employees, and the context of the cases on which Plaintiff relies are wholly inapplicable here.

Primarily, Plaintiff relies extensively on *CACI Premier Technology v. Rhodes*, 536 F.3d 280 (4th Cir. 2008) (cited at Opp. at 18-20), for the proposition that an organization can be accused of criminal misconduct. But the defamatory statements at issue in the portion of the case Plaintiffs discuss did not refer to individuals; they were instead express accusations against the plaintiff company (CACI) directly, by its name.[5] No one would seriously question that a company can be defamed when it is directly accused of facilitating a corporate policy of rape and murder, but that is nothing like VCDL's theory here.[6]

Plaintiffs next claim that "Defendants fail to cite a single case" actually supporting their position, but that is plainly not so. The case most closely analogous to this one is *Church of Scientology of California v. Flynn*, 578 F. Supp. 266, 268-69 (D. Mass. 1984). In *Flynn*, the Court held that the Church of Scientology, a non-profit association, was not defamed when a number of its members, identified as "Scientologists," were accused of improperly attacking

---

[5] Some examples of the many statements at issue included the defendant radio host saying, in relevant part: (1) "the ones that are being paid to do this are not our troops but it's CACI"; (2) "How about the defense contractors or the oil conglomerates or CACI or Titan International?"; (3) "No one dared talk about the mercenaries. No one dared talk about all these companies, Blackwater, and CACI"; (4) "So for those people that just want to kill for the sake of killing . . . call Triple Canopy or call Blackwater or call CACI"; (5) "So the only law that anybody that wants to prosecute CACI and Titan, the only law—and believe me, people do—and the only law that they can find to prosecute CACI and Titan is this obscure Department of Defense law . . . " *CACI Premier Tech., Inc.*, 536 F.3d at 289-91, 298-99.

[6] The only portion of *CACI* that Defendants briefly cited was a different part of the opinion, in which the Court did hold that some defamatory statements about individual CACI contractors did not defame CACI. 536 F.3d at 302 (cited at Atlas Mot. at 25). In a footnote, Plaintiffs attempt to distinguish that portion of the opinion by pointing out those statements concerned conduct by individuals before they were hired by CACI, which is not analogous to the circumstances here. Opp. at 18 n. 4. That is a fair point, but the appropriate conclusion to draw would be that *CACI* does not really speak to either side's position in this case.

15

Church critics.  *Id.*  Plaintiffs try to distinguish *Flynn* on the grounds that "the defamatory accusation was not in direct relation to the trade or business of the organization, as is the case here."  Opp. at 20.  To the contrary, the nexus in *Flynn* was far closer.  The defendant was expressly identified in the newspaper article at issue as a media "consultant on the Church of Scientology" and the actual defamatory statements specifically referred to "Scientologists."  578 F. Supp. at 267.

*Mullins v. Brando*, 13 Cal.App.3d 409 (1970), a decision discussed at length in *Flynn*, is also instructive here.  In *Mullins*, the Court held that an unincorporated police officers' association was not defamed when some of its members were accused of misconduct, because while "an unincorporated association . . . can be defamed," there was nothing pled about the motivations of individual members that "can be construed as defamatory of the organization." *Id.* at 422.  The same is true here.

Plaintiffs also rely heavily on *D.A.R.E. America v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270 (C.D. Cal. 2000), but the portion of the opinion they cite has actually been disavowed. In that case, the district court concluded that, in the context of a magazine article that was expressly about the plaintiff non-profit organization – it was titled, "Truth or D.A.R.E." – "references to actions taken by an organization's supporters imply that such actions were undertaken at the behest, or certainly with the approval, of the organization itself."  *Id.* at 1290. Those facts obviously presented a far closer nexus between the alleged actions of supporters and those of the organization than in *Under the Gun*, which is not a film about the VCDL.  Yet even on those facts, the opinion Plaintiffs cite has essentially been disavowed by the Ninth Circuit. *See D.A.R.E. Am. v. Rolling Stone Magazine*, 270 F.3d 793, 793 (9th Cir. 2001) ("[W]e agree

16

with and adopt the well-reasoned opinion of the district court on all issues *but the discussion on . . . statements 'of and concerning' D.A.R.E. and Levant* (Part VIII).") (emphasis added).

Collectively, *Flynn, Mullins,* and the Ninth Circuit's resolution of *D.A.R.E.* reinforce the conclusion that the law is reluctant to find that organizations like VCDL, with thousands of members, can be defamed every time some fault is allegedly found with a few of them. Indeed, the facts alleged here present an even more remote nexus between the statements and the organization than was presented in any of those cases. Here, the context involves a group interview of about nine people who are simply identified as "members." The film does not identify any of them as VCDL leaders or spokespersons, nor does a single one of the questions, or answers, mention VCDL. To the contrary, it simply identifies each individual by name and occupation. While the Complaint makes a series of additional allegations about who some of those individuals are within the organization and how the interview came about, none of that is communicated by the film itself.

Moreover, the fact that the context presented here is an interview with a group of individual members makes it particularly inappropriate to suggest that a statement by or about members of that group are statements about the VCDL. During the interview, the individual members do not always agree with each other. For example, when Couric asks the group if they are afraid the government will take away their guns, Webb raises her hand, but Hawes does not. Compl. Ex. 1 at 20:47-20:55. So what is VCDL's position? And in response to Couric's question about felons, the first speaker says that felons should be permitted to buy guns, Hawes points out that current law already prohibits felons from buying guns, and Webb asserts that laws never prevent crimes. Those responses are at least arguably in tension, so which of the three should be imputed to the VCDL? Such inconsistencies show the irrationality of imputing to an

17

organization like VCDL the personal statements and actions of multiple individual members during an interview, at least in this context.

Finally, Plaintiffs assert that Couric's statement apologizing for the exchange proves that it allegedly defamed the VCDL.  But her statement specifically responded to a complaint by the VCDL, so it naturally addressed the organization.  Even so, Couric's statement generally refers to the members of the group the same way that the film briefly did, simply as "VCDL members." In any event, none of that changes the central point here:  that viewers of the film itself would not reasonably understand an interview with a group of members, who express varying and even inconsistent views, to be the equivalent of an official VCDL press release.

## CONCLUSION

For the foregoing reasons, Defendants Atlas Films, LLC and Katie Couric respectfully request that their motion to dismiss be granted and the Complaint be dismissed, with prejudice.

Dated:  December 23, 2016                Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, LLP

By:      /s/ *Matthew E. Kelley*
          Nathan Siegel (admitted *pro hac vice*)
          Mara J. Gassmann (VSB No. 82131)
          Matthew E. Kelley (VSB No. 84045)

1899 L Street, NW, Suite 200
Washington, D.C. 20036-5514
Telephone:      (202) 508-1100
Facsimile:      (202) 861-9888
Email:            nsiegel@lskslaw.com

*Counsel for Defendant Atlas Films, LLC*

WILLIAMS & CONNOLLY LLP
Kevin T. Baine (admitted *pro hac vice*)
Thomas G. Hentoff (admitted *pro hac vice*)
Nicholas G. Gamse (admitted *pro hac vice*)
Emily A. Rose (VSB No. 89529)*

18

725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
thentoff@wc.com

*Attorneys for Katie Couric*

*\*Admitted only in Virginia and the Eastern District of Virg
Practice supervised by D.C. Bar members pursuant to D.C.
Court of Appeals Rule 49(c)(8).*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of December, 2016, I electronically filed the foregoing Reply Memorandum in Support of Defendants Atlas Films LLC and Katie Couric's Motion to Dismiss Complaint with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following counsel of record:

Elizabeth Marie Locke
libby@clarelocke.com
Megan Lambart Meier
megan@clarelocke.com
Thomas Arthur Clare
tom@clarelocke.com
CLARE LOCKE LLP
902 Prince Street
Alexandria, VA 22314

*Counsel for Plaintiffs Virginia Citizens Defense League, Daniel L. Hawes, Esq., and Patricia Webb*

Elizabeth McNamara
lizmcnamara@dwt.com
Linda Steinman
lindasteinman@dwt.com
Patrick J. Curran Jr.
patcurran@dwt.com
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104

*Counsel for Defendant Studio 3 Partners, LLC d/b/a Epix*

*/s/ Matthew E. Kelley*
Matthew E. Kelley