IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

VIRGINIA CITIZENS DEFENSE LEAGUE,
DANIEL L. HAWES, and
PATRICIA WEBB,
        Plaintiffs,

v.                                            Civil Action No. 3:16-cv-00757-JAG

KATIE COURIC,
STEPHANIE SOECHTIG,
ATLAS FILMS LLC, and
STUDIO 3 PARTNERS, LLC,
        Defendants.

## OPINION

The 2016 film *Under the Gun* deals with the social issues of gun control and the proliferation of firearms in the United States. The film includes an interview with members of the Virginia Citizens Defense League (the "VCDL"), a gun rights advocacy organization. At one point during the interview, *Under the Gun* shows VCDL's members apparently stumped when an interviewer asks how to keep felons and terrorists from getting guns without background checks. In the real interview, the VCDL members responded to the question, but their responses did not actually answer the question. They either could not, or would not, say how to keep felons and others from obtaining firearms without background checks.

The VCDL and two of its members have sued the director, producer, and distributor of the film for defamation. The defendants have moved to dismiss. Because the film is not false or defamatory, the Court grants the defendants' motion.

# I. BACKGROUND

*Under the Gun* portrays firearms as a serious social problem and advocates gun control.[1] Each of the defendants took roles in making and distributing the movie. Stephanie Soechtig directed the film. Katie Couric interviewed the VCDL members, narrated the film, and served as an executive producer. Atlas Films LLC ("Atlas") was the production company for the film. Studio 3 Partners LLC, doing business as EPIX ("EPIX"), distributed the film.

## *The Interview*

In 2015, Couric interviewed nine members of the VCDL. The VCDL "is a non-partisan, grassroots organization dedicated to advancing the rights of responsible gun owners under the Second Amendment and Virginia Constitution." (Compl. ¶ 18.) Two of the members interviewed are plaintiffs here: Patricia Webb, a licensed firearms dealer and gun store owner, and Daniel L. Hawes, an attorney who practices litigation related to firearms and personal defense.

Before the interview, Couric asked the VCDL members to sit in silence for ten seconds to allow for calibration of the recording equipment. The cameras filmed the members during the period of silence.

During the interview, Couric asked:

> If there are no background checks how do you prevent—I know how you all are going to answer this, but I'm asking anyway—if there are no background checks for gun purchasers, how do you prevent felons or terrorists from walking into say a licensed gun dealer and purchasing a gun?

The VCDL members, including Hawes and Webb, did not answer Couric's question. Instead, they articulated their opposition to any gun control, but never said how to keep guns out of the

---

[1] The film has played at film festivals, at various advocacy events, over the internet, and through other streaming services.

2

hands of felons and terrorists. One VCDL member said that felons should have the right to own a gun after serving their time. Hawes responded by discussing existing laws related to firearms. Webb responded by saying why she opposed background checks. While they offered views on gun control, they did not answer Couric's query about how to stop the wrong people from getting guns without background checks.

### *The Film*

The film opens on a dimly lit, empty circle of chairs. Text appears: "Before this film is over . . . 22 people in America will be shot." People begin filing into the interview room. Text appears: "6 of them will die." Couric then thanks the seated group for the interview, identifying the group as one with "a specific point of view on this issue and some of the issues we're tackling." She then asks how many in the group are carrying guns. Everyone in the group raises their hand.

The film then shows opening credits, with a background of historical voice and video clips related to guns. It shows headlines and footage of the shootings of John F. Kennedy, Martin Luther King, Jr., Robert F. Kennedy, and Ronald Reagan. The film also plays news clips regarding the National Rifle Association ("NRA") and congressional action on gun legislation.

After the opening credits, the film begins with an interview of parents of a child shot at Sandy Hook Elementary School. Newsreels from other mass shootings follow. Next, the film plays an interview with members of Open Carry Texas, a group that advocates for the lawful open carrying of guns in public places. The film proceeds to the story of Gabby Giffords, the Arizona congresswoman shot while meeting with her constituents in front of a grocery store.

Eighteen minutes and twenty-seven seconds in, the film goes back to the interview. This segment starts with images from the Richmond Gun Show while classical music plays in the

background. This music continues throughout the segment, as do images from the gun show and footage from a shooting range.

The film again shows each participant saying they had brought a gun to the interview. Text identifies the group as "Members of the Virginia Citizens Defense League."

Couric begins by asking about the appeal of owning a gun. A female member answers first. Then, Webb—identified in the film as "Patricia Webb, Gun Store Owner"—talks about reasons to own a gun beyond personal defense. Two male members answer the next question about why states should not require training or a test to own a gun, like those required for getting a driver's license.

Couric next asks, "Do you think that people should have to pass a background check before they purchase a gun?" One male member says no. Hawes—identified in the film as "D.L. Hawes, Attorney"—then responds, "You might better say, is there anyone here who thinks such a thing?" Another male adds more in response.

Couric next asks who in the group fears that the government will take their guns, to which most of the VCDL members in the circle raise their hands. The film then cuts to two gun control advocates, responding to this fear, saying that the Supreme Court's decision in *District of Columbia v. Heller*[2] should take this argument "off the table."

Finally, at twenty-two minutes and seven seconds into the film, the controversial moment arrives. Couric asks the question: "If there are no background checks for gun purchasers, how do you prevent felons or terrorists from purchasing a gun?"[3] Eight seconds of silence follow. During these eight seconds, the camera focuses on a male member shifting his eyes around the

---

[2] 554 U.S. 570 (2008).
[3] The plaintiffs point out that the film edited out "I know how you all are going to answer this" and "walking into say a licensed gun dealer" from Couric's question in the actual interview.

circle (about two seconds); (2) a male member looking down, then around the circle (about three seconds); and (3) Hawes looking forward, then shifting his focus downward (about three seconds). Webb appears un-focused in the background during one of these moments. According to the plaintiffs, this footage comes from the time when Couric asked the group to sit in silence to allow calibration of the cameras and recording equipment. At the ninth second, the film shows the chamber of a revolver closing. Immediately following, Couric says, "the background check is considered the first line of defense, and 90% of Americans agree it's a good thing." The film then explains background checks and the loopholes to the requirements.

The rest of the film does not return to the members of the VCDL.[4] Segments include the stories of parents of shooting victims, the history of the NRA's lobbying efforts, and a discussion of the State of Washington's requirement of universal background checks. *Under the Gun* ends with a call to action to stop gun violence and to close the background check loopholes.

## II. DISCUSSION[5]

The plaintiffs allege that the defendants manipulated footage in *Under the Gun*, and that the VCDL segment defamed them, both directly and by implication. To state a claim for

---

[4] The last glimpse of the VCDL members happens at twenty-two minutes and twenty-seven seconds into the hour and forty-five minute film.

[5] The defendants have moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. A Rule 12(b)(6) motion gauges the sufficiency of a complaint without resolving any factual discrepancies or testing the merits of the claim(s). *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering the motion, a court must accept all allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). The principle that a court must accept all allegations as true, however, does not apply to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a Rule 12(b)(6) motion to dismiss, a complaint must state facts that, when accepted as true, state a claim to relief that is plausible on its face. *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565 (2007)).

defamation in Virginia, the plaintiffs must allege that the defendants published an actionable statement about the plaintiffs with the requisite intent. *Schaecher v. Bouffault*, 290 Va. 83, 91, 99, 772 S.E.2d 589, 594, 598 (2015). An actionable statement must be both false and defamatory, and, depending on the statement, must result in actual damages. *Id.*; *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 7, 82 S.E.2d 588, 591 (1954).

The plaintiffs' defamation claims fail because the interview scene is not false. *Under the Gun* portrays members of the VCDL not answering the question posed by Couric. In reality, members of the VCDL *did not* answer the question posed by Couric. They talked about background checks and gun laws generally, but did not answer the question of how to prevent felons or terrorists from purchasing guns without background checks. The editing simply dramatizes the sophistry of the VCDL members.

The plaintiffs' claims also fail because the footage does not defame. Defamatory words damage a plaintiff's reputation in the community or deter others from associating or dealing with him. *Schaecher*, 290 Va. at 91–92, 772 S.E.2d at 594. Words that simply offend or insult the plaintiff do not qualify as defamatory; the words must "sting" the plaintiff's reputation. *Id.* at 92, 772 S.E.2d at 594. Defamatory language "tends to injure one's reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon him, or . . . tends to hold him up to scorn, ridicule, or contempt, or . . . is calculated to render him infamous, odious, or ridiculous." *Id.* (quoting *Moss v. Harwood*, 102 Va. 386, 392, 46 S.E. 385 (1904)). For example, statements that falsely call a person a convict, a perjurer, or a leper sting the reputation because they render that person odious and may hold him up to scorn and ridicule. *See Carwile*, 196 Va. at 7, 82 S.E.2d at 591. Likewise, statements that falsely impute unfitness in a trade or

profession, such as a lying lawyer[6] or a dirty doctor,[7] sufficiently sting a person's reputation because they lower her in the eyes of the community and may deter others from dealing with her. *Id.* On the other hand, a statement that a business owner may have violated an easement, by itself, does not carry the required defamatory sting. *Schaecher*, 290 Va. at 95, 772 S.E.2d at 596.

A statement can qualify as defamatory whether made directly (i.e., on the face of the statement) or by implication. *Carwile*, 196 Va. at 7, 82 S.E.2d at 591–92. For example, a false statement will meet the defamatory element if the defendant either directly says "Robert is a leper," or says other words that imply that Robert is a leper. Although the plaintiffs here claim direct defamation, they cannot point to a directly defamatory statement pertaining to them. Rather, this case involves defamation by implication.

When a plaintiff alleges that a statement is defamatory by implication, the court must determine whether "the words ascribed to the defendants, given their plain meaning, are reasonably capable of conveying the defamatory innuendo of which the plaintiff complains." *Pendleton v. Newsome*, 290 Va. 162, 175, 772 S.E.2d 759, 765 (2015). In making this evaluation, courts must accept reasonable inferences in the plaintiffs' favor, but must resist using innuendo to extend the meaning of defamatory language beyond its ordinary meaning. *Webb v. Virginian-Pilot Media Cos.*, 287 Va. 84, 89, 752 S.E.2d 808, 811 (2014) (citing *Carwile*, 196 Va. at 8, 82 S.E.2d at 592). "The province of the innuendo is to show how the words used are defamatory, and how they relate to the plaintiff, but it cannot introduce new matter, nor extend the meaning of the words used, or make that certain which is in fact uncertain." *Id.* at 89–90, 752 S.E.2d at 811 (citing *Carwile*, 196 Va. at 8, 82 S.E.2d at 592 (1954)).

---

[6] *See, e.g., Tronfeld*, 272 Va. at 714, 636 S.E.2d at 450.
[7] *See, e.g., WJLA-TV v. Levin*, 264 Va. 140, 154, 564 S.E.2d 383, 391 (2002).

7

Courts decide as a matter of law whether a statement is defamatory or, if alleged by implication, whether the statement is reasonably capable of the defamatory meaning alleged. *Schaecher*, 290 Va. at 93, 772 S.E.2d at 595. When evaluating the allegedly defamatory statement, context matters. "[A]llegedly defamatory words are to be taken in their plain and natural meaning and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used." *Carwile*, 196 Va. at 7, 82 S.E.2d at 591–92.

In this case, the footage does not, on its face, carry the defamatory sting required by Virginia law. The plaintiffs allege four defamatory meanings implied by the film: that they (1) have no basis for their opposition to background checks; (2) are uninformed notwithstanding their expertise in the areas of gun regulations and rights; (3) were stumped by Couric's question; and (4) are ignorant or unfit in their trades. (Mem. Opp'n to Atlas's & Couric's Mot. Dismiss 15.) The first two alleged defamatory implications do not arise from the film. The film does not suggest that they do not have a basis to oppose background checks or are ignorant about gun regulations and rights. Rather, the film makes a different point about the effect of existing regulations on how to keep guns out of the wrong hands.

The film does imply that the individual plaintiffs were stumped by Couric's question. As presented by *Under the Gun*, members of the VCDL answered a handful of questions about guns and background checks, but then sat silently in the face of a question about how to prevent felons and terrorists from purchasing guns without the use of background checks. At worst, this shows artistically that they either cannot or will not answer the question. Their verbal responses during the interview showed the same thing. Either way, not having an answer to a question on a

difficult and complex issue is not defamatory. It does not lower these plaintiffs in the estimation of the community to the extent and with the sting required.

Nor does the film imply that the plaintiffs are unfit in their trades. Taken in context, *Under the Gun* conveys that members of the VCDL, including Webb and Hawes, oppose background checks, but that they did not have an answer to the question posed. What this implies about each of the plaintiffs' fitness in their trade depends upon their specific trade, so the Court must evaluate each plaintiff individually.

As to Webb, the scene is not reasonably capable of implying that she is unfit as a gun store owner because supporting a certain position on background checks has nothing to do with that trade. A gun store owner can support background checks, oppose background checks, or remain indifferent to background checks. Not having an answer to a specific question about effective alternatives to background checks does not imply anything about fitness to own a gun store and to sell guns. Webb argues that the footage falsely conveys that "she lacks knowledge regarding integral aspects of her business," specifically, knowledge about "background checks and the rights of individuals to purchase firearms." (Compl. ¶ 115.) This argument fails because it seeks to introduce new matter, which innuendo in the defamation context cannot do. *See Webb*, 287 Va. at 89–90, 752 S.E.2d at 811. Couric did not ask "Under the current law, can felons purchase firearms?" Falsely stating that Webb did not have an answer to that question would certainly imply unfitness in her trade. This, however, was not Couric's question. Rather, Couric's inquiry focused on the effect of background checks, not the plaintiffs' knowledge of the current state of the law or the rights of gun owners. Thus, the implications from the interview had no bearing on Webb's fitness in her trade as a gun store owner. Consequently, Webb's claim for defamation fails.

Similarly, the interview scene is not reasonably capable of conveying that Hawes is unfit as an attorney. His participation in the interview as a member of the VCDL does not involve his practice of law. Hawes argues that the film conveys that he lacks competence as an attorney who focuses his practice on litigation involving firearms and personal defense. This argument, however, impermissibly extends the meaning of the footage. *See Webb*, 287 Va. at 89–90, 752 S.E.2d at 811. This differs from the cases cited by Hawes where the alleged statements imputing attorney incompetence focus on the attorneys' conduct while actually practicing law.[8] *Under the Gun* has nothing to do with the practice of law, and Couric does not ask Hawes about the law or his practice. Accordingly, the interview segment is not reasonably capable of implying incompetence as a practicing lawyer without extending its meaning beyond the bounds permitted by defamation law. Thus, Hawes also fails to state a claim for defamation.

Finally, the film is not reasonably capable of implying that VCDL is unfit as a gun rights advocacy organization because such a holding would take the film beyond its plain meaning. The plain meaning of *Under the Gun* is that members of the VCDL did not have an answer to a specific question (i.e., how to stop felons and terrorists from purchasing guns without background checks). Getting from this meaning to the VCDL's unfitness in its trade takes

---

[8] In *Cretella v. Kuzminski*, the alleged defamatory statements included questioning Cretella's ethical conduct as a practicing attorney, accusing him of the criminal act of extortion, and stating that a law firm had fired him because of this conduct. 640 F. Supp. 2d 741, 747 (E.D. Va. 2009). In *Tronfeld v. Nationwide Mutual Insurance Co.*, the alleged statements said that the attorney just takes money from his clients. 272 Va. 709, 712, 636 S.E.2d 447, 449 (2006). Similarly, in *Perk v. Vector Resources Group, Ltd.*, a case that Hawes brushes off as old, the alleged defamatory statements dealt with the attorney's work as a debt collector. 253 Va. 310, 313, 485 S.E.2d 140, 142 (1997).

inferential leaps beyond the reach of defamation law. Accordingly, VCDL fails to state a claim for defamation.[9]

### III. CONCLUSION

For the reasons stated, the Court grants the defendants' motions to dismiss.

The Court will enter an appropriate order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: May 31, 2017
Richmond, VA

/s/ 
John A. Gibney, Jr.
United States District Judge

---

[9] The VCDL's claim also fails because the footage was not really about VCDL or, in the words of the common law, was not "of and concerning" VCDL. *See Schaecher*, 290 Va. at 99, 772 S.E.2d at 598; *see also Church of Scientology of Ca. v. Flynn*, 578 F. Supp. 266, 267–68 (D. Mass. 1984) (holding that the alleged defamatory statement "was directed at an individual or a few individuals, not a not-for-profit corporation"). *But see D.A.R.E. Am. v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270, 1274, 1290 (C.D. Cal. 2000).

11